FILED BY _____ D.C.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

00 JAN 28 PM 3:57

CASE NO.

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FTL

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
v. )
)
FLORIDA HEALTH INSTITUTE, INC., )
SAMPLE ROAD REHABILITATION )
CENTER, INC., PENNACLE REHAB )
SERVICES OF FLORIDA, INC., )
NATIONAL MEDICAL SYSTEMS and )
SUPPLIES, INC., GATEWAY TO )
HEALTH REHABILITATION, INC., )
WEMAC, INC., ELLIOT HOUSLEY, )
PRESIDENT, RICARDO CHOI, )
TREASURER, and ANTHONY MIGNOTT, )
VICE-PRESIDENT a/k/a )
MARK A. MIGNOTT, )
)
    Defendants. )
_____ )

**00-6143**

**CIV-FERGUSON**

MAGISTRATE JUDGE
SNOW

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION
AND OTHER EQUITABLE RELIEF

The United States seeks a temporary restraining order, preliminary injunction, and other equitable relief in this cause to prevent further losses from being suffered by the United States and the Medicare program as a result of defendants' submitting, or causing to be submitted, false or fraudulent Medicare claims for payment. Injunctive and equitable relief are necessary because they are the only methods of relief which can stop the defendants from continuing to obtain Medicare funds through false claims and which can prevent the dissipation or concealment from the United States of funds and assets (the "Assets") which were previously



obtained by defendants through submission of false claims. The United States seeks the foregoing relief, as well as damages and penalties, under the False Claims Act and for breach of contract, and also seeks pre- and post-judgment remedies pursuant to the Federal Debt Collection Procedures Act.

I. **Statement of Facts**

a. **The Medicare Program**

At all times relevant to this complaint, defendants FHI and Sample were represented to First Coast as providers of outpatient rehabilitation therapy services pursuant to the Medicare - Part A program (hereinafter referred to as "Part A Program"), which was established under subchapter XVIII of Chapter 7 of the Social Security Act, 42 U.S.C. § 301 et seq. and the Medicare Part B Program (hereinafter referred to as "Part B Program"), which was established under subchapter XVIII of Chapter 7 of the Social Security Act, 42 U.S.C. § 301 et seq.

The Part A Program provides for benefits to participating hospitals, skilled nursing facilities, home health agencies, hospices, and other health care facilities or agencies to cover the reasonable cost of medically necessary services furnished to individuals entitled under this program. The Part B Program provides for supplementary medical insurance benefits to individuals entitle under this program. The individuals entitled under are generally those individuals aged 65 years and older who are entitled to Social Security benefits (hereinafter referred to as "Medicare beneficiaries").

The Part A Program is funded by the federal government through the use of federal funds and employee contributions. The Part B Program is funded in part by premiums paid by Medicare beneficiaries enrolled in the program and is supplemented by contributions from funds provided and paid by the federal government.

The DHHS, through HCFA, administers and supervises the Part B Program in Florida. HFCA contracted with First Coast to receive, adjudicate, process and pay any Part B Program claims submitted to it by Medicare beneficiaries or providers. HCFA supplies numbers to health care providers under the Part A Program based on a provider application submitted by the provider to HCFA. The use of these provider numbers allows the health care providers to bill First Coast (the fiscal intermediary) directly for services rendered to patients who are eligible to receive medical services under the programs.

CORFs are reimbursed by the Fiscal Intermediary for physician administrative services. Physician direct patient care and other professional services are billed to the Carrier. Through December 1997, Medicare provider reimbursement was based on the provider's cost of providing these services. These reimbursable costs must be reasonable, necessary and proper, as well as related to patient care. On January 1, 1998, the provider Medicare reimbursement was changed to an Adjusted Reimbursable Cost (90% of reimbursable cost). As of January 1, 1999, the provider's Medicare reimbursement changed to a Prospective Payment Service Fee-For-

Service with capitation limits on the therapy services provided, such as physical therapy, speech therapy and occupational therapy. There is, however, no capitation limit on respiratory therapy services.

Claims are submitted by the CORFs for each Medicare beneficiary and are reimbursed, on an interim basis. Claims under Part A are paid on an interim basis based on the estimated costs of serving Medicare beneficiaries. For these providers, these interim payments are based on the number of covered visits to Medicare beneficiaries by the provider and the individual provider's rate per visit, which is determined by the provider's previous cost experience.

After the end of its fiscal year, each provider submits a cost report to its fiscal intermediary. Based on this cost report, and any adjustments thereto required by the fiscal intermediary, the correct reimbursement for the year is determined. The fiscal intermediary then either pays the provider any additional amounts due or requires the provider to reimburse the Medicare program for excess interim payments.

The costs contained in the cost reports are required to be reasonable, necessary for the maintenance of the entity, and related to patient care. Outpatient rehabilitation therapy facilities must disclose the identity of related parties with whom they conduct business in order to allow the fiscal intermediary to adjust costs that are likely to be inflated by health care providers who are self-dealing.

Claims under Part A by outpatient rehabilitation therapy providers are submitted to the fiscal intermediary by using UB-92 forms or by transmitting electronically the same information as is required on a UB-92. The UB-92 form includes information on the beneficiary's name and HIC number, the period covered, the number of skilled nursing visits, physical therapy visits, social worker visits, aide visits, a description of any medical supplies provided, the principal diagnosis requiring home health services, and the referring physician.

For each Medicare beneficiary who receives CORF services, the Medicare beneficiary must be under the care of a physician who certifies that the beneficiary needs skilled rehabilitation services. The referring physician must advise the CORF of the beneficiary's medical history, current diagnosis and medical findings, desired rehabilitation goals; and any contraindications to specific activity or intensity of rehabilitation services.

For each Medicare beneficiary, the CORF services must be furnished under a written plan of treatment established by ta physician. The provider is required to have a Plan of Treatment which includes the principal diagnosis, types and amounts of services; frequency and duration of services required, and the anticipated rehabilitation goals. The Plan of Treatment must be reviewed by the CORF physician at least every 60 days. Following the review, the physician should certify that the plan of treatment is being followed and the patient is making progress in attaining the established rehabilitation goals. When the patient has reached

a point where no further progress is being made toward one or more of the goals, Medicare coverage ends with respect to that aspect of the plan of treatment.

### b. The Defendants

Defendant Florida Health Institute, Inc. ("FHI"), is a corporation organized and existing under the laws of Florida since June 26, 1997, which lists as its business address 9370 Sunset Drive, Suite 103 & 104, Miami, Florida 33173. The corporate documents list Jose Pujols, Esquire as the registered agent. Michael Scully is listed as president and director.

Defendant Sample Road Rehabilitation Center, Inc. ("Sample"), is a corporation organized and existing under the laws of Florida since May 6, 1997, which lists as its business address 440 East Sample Road, Suite 103, Pompano Beach, Florida 33064. The corporate documents list John E. Bodden, M.D., as the registered agent and director.

Defendant Pennacle Rehab Services of Florida, Inc. ("Pennacle"), is a corporation organized and existing under the laws of Florida since October 29, 1998, which lists as its business address 4200 N.W. 16th Street, Suite 310, Ft. Lauderdale, Florida 33313. The corporate documents list Elliot J. Housley as the registered agent and director.

Defendant National Medical Systems and Supplies, Inc., is a corporation organized and existing under the laws of Florida since September 9, 1999, which lists as its business address 7501 W. Oakland Park Blvd., Suite 101, Ft. Lauderdale, Florida 33319.

The corporate documents lists Service Company, 1201 Hays Street, Tallahassee, Florida 32301 as the registered agent. Elliot J. Housley is listed as the director.

Defendant Gateway to Health Rehabilitation, Inc. ("Gateway"), is a corporation organized and existing under the laws of Florida since June 2, 1997, which lists as its business address 510 N.W. 207th Avenue, Pembroke Pines, Florida 33029. The corporate documents list Ricardo Choi as the registered agent and director.

Defendant Wemac, Inc., ("Wemac"), is a corporation organized and existing under the laws of Florida since September 21, 1999, which lists as its business address 8366 N.W. 43rd Street, Coal Springs, Florida 33065-1304. The corporate documents lists Corporate Service Company, 1201 Hays Street, Tallahassee, Florida 32301 as the registered agent. Anthony Mignott and Tony Saron are listed as directors.

Defendant Anthony Mignott ("Mignott") is director of Wemac according to Florida Secretary of State Records. Mignott has signature authority for the bank accounts of Wemac, Pennacle, Sample, and FHI.

Defendant Ricardo Choi ("Choi") is director of Gateway to Health Rehabilitation, Inc. Choi has signature authority for the bank accounts of Gateway, Sample and FHI.

Defendant Elliott J. Housley ("Housley") is director of National Medical and Pennacle. Housley is the corporate Registered Agent according to the Florida Secretary of State records. He has

signature authority for bank Pennacle, National Medical, Sample and FHI.

In January 1998, FHI became eligible to use provider number 10-3251 in order to participate in the Medicare program, as a Comprehensive Outpatient Rehabilitations Facility ("CORF").

FHI submitted claims for beneficiaries residing in the Dade and Broward counties of Florida as purportedly referred by Florida physicians.

On the basis of claims submitted by FHI (Provider 10-3251), First Coast has paid $154,963.81 in Medicare funds in 1998 and has paid $1,578,742.88 in 1999. Pending payments in the amount of $7,215.00 are due Sample.

### C. The Fraud

As set forth in more detail in the complaint and supporting declarations, the United States and First Coast conducted an investigation of the business of FHI and Sample. Although the investigation is ongoing, the results to date so compellingly point to fraudulent nature of their operation that immediate action is necessary to prevent further harm to the United States.

### GENERAL ALLEGATIONS

Based upon the facts and circumstances set forth in the attached Declaration of Special Agent Bernardo Rodriguez, Department of Health and Human Services (DHHS), Office of the Inspector General (OIG), Office of Investigation (OI), an investigation of the defendants was commenced. See Declaration of S/A Rodriguez attached hereto (hereinafter "Rodriguez

Declaration").

After becoming eligible as CORFs in 1997 and 1998, SAMPLE and FHI, respectively, submitted claims to First Coast for outpatient rehabilitation therapy services. Prior to 1999, SAMPLE and FHI, did not provide or submit claims for any respiratory therapy. Their claims during prior years consisted primarily of the provision of physical therapy services. Based upon a review of billing patterns, First Coast determined that the shift in billing for SAMPLE and FHI is due to the fact that respiratory therapy has no capitation fee, versus the $1,500 capitation fee imposed on the other types of therapy. (Rodriguez Declaration).

In 1999, a total of eleven beneficiaries contacted the Fraud Control Hotline of First Coast to file complaints against SAMPLE. Of these complaints, nine reported that they did not receive the services that SAMPLE had billed on their behalf. On January 5, 2000, a beneficiary filed a complaint against FHI alleging that FHI did not provide the services billed on that beneficiary's behalf. (Rodriguez Declaration).

The Medicare Anti-Fraud Branch of First Coast requested a disproportionate stratified random sample of thirty beneficiaries be selected from claims submitted by FHI and SAMPLE for the years in question. FHI's random sample provided the following results: eleven stated they were recruited and referred to the facility by a fried; six stated that they did not receive the services; six could not be located; two were out of town, one could not be interviewed due to his mental state; and four stated that they had

9

received the services allegedly provided. SAMPLE's random sample provided the following results: seven did not receive the services; three stated that they were recruited and referred to the facility by a friend; six had died; one refused to be interviewed; eight could not be located; one never received the therapy that was billed; two did not recognize the name of the physician that was listed as the referring physician, and one was out of town.

Based upon the information gathered, the random sampling data and the records reviewed by S/A Rodriguez, the investigation has disclosed that FHI and SAMPLE are engaged in the following illegal activities: (1) providing services to Medicare beneficiaries that were not referred by a physician; (2) providing services to Medicare beneficiaries that were not medically necessary; (3) services not rendered, and/or services not provided as billed. It has been discovered that FHI and SAMPLE have engaged in the recruitment of Medicare beneficiaries which is prohibited. Recruitment allows FHI and SAMPLE to submit claims on behalf of Medicare beneficiaries without possibly obtaining an appropriate physician referral as required. The investigation has further disclosed that Medicare payments made to FHI and SAMPLE are withdrawn and deposited into the PENNACLE, NATIONAL, GATEWAY and WEMAC business accounts. All of these accounts are controlled by the individual defendants, HOUSLEY, CHOI and MIGNOTT. These individuals are connected to the illegal activities of FHI and SAMPLE.

II. <u>Memorandum of Law</u>

**a. Federal Law Directly Authorizes an Injunction to Prohibit Violation of the False Claims Act**

Injunctive relief to restrain a violation of the False Claims Act is directly authorized by statute as well as by Federal Rule of Civil Procedure 65. The applicable portion of 18 U.S.C. § 1345 provides as follows:

> (a)(1)  If a person is--
>
> (A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title;
>
> * * *
>
> (c) committing or about to commit a federal health care offense.
>
> the Attorney General may commence a civil action in any Federal court to enjoin such violation.
>
>> (2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of ... a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal Court -
>>
>>> (A) to enjoin such alienation or disposition of property; or
>>
>> (B) for a restraining order to -
>>
>>> (I) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

11

* * *

> (b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought....

Section 287, 18 U.S.C., provides as follows:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

The 1996 Act known as the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, includes in the definition of a "Federal health care offense" a "violation of the mail fraud statute" if the violation relates to a health care benefit program, such as Medicare. See United States v. Fang, 937 F.Supp. 1186, 1192 (D. Md. 1996).

Pursuant to the authority 18 U.S.C. § 1345 and the general equitable power of the court, plaintiff is asking the court to enter a temporary restraining order and preliminary injunction in order to prevent a continuing and substantial injury to the United States by halting the submission of false Medicare claims by these

defendants, which are being paid by PGBA and BC/BS, and preventing the disposition and concealment of funds and assets presently in the hands of defendants.

> **b. Prior Notice to the Defendants is Unnecessary When Notice Would Cause the Very Harm Which the Application Seeks to Prevent**

The issuance of the temporary restraining order without prior notice is warranted, indeed necessary, in this case. If advance notice of the application for the temporary restraining order were given to the defendants, it is virtually certain that the Assets would immediately be transferred beyond the reach of the United States. This is especially true where the technology of electronic transfers is in the hands of unscrupulous operators who have already defrauded the United States of hundreds of thousands of dollars. To provide advance notice to these defendants would simply tip them off and invite them to transfer the funds, thereby accentuating the very harm which this application seeks to prevent.

The law supports the issuance of <u>ex parte</u> temporary restraining orders in these circumstances. The Court's statement in <u>In the Matter of Vuitton Et Fils S.A.</u>, 606 F.2d 1, 5 (2d Cir. 1979) is particularly apropos to this case:

> If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of "notice," and it is surely not what the authors of the rule either anticipated or intended.

<u>See also</u> <u>Calero-Toledo v. Pearson Yacht Leasing Company</u>, 416 U.S. 663, 679 (1974)(preseizure notice and hearing not necessary where such procedure might frustrate the interests served by the

statutes); <u>Little Tor Auto Center v. Exxon Company USA</u>, 822 F.Supp. 141, 143 (S.D.N.Y. 1993)(<u>ex parte</u> procedure allowed in connection with TRO application "where advance contact with the adversary would itself be likely to trigger irreparable injury").

As a result, it is appropriate that the United States' application be granted without prior notice and hearing to the defendants. The defendants can be fully protected by prompt post-seizure notice and opportunity for hearing, both of which can be required by the terms of the order itself.

    c.   **Every Prerequisite to the issuance of a Temporary Restraining Order in the Context of A Claim Under the False Claims Act Exists in this Case**

Generally, in order to obtain a preliminary injunction the moving party is required to show irreparable harm unless an injunction is issued, a substantial likelihood of prevailing on the merits, a balancing of equities in the movant's favor, and that the injunction if issued would not be adverse to the public interest. <u>Cunningham v. Adams</u>, 808 F.2d 815, 819 (11th Cir. 1987). <u>See also</u> <u>Continental Group, Inc. v. Amoco Chemicals Corp.</u>, 614 F.2d 351, 356-57 (3rd Cir. 1980); <u>Mason County Medical Association v. Knebel</u>, 563 F.2d 256, 261 (6th Cir. 1977).

    **1. The Traditional Prerequisites to a Temporary Restraining Order Are Not Applicable when the Government seeks an Injunction Pursuant to a Federal Statute Which Was Enacted to Protect the Public Interest**

The traditional test for the issuance of a temporary restraining order does not apply, however, where the government is seeking an injunction pursuant to a federal statute which was

enacted to protect the public interest and which authorizes injunctive relief. United States v. Medina, 718 F. Supp. 928, 930 (S.D. Fla. 1989). Under such circumstances the government is not required to demonstrate irreparable harm in order to obtain an injunction. Id.; see also Government of the Virgin Islands v. Virgin Island Paving, Inc., 714 F.2d 283, 286 (3rd Cir. 1983); United States v. Siemens Corp., 621 F.2d 499, 505 (2d Cir. 1980).

Nor is the government required to show the inadequacy of other remedies at law. United States v. Sene X Eleemosynary Corp., Inc., 479 F. Supp. 970, 981 (S.D. Fla. 1979). "[P]assage of the statute is in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." United States v. Diapulse Corp. of America, 457 F.2d 25, 27 (2nd Cir. 1972).[1] In such cases no balancing of the interests of the parties is required. Medina, 718 F. Supp. at 930.

In order for the court to issue an injunction there need only be a showing that the defendant has violated the statute and that there exists "some cognizable danger of recurrent violation." Medina, 718 F. Supp. at 930; Sene X, 479 F.Supp. at 981. Once the government establishes that defendant has violated the statute, it is the burden of the defendant to show that "there is no reasonable

---

[1] As one Court has stated,
> [I]t is probable that Congress considered the continued existence of a scheme to defraud as irreparable harm per se, since it is likely that the victims of such a scheme would not be able to recover money lost as a result of it. United States v. Belden, 714 F. Supp. 42, 45 (N.D.N.Y. 1987).

expectation that the wrong will be repeated." Id. An assertion by a defendant that he will cease violating the law is not, of itself, grounds for denial of a statutory injunction. Id.

Additionally, in order to obtain a preliminary injunction under 18 U.S.C. §1345, the government need not show a likelihood that it will prevail on the merits of its injunction action; the government is required to show only that there is "probable cause" to believe that the defendants are violating or about to violate any of the sections specified in § 1345, including 18 U.S.C. § 287. United States v. William Savran & Associates, Inc., 755 F. Supp. 1165 (E.D.N.Y. 1991); United States v. Belden, 714 F. Supp. 42, 45-46 (N.D.N.Y. 1987).

Section 1345, 18 U.S.C., provides not only for the enjoining of fraudulent conduct but also the preservation of assets. Once the United States demonstrates that there is probable cause to believe that defendants are violating or are about to violate 18 U.S.C. § 287, or any other section specified in § 1345, the district court may freeze assets related to the alleged fraud.

In sum, the United States is entitled to the requested injunction simply by showing that there is probable cause to believe that the defendants have violated the statute and that there is some cognizable danger of recurrent violation. At that point, the United States has satisfied its burden. The defendants, if opposed to the issuance of an injunction as to any funds or assets, bear the burden of establishing that such funds or assets are not related to the fraud. In the Savran case, the court

16

expressly held that the defendant bears the burden of showing by a preponderance of the evidence which funds are not the proceeds of fraud. Savran, 755 F. Supp. at 1183. Savran quite logically places the burden upon the party having knowledge and control of a bank account to provide information necessary to determine the amount of the fruits of illegal activity deposited in the account. Id. In United States v. Eighty-Eight (88) Designated Accounts, 786 F. Supp. 1578, 1581-82 (S.D. Fla. 1992), the logic of the Savran approach and its consistency with Eleventh Circuit forfeiture law were recognized.[2]

**2. There is probable cause to believe that the defendants are presenting or causing to be presented Medicare claims for outpatient rehabilitation therapy services knowing that the claims are false and fraudulent**

Based upon the investigation conducted by the OIG Special Agents, it is evident that the defendants are submitting Medicare claims for outpatient rehabilitation therapy services which they

---

[2] In one case, United States v. Brown, 988 F.2d 658, 663-64 (6th Cir. 1993), the Court of Appeals for the Sixth Circuit ruled that the government should bear the burden of showing that funds or assets are related to the alleged fraud. However, in the Brown case, the district court had frozen all defendants' funds, except a monthly business expense allowance, even though only 25% of the defendants' business was related to Medicare claims. In the instant case, it is likely that virtually all of defendants' income is derived from Medicare funds. More importantly, the amount to be frozen is less than the amount which was paid based on false claims. Under the standard approach used to trace proceeds of fraud, all of the money remaining in the accounts of the defendants is subject to restraint. See, e.g., United States v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986); United States v. Eighty-Eight Designated Accounts, 786 F.Supp. 1578 (S.D.Fla. 1992); Savran, 755 F.Supp at 1183.

17

are representing to have been provided and to be medically necessary, and to be otherwise reimbursable, when, in fact, the services were not received, were unnecessary or were never ordered by a physician.

The foregoing circumstances easily create probable cause to believe that the defendants are violating 18 U.S.C. § 287 by presenting or causing the presentation of claims upon federal Medicare funds with knowledge that the claims are false and fraudulent.

### III. CONCLUSION

As demonstrated by the declarations and attachments submitted herewith, there is probable cause to believe that the defendants are violating 18 U.S.C. § 287. Accordingly, plaintiff requests that the court, pursuant to 18 U.S.C. § 1345, grant its motion for temporary restraining order, preliminary injunction, and other equitable relief in this case.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By: *Laurie E. Rucoba*
LAURIE E. RUCOBA
Assistant United States Attorney
No. A5500052
500 East Broward Boulevard
Suite 700
Ft. Lauderdale, Florida 33394
Tel: (954) 356-7314, ext. 3613
Fax: (954) 356-7180