UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6143-CIV-
FERGUSON/SNOW

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

FLORIDA HEALTH INSTITUTE, INC.,
etc., et al.,

                Defendants.

_____/



CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

MAR - 2 2000

## DEFENDANTS' MOTION TO VACATE TEMPORARY RESTRAINING ORDER AND SUPPORTING MEMORANDUM OF LAW
### (Fla. Bar No. 133162)

Defendants, by their undersigned attorneys and pursuant to Rule 65, Federal Rules

of Civil Procedure, respectfully move for the entry of an order in the above styled civil action

vacating the January 31, 2000, Temporary Restraining Order ("the TRO").  In support of

this motion, Defendants respectfully direct the Court's attention to the following

Memorandum of Law.



<u>MEMORANDUM OF LAW</u>

The TRO was entered pursuant to 18 U.S.C. § 1345.[1]  In *United States v. William*

---

[1]  Section 1345, Title 18, U.S. Code, is entitled "Injunctions against fraud" and provides:

"(a)(1) If a person is-

"(A) violating or about to violate this chapter or section 287.371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof, or 1001 of this title;

"(B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title); or

"(C) committing or about to commit a Federal health care offense,

"the Attorney General may commence a civil action in any Federal court to enjoin such violation.

"(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title or a Federal health care offense) or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court–

"(A) to enjoin such alienation or disposition of property; or

"(B) for a restraining order to–

"(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

"(ii) appoint a temporary receiver to administer such restraining order.

"(3) A permanent or temporary injunction or restraining order

2

*Savran & Associates, Inc.*, 755 F. Supp. 1165 (E.D.N.Y., 1991), the Court observed that:

> "To support an application for a preliminary injunction under 18 U.S.C. § 1345, the Government must demonstrate that `probable cause' exists to believe that the defendant is currently engaged or about to engage in a fraudulent scheme violative of either the mail, wire or bank fraud statutes...
>
> "Injunctive relief is authorized under section 1345 only when the alleged fraudulent scheme is ongoing and there exists a threat of continued perpetration; the statutory equitable remedy is not available for solely past violations..." (Citations omitted)

755 F. Supp. at 1177-1178.

Simultaneously with its commencement of this civil action, Plaintiff United States of America ("the Government") moved *ex parte* for a temporary restraining order. The sole evidentiary support for that motion was the affidavit of Special Agent Bernardo Rodriguez, who is assigned to the Office of Investigations, Office of the Inspector General, U.S. Department of Health and Human Services. Proceeding exclusively upon Special Agent Rodriguez's affidavit, the Court, acting *ex parte*, granted the Government's motion and entered the TRO.

_____

shall be granted without bond.

"(b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure."

3

Defendants' undersigned counsel, on Friday, February 18, 2000, took the deposition examination of Special Agent Rodriguez. Attached hereto as Exhibit "A" is the court reporter's preliminary version of the transcript of that deposition examination.[2]

The court reporter's preliminary version of the transcript of Special Agent Rodriguez's February 18, 2000, deposition examination establishes that:

(1) the factual matters set forth in his sworn affidavit for the most part consisted of hearsay and speculation;

(2) because the Medicare provider numbers of Defendants Florida Health Institute, Inc. ("FHI"), and Sample Road Rehabilitation Center, Inc. ("Sample Road"), have been suspended, the Government is in no current danger of being victimized by the submission and payment of fraudulent Medicare claims; and

(3) as of January 31, 2000, the Government had not demonstrated to the Court the requisite "probable cause" for the issuance of the TRO.

Under these circumstances, it is evident that because the TRO was improvidently entered, it should be vacated forthwith.

Respectfully submitted,

METSCH & METSCH, P.A.
Attorneys for Defendants
1385 N.W. 15th Street
Miami, Florida 33125
(305) 545-6400
FAX: (305) 545-7224

---

[2] Special Agent Rodriguez reserved the right to review the court reporter's transcript of his deposition examination and to make corrections thereto.

4

by

LAWRENCE R. METSCH
FBN 133162

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing motion and supporting memorandum

of law was delivered this 1st day of March, 2000, to:

Laurie E. Rucoba, Esq.
Assistant U.S. Attorney
500 East Broward Blvd.
Suite 700
Fort Lauderdale, FL 33394
FAX: (954) 356-7180

LAWRENCE R. METSCH

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,        CASE NO. 00-6143-CIV
                                 FERGUSON/SNOW
          Plaintiff,

vs.

                                 **ORIGINAL**

FLORIDA HEALTH INSTITUTE,
INC., et al.

          Defendants.
_____/

                    524 South Andrews Avenue
                    Suite 102N
                    Ft. Lauderdale, FL
                    February 18, 2000
                    10:30 A.M.


              DEPOSITION OF SPECIAL AGENT,
                 BERNARDO RODRIGUEZ

     Taken before Melanie Stinson, Court Reporter
and Notary Public in and for the State of Florida at
Large pursuant to Notice of taking Deposition filed
in the above-styled cause.



EXHIBIT


              OFFICIAL COURT REPORTING

```
APPEARANCES:    Laurie E. Rucoba, Esq.
                Assistant U.S. Attorney
                500 East Broward Blvd.
                Suite 700
                Ft. Lauderdale, FL 33394

                METSCH & METSCH, P.A.
                Attorneys for Defendants
                Lawrence R. Metsch
                1385 N.W. 15th Street
                Miami, FL 33125
```

I N D E X

|                                               | Page |
|-----------------------------------------------|------|
| Witness - Bernardo Rodriguez                  | 3    |
| Direct Examination by Lawrence R. Metsch      | 3    |
| Defendants' Exhibits:                         |      |
|     Defendants' Exhibit "A" | 45 |
|     Defendants' Exhibit "B" | 114 |
|     Defendants' Exhibit "C" | 121 |

OFFICIAL COURT REPORTING

3

1    Thereupon the following proceeding was held:

2        MR. METSCH: My name is Lawrence R. Metsch.    I'm

3    with the law firm of Metsch & Metsch, P.A.    I

4    represent all of the Defendants.

5        MS. RUCOBA: My name is Laurie Rucoba.    I'm an

6    Assistant United States Attorney on behalf of the

7    United States of America.

8    Thereupon:

9                    BERNARDO RODRIGUEZ

10   was called as a witness and after having been first

11   duly sworn, was examined and testified as follows:

12               D I R E C T   E X A M I N A T I O N

13   BY MR. METSCH:  As you know, my name is Lawrence R.

14   Metsch and I represent all the Defendants in this

15   case.  We are taking the deposition today pursuant

16   to Rule 30 of the Federal Rules of Civil Procedure,

17   and Local Rule 26.1.J, of the Rules of the US

18   District Court of the Southern District of Florida.

19       Q    Could you please state your full name?

20       A    Bernardo Rodriguez.

21       Q    Your home address?

22       A    1571 --

23       MS. RUCOBA: Let me advise the witness that if

24   you have any concerns about your safety as a Special

25   Agent you can refuse to identify your home address

OFFICIAL COURT REPORTING

4

 1    and you can identify your office address.

 2         WITNESS: I will identify my office address.

 3         MR. METSCH: That's fine with me, go ahead.

 4         WITNESS: 15500 Newbarq Road, Suite 207, Miami

 5    Lakes, 33193.

 6    BY MR. METSCH:

 7         Q    Your date of birth?

 8         A    July 24, 1963.

 9         Q    Your marital status?

10         A    Married.

11         Q    Please give us a brief resume of your

12    educational background?

13         A    I was born and raised in Puerto Rico.  I

14    joined the Navy, I was in the Navy for eleven years.

15         Q    What did you do in the Navy?

16         A    I was a cryptographer which had to do with

17    communications, military intelligence  --

18         Q    Were you in the NSGA?

19         A    I never worked there physically, but I

20    worked for them.  They gave me the task --

21         Q    And what was the highest grade you

22    attained?

23         A    A college degree.

24         Q    In the Navy, what was the highest?  Were

25    you an E6?

OFFICIAL COURT REPORTING

5

1        A     Yes, correct.

2        Q     You were a cryptographer and there was a

3   special rating for a cryptographer?

4        A     Correct.   The last four years though, I

5   was a recruiter and I was here physically in

6   Florida.

7        Q     All right.   So, for the first seven years

8   you were in cryptography?

9        A     Correct.

10        Q     And for the last four years you were

11   recruiting?

12        A     Correct, the last four and a half.

13        Q     And what was the highest security

14   clearance that you were afforded?

15        A     Top Security.

16        Q     Did you hold that while you were in

17   recruiting?

18        A     Well, you never lose your clearance, you

19   lose your access.

20        Q     And when you were discharged, did you

21   receive an honorable discharge?

22        A     That's correct, sir.

23        Q     And you also indicated you have a college

24   degree.   Did you get your college degree while in

25   the Navy?

OFFICIAL COURT REPORTING

6

1          A      It's a combination of college credits, I

2     attended colleges, military training and

3     professional experience.

4          Q      Where did you get your degree?

5          A      The Union Institute.

6          Q      Where is that?

7          A      That's here, it's based out of Ohio but it

8     has locations throughout the United States.

9          Q      And what did you get, a B.A.?

10         A      Yes.

11         Q      And what was the major?                 .

12         A      Public Administration.

13         Q      What year was that?

14         A      This was last year.

15         Q      What year did you leave the Navy?

16         A      In 1995.

17              (OFF THE RECORD DISCUSSION WAS HELD.)

18    BY MR. METSCH:

19         Q      So you were released from active duty and

20    discharged in 1995?

21         A      It was June, June 3rd, I believe.

22         Q      And what did you do after that?

23         A      I worked for several firms; private

24    corporations in the security business.  Beginning,

25    you have to excuse me, I don't remember the date, in

OFFICIAL COURT REPORTING

7

1    the beginning of '96, I was hired by the Immigration

2    and Naturalization Service as a Special Agent.

3         Q    Where were you stationed?

4         A    I was stationed in Puerto Rico, San Juan,

5    Puerto Rico.

6         Q    What were your duties?

7         A    I was a Special Agent Criminal

8    Investigator and investigated immigration

9    violations.

10        Q    And that would be under Title A of the

11   United States Code; is that correct?  The

12   immigration --

13        A    I don't remember, but if you say so.

14        Q    All right.  And how long did you work for

15   the INS?

16        A    Roughly, a year and a half.

17        Q    Then, where did you go after that?

18        A    I came to Miami to work with the office

19   that I'm working in right now.

20        Q    What office is that, which you are

21   working?

22        A    That's the Department of Health and Human

23   Services, Office of the Inspector General, Office of

24   Investigations.

25        Q    Now, I know what the Department of Health

OFFICIAL COURT REPORTING

8

1    and Human Services is, that's the parent agency for

2    the Social Security Administration and the Food and

3    Drug Administration and the Public Health Service,

4    but what does the Office of Inspector General do?

5         A    Office of Inspector General has three

6    components.  I work for the investigation side.  We

7    investigate violations, alleged violations, against

8    the Medicare portion of the Department.

9         Q    So, your job is to investigate possible

10   violations of those divisions of the Social Security

11   Act that deal with Medicare; is that correct?

12        A    Correct.  We do other things.

13        Q    And what other things does the Office of

14   Inspector General do?

15        A    Here in Florida, we do Child Support

16   enforcement.  It becomes a federal offense when the

17   non-custodial parent moves to a city other than the

18   custodial parent and he is behind his payments and

19   that sort of thing.

20        Q    And there is a third area you mentioned.

21        A    There are several programs.  I couldn't

22   even begin to tell you how many there are that we

23   don't really investigate in Florida because we saw

24   the one with Medicare, but there are other offices

25   in the United States that investigate several

OFFICIAL COURT REPORTING

9

1     violations.

2          Q     Are you considered a law enforcement

3     officer for purposes of federal compensation and

4     benefits?

5          A     Yes, sir, I am.

6          Q     Do you carry a weapon?

7          A     Yes, I do.

8          Q     So you would be considered a criminal

9     investigator?

10         A     Correct.

11         Q     And right now we're in a civil suit, are

12    you conducting a criminal investigation of the

13    Defendants in this case?

14         A     There is a criminal investigation being

15    considered.  We are conducting a civil investigation

16    at this moment.

17         Q     When you say a criminal investigation is

18    being considered, the Complaint in this case alleges

19    that the Defendants have violated Title 18, Section

20    257 of the US Code.  Do you know what that section

21    does?

22         A     I don't recall putting that in there.

23         Q     I'm going to show you, just a second, I

24    want to make sure I know what you are doing right

25    now.  This is a copy of 18USC, Section 287, which

OFFICIAL COURT REPORTING

10

1    appears in the Complaint.  Have you ever read that

2    before?

3         A    I've seen this before.

4         Q    That is a criminal statute, is it not?

5         A    Correct.

6         Q    And are you now investigating alleged

7    violations of that statute?

8         A    We are investigating, proceeding to

9    investigate the allegations that were presented to

10   us.  This becomes eventually part of the case.  I

11   will investigate this.

12        Q    Have you read the Complaint in this case?

13        A    I --

14        Q    No, that's your Affidavit.  Have you seen

15   the Complaint that's been filed by the government in

16   this case?

17        A    I don't think I have a copy here.

18        Q    Let me just show you something.  I'm

19   referring counsel to page 11 of the Complaint in

20   this case and paragraph 32.  It says as follows:

21        "Defendants (I'll leave out all the names) have

22   presented or caused to be presented false and

23   fraudulent claims upon the United States in

24   violation of 18 U.S.C., Section 287.

25        Defendants have knowingly and willfully

OFFICIAL COURT REPORTING

11

1     presented, or caused to be presented, false and

2     fraudulent claims to First

3     Coast, the fiscal agent administering the Medicare

4     program." Have you seen those allegations before in

5     the Complaint?

6         A     Uh-huh.

7         MS. RUCOBA: You need to answer outloud.

8         WITNESS: Yes, sir.

9     BY MR. METSCH:

10        Q     So you are indeed investigating a possible

11    criminal violation because the statute has been

12    revoked 18 U.S.C., Section 287.  Isn't that correct?

13        A     Yes, sir.

14        Q     I'd just like to have an idea of the

15    structure of the investigation, the team that's

16    working on this right now.  Before we get into that,

17    there's just one other thing.  Have you ever been

18    given court room or deposition testimony before?

19        A     I have, sir.

20        Q     All right.  Under what circumstances?

21        A     The first one was that I had an accident.

22        Q     Okay, let's say your official capacity,

23    okay?  Forget about your own, your traffic

24    accidents.

25        A     Grand jury depositions that I had in


OFFICIAL COURT REPORTING

12

 1    Puerto Rico concerning immigration and grand jury

 2    depositions here concerning health care fraud.

 3         Q    So those are secret proceedings?

 4         A    Correct.

 5         Q    Have you ever testified on a deposition

 6    before?

 7         A    No, sir.

 8         Q    Were you examined by an adverse party?

 9         A    No.

10         Q    How about a trial?  Have you testified at

11    a trial yet?

12         A    No.

13         Q    What is the GS level of which you are --

14         A    I'm a GS11 right now.

15         Q    And while in the immigration service did

16    you hold the same grade?

17         A    No.

18         Q    You were a 10?

19         A    No, no.  I started immigration as a 5, I

20    went up to 7 and that's when I transferred to a --

21         Q    Do you still have any affiliation with the

22    Department of the Navy?  Are you a Reservist or

23    anything like that?

24         A    No.

25         Q    Okay.  In preparing for today's deposition

OFFICIAL COURT REPORTING

13

examination have you reviewed any documents?

    A    I have reviewed my deposition.

    Q    Your Affidavit:

    A    My Affidavit, I'm sorry.

    Q    Anything else other than your Affidavit?

    A    We have reviewed other documents, so, I mean this document that I have here.

    Q    What is that document, I see it with all different colored markings on it.

    A    These are basically the 30-day survey for both Sample and FHI.

    Q    And that is one for each. Is this part of your Affidavit? Are these exhibits with your Affidavit?

    A    I don't recall.

    MS. RUCOBA: I don't believe they are.

    MR. METSCH: I don't think so either.

    WITNESS: I don't think, no.

    MR. METSCH: Have I gotten these before or is this the first time?

    MS. RUCOBA: We prepared them this morning.

    MR. METSCH: I was wondering, maybe I had a blank. I was getting a senior moment here.

    WITNESS: We didn't prepare the list this morning. We colored it this morning.


OFFICIAL COURT REPORTING

14

1      MR. METSCH:  Okay, what about the list, have I seen

2    that list yet?  I don't remember seeing it.

3        MS. RUCOBA: It was attached to the subpoenas

4    that I faxed to you yesterday and I understand that

5    before I faxed to you all the subpoenas yesterday,

6    you had in your possession a subpoena that attached

7    those as well.

8        MR. METSCH: I don't think I've ever seen the

9    attachment, and I didn't get that part, okay, but

10   maybe we can make arrangements for us to look at it

11   and get a copy of it before we leave today.

12   BY MR. METSCH:

13       Q    Before today's deposition, have you had

14   occasion to consult with Ms. Rucoba?

15       A    We have consulted.

16       Q    Well, I'm not going to ask you the

17   substance of that conversation.

18       MS. RUCOBA: That's good of you.

19   BY MR. METSCH:

20       Q    I've been around too long to do that,

21   that's attorney/client privilege, but I am going to

22   ask you in advance of today's deposition, have you

23   consulted with others?  Any of your colleagues or

24   superiors, or subordinates, co-workers in the Office

25   of Investigations of the Inspector General's Office

OFFICIAL COURT REPORTING

15

1    concerning this case in preparation for today's

2    deposition?

3         A    Certainly, we have. There's no way I'd be

4    able to do this by myself.  We all collaborated.

5         Q    All right.  I'm talking about specifically

6    in preparing for today's deposition, did you have

7    any special meetings or sessions or conferences to

8    get ready for today's deposition?

9         A    I've been --

10    MS. RUCOBA: Colleagues.

11    WITNESS: Oh with my colleagues?

12   BY MR. METSCH:

13        Q    Yes.

14        A    No I mean, we the means we have to the

15    extent of the investigation as far as we've gone so

16    far, but not for this deposition.

17        Q    Are you the lead agent on this

18    investigation?

19        A    I have a cold case agent.

20        Q    All right.  Who is that?

21        A    He's Ariel Rodriguez.

22        Q    Ariel Rodriguez?

23        A    Yes.

24        Q    And where does he work; in the same office

25    you're in?

OFFICIAL COURT REPORTING

16

1     A     Correct.

2     Q     Are you brothers?  Are you related?

3     A     No.

4     Q     No?  Okay, it's just an accident?

5     A     There's three of us in the office.

6     Q     With the name Rodriguez?

7     A     Yes.  Madeline, you know.

8     Q     Madeline, of course.  And there are people

9  working under your supervision; is that correct?

10    A     I wouldn't categorize it as supervision.

11  We are working as a team.

12    Q     Who's the boss?

13    A     I call a lot of shots.

14    Q     Okay, but you've only been with this

15  agency just a few years, haven't you?  Just a short

16  time?

17    A     That's correct, sir.

18    Q     And how about Mr. Ariel Rodriguez, has he

19  been with the agency longer than you have?

20    A     No, he has not.

21    Q     Who on your team has been with the agency,

22  your agency, the longest?

23    A     Joe Birdsong.

24    Q     How do you spell his name?

25    A     Who?

OFFICIAL COURT REPORTING

17

1     Q     I'll get it in a few minutes.  And how
2     long has he been there?
3     A     He's been there, I couldn't tell you the
4     amount of time he's been there, but I know he's been
5     there a long time.
6     Q     Now you have in front of you the Affidavit
7     which has been executed in this case, and I've got a
8     copy and you've got a copy, we all have copies of it
9     here.  Did you draft the Affidavit?
10     A     Yes, I did.
11     Q     All right.  Did anyone assist you?
12     A     Some people assisted me.
13     Q     Who did?
14     A     My team.
15     Q     Who's on your team?  Are those the people
16     who are identified in the Affidavit?
17     A     Correct, sir.
18     MS. RUCOBA: You need to wait for him to finish
19     the question before you answer it.
20     BY MR. METSCH:
21     Q     That would be in paragraph 3 of the
22     Affidavit, wouldn't it, page 2?  The ones that we
23     have here: "...seven fellow OIG agents, S/A Ariel
24     Rodriguez, S/A Madeline Rodriguez, S/A Alain
25     Rosello, S/A Joe Birdsong, S/A Tom Murach, S/A John

OFFICIAL COURT REPORTING

18

1    Mejia and Investigative Assistant Isel Avila." Did

2    they all work in preparing this Affidavit?

3        A    No, sir.

4        Q    Who did?

5        A    I worked with Assistant Avila, Ariel

6    Rodriguez, and I think that's the extent of it. We

7    all gathered the information. As far as drafting

8    is, it was myself.

9        Q    Did you consult with counsel in drafting

10   it?

11       A    We consulted several times.

12       Q    With Ms. Rucoba?

13       A    Correct.

14       Q    Were any other members of the US

15   Attorney's Office here in the Southern District of

16   Florida with whom you consulted in connection with

17   this case? Without telling me what you've said to

18   them, just identify who they are.

19       A    I, it was my recollection that I

20   identified everyone.

21       Q    The US Attorney's Office?

22       A    Uh-huh.

23       Q    The only one you've talked to is Ms.

24   Rucoba?

25       A    She's, oh, I'm sorry about that, we have

OFFICIAL COURT REPORTING

19

1   another AUSA, but I don't remember his last name.
2        MS. RUCOBA: Let me help for the record.
3        MR. METSCH: Please.
4        MS. RUCOBA: Kirk Ogrosky was providing some
5   assistance and was present in conversations with
6   Special Agent Rodriguez and both Special Agents
7   Rodriguez and, I believe, the witness, just to
8   refresh his memory, may have also consulted with a
9   AUSA, Barbara Bisdo.
10       WITNESS: Ariel did.
11       MS. RUCOBA: Ariel did, I'm sorry.
12       MR. METSCH: Ms. Rucoba, I'm not going to use
13  first names because we're on videotape and that, but
14  is Mr. Ogrosky in the Civil Division?
15       MS. RUCOBA: Yes, he is and so is Ms. Bisdo.
16  BY MR. METSCH:
17       Q   As you know, I had a case with her the
18  last two years so we're still slugging through that
19  one.  In many of the affidavits that I've
20  participated in drafting over the years, I usually
21  make a recitation that the Affiant is making a
22  declaration of personal knowledge, but I don't see a
23  personal knowledge declaration in this Affidavit.
24  Are there some items of the factual statement in
25  here which are not based on your personal knowledge?

OFFICIAL COURT REPORTING

**20**

1    A    There are sole statements, I take it back.

2  There is information that I received that I'm not

3  the expert on it and I've conferred with people from

4  other entities.

5    Q    And what would that be, in what areas?

6    A    That would be identifying F.I., Fiscal

7  Intermediary in this case which is First Coast

8  Options, and people that work for them in different

9  levels.

10    Q    First Coast Options, just so we get it

11  straight, is a contractor for the government, is it

12  not?

13    A    That's correct.

14    Q    And it's job is to process claims for the

15  government and also to conduct a certain amount of

16  oversight of the claims process system, correct?

17    A    Seems like it.

18    Q    Right.  And who at First Coast Options do

19  you primarily deal with, have you dealt with in the

20  course of this investigation?

21    A    Imogene McCrae, don't ask me to spell that

22  please.

23    Q    And where's her office?

24    A    She's in Jacksonville.

25    Q    Is First Coast Options owned by some other

OFFICIAL COURT REPORTING

1    company, such as Blue Cross or something like that?

2         A    I don't know if they own, I couldn't tell

3    you what relationship, I know they're related

4    somehow.

5         Q    Are they located in the Blue Cross/Blue

6    Shield Building in Jacksonville?

7         A    I've never been there, sir.

8         Q    What relationship do you think there

9    exists between Blue Cross/Blue Shield of Florida and

10   First Coast Options?

11        A    Originally, it was Blue Cross/Blue Shield

12   and then there was a name change.  The reason for

13   the name change or the circumstance surrounding

14   that, I couldn't tell you.

15        MS. RUCOBA: It's actually First Coast Service

16   Options.

17        MR. METSCH: Ms. Rucoba, is it in fact an

18   affiliate of Blue Cross/Blue Shield?

19        MS. RUCOBA: I believe so, yes.

20   BY MR. METSCH:

21        Q    Is there anybody down here in South

22   Florida employed by either Blue Cross/Blue Shield or

23   First Coast Options working on this investigation?

24        A    We consulted two others, I don't know if

25   they work under again Blue Cross or First Options.


OFFICIAL COURT REPORTING

1    I'm still confused about that relationship.

2       Q    And who are they?  Their names?

3       A    Sir, I don't remember right now.  There

4    are two others that worked and they are physically

5    in Miami, I can't remember their names.

6       Q    Could you get those names for me at some

7    point in the future?

8       MS. RUCOBA: I can produce those names for you.

9    I believe it's Washdi, is it Washdi?

10       WITNESS: Is that his first name?

11       MS. RUCOBA: I don't know his full name either.

12    He'll probably know.  I'll provide those names for

13    the record.

14       MR. METSCH: Would you please?

15       MS. RUCOBA: Yes.

16    BY MR. METSCH:

17       Q    Now, I understand as we go through this

18    Affidavit in a few minutes, I'm going to ask you

19    which of the items in there are based on your

20    personal knowledge and which of the items in there

21    came from other people, and maybe you'll be able to

22    assist us so I can figure out how this was put

23    together.  In other contexts, ordinarily the Affiant

24    is able to say that the information set forth in the

25    Affidavit is on his or her own personal knowledge.

OFFICIAL COURT REPORTING

23

1    Speaking of that, are there any wiretaps out in

2    connection with this case?

3         A    Any leads, any video techniques we have

4    utilized in this investigation, eventually get

5    utilized in this investigation, I refuse to answer

6    that question that might interfere or may compromise

7    any other steps I may take or the consideration of

8    the criminal investigation that we are currently

9    taking.

10         Q    Do you have these three Defendants, they

11    are Defendants so I can call them Defendants in the

12    Civil case, are they under surveillance at this

13    time?

14         A    Again sir, I refer back to my answer.

15         Q    Has the government used any scanning

16    devices to ease drop on their cellular phone

17    communications?

18         A    I refuse to answer that question because

19    it could compromise our investigation, our current

20    investigation of further consideration of the

21    criminal investigation.

22         Q    All the other people who are working on

23    this investigation would be from the Office of

24    Investigations, also authorized to carry weapons?

25         A    Except for one.


OFFICIAL COURT REPORTING

1      Q     Who's that?

2      A     That's an investigator assistant.

3      Q     ·Has your agency made any recommendations

4      as of yet to the Justice Department concerning a

5      criminal prosecution.

6      MS. RUCOBA: Objection, privileged. Instruct him

7      not to answer.

8      BY MR. METSCH:

9      Q     Now, we're in the civil action today and

10     the civil action was filed on January 28[th,] the year

11     2000.  Has your agency made a recommendation to the

12     Department of Justice that a civil action be filed?

13     A     I don't understand what you are trying to

14     ask.

15     Q     Well, I'm trying to find out whether the

16     Office of Investigations of the Inspector General's

17     Office of the Department of Health and Human

18     Services made a referral to the Department of

19     Justice for the filing of a civil action against

20     these Defendants.

21     A     I'm sorry to say this, but I really don't

22     understand because obviously we're here because I

23     came to AUSA, Rucoba if you categorize that as a

24     referral, I still don't know what you are trying to

25     --

OFFICIAL COURT REPORTING

25

1    Q    That's what I'm trying to get at, that's

2    right.  So, you on behalf of the Department of

3    Health and Human Services went to Ms. Rucoba as a

4    representative of the Department of Justice and

5    presented some preliminary findings; is that

6    correct?

7        MS. RUCOBA: Well, he's not a representative of

8    the Department of Justice.

9        MR. METSCH: No, no, no.  He's the Department of

10   Health and Human Services.

11       MS. RUCOBA: Right.

12   MR. METSCH: You're the Department of Justice.

13       MS. RUCOBA: Right.

14   BY MR. METSCH:

15       Q    So, you as the Department of Health and

16   Human Services representative went to confer with

17   Ms. Rucoba who works with the Department of Justice,

18   and you provided her with certain findings or

19   materials that you had developed; is that correct?

20   And did you make a recommendation to her?  And if

21   so, what was it?

22       A    The extent of that communication that I

23   had with Ms. Rucoba, I understand is privileged

24   information.  As to making a recommendation it is

25   not my position to make recommendations to her, just

OFFICIAL COURT REPORTING

26

1    present the facts and we conferred and decide what

2    next action needs to be taken.

3        Q    To whom do you report in the Office of

4    Investigations?  Who's your boss?

5        A    Cathy Colton.

6        Q    Spell it please.

7        A    Cathy with a "C" Colton.

8        Q    And what is her title?

9        A    Her title is Assistant Regional Inspector

10   General for Investigations.

11       Q    Where is she located?

12       A    She's located in the same office I am at.

13       Q    Who does she report to?

14       A    Linda J. Hillier.

15       Q    Who is she?

16       A    She is a Regional Inspector General for

17   Investigations.

18       Q    Where is she located?

19       A    Atlanta, Georgia.

20       Q    And who does she report to?

21       A    Who?

22       Q    The Inspector General of the Department?

23       A    It could be a number of people, I'm not

24   going to guess now.  I believe it would be a deputy.

25   It's in D.C. somewhere.


OFFICIAL COURT REPORTING

27

1        Q    In the Office of the Inspector General is

2   the next highest level after the Regional Office; is

3   that correct?

4        A    Correct.

5        Q    Have you conferred with any members of the

6   Criminal Division of the US Attorney's Office

7   concerning this case?

8        A    I don't understand what you mean by

9   conferred?

10       Q    Have you talked to?

11       A    Concerning?

12       Q    This case?

13       A    I switched (phonetic) for a couple of

14   them, but I haven't officially gotten to know --

15       MS. RUCOBA: Just answer the question.

16   BY MR. METSCH:

17       Q    Do you know?

18       A    No.

19   BY MR. METSCH:

20       Q    You haven't had any contact with them yet?

21       A    No.

22       Q    Are there any other investigatory agencies

23   of the US government or the state government

24   involved in this investigation other than yours?

25   For example, the FBI or the postal inspectors or

OFFICIAL COURT REPORTING

28

1    somebody like that?

2         A    Not at this time.

3         Q    Have you attempted to enlist the

4    assistance of any other agencies of the government

5    such as the IRS?

6         A    I have communicated with one IRS agent.  I

7    have not presented the case to her.  I have not done

8    anything else.  In fact, I was out of town because I

9    had a meeting.

10        Q    The reason I asked is that in the past

11   dealings with your office, we encountered a Medicare

12   Fraud Task Force which consisted of agents drawn

13   from several agencies, one of which was the IRS, and

14   that was Ms. Fockey, was an IRS agent, and she was

15   working on the case, so, and then we met several

16   other IRS agents who were working on Medicare Fraud,

17   so I would like to know if you got any IRS agents

18   who are working on this case?  Are there?

19        A    Not at the moment, they are not involved.

20        Q    Are you attempting to bring them in?

21        A    I have to consider many options in my

22   case.

23        Q    Have you approached the Internal Revenue

24   Service and asked for assistance?

25        A    I asked an Internal Revenue agent to meet

OFFICIAL COURT REPORTING

29

1    with me.

2         Q    And that hasn't come up yet?

3         A    No, sir.

4         Q    Have you dealt with any of Ms. Rucoba's

5    supervisors in the US Attorney's Office in

6    connection with this investigation?

7         A    I will have to ask her who her supervisor

8    is.

9         MS. RUCOBA: No, he hasn't.

10   BY MR. METSCH:

11        Q    Now, we're dealing with a thing called a

12   CORF, which is a comprehensive outpatient

13   rehabilitation facility.  What research have you

14   personally done to determine what a CORF is and what

15   regulations govern its activities?

16        A    Perhaps, I guess you can say met over the

17   phone we have spoken to Imogene McCrae, we've spoken

18   to one of the nurses available to them, which I

19   believe the name is Brenda.  We talked to four of

20   the investigators in their unit, I can't recall

21   their names.  We talked to the statistician of some

22   type of computer related position who's name was

23   Debbie, and we have put, they have given me either

24   regulations established by the FI concerning CORFs.

25        Q    The FI is the fiscal intermediary which is

OFFICIAL COURT REPORTING

30

1    First Coast Service Options.

2        A    I'm sorry, yes.  Right.

3        Q    Have you ever read the regulations

4    yourself?

5        A    I haven't read the whole regulations, sir.

6    I have been directed to certain portions of the

7    regulations.

8        Q    Well, the regulations that I found dealing

9    with CORFs appear in Title 42 of the Code of Federal

10   Regulations, Chapter 4, which deals with the health

11   care financing administration; subchapter B, the

12   Medicare Program; Part 410, which deals with

13   supplementary medical insurance benefits; subpart D,

14   which deals with comprehensive outpatient

15   rehabilitation facility services, and it starts,

16   from the collection I've made, starts in Section

17   410.100 of the Code of Federal Regulations.

18       It sets forth the various types of services

19   which a CORF is authorized to provide to eligible

20   Medicare beneficiaries and to seek reimbursement

21   from the government.  So, I'm going to show you what

22   was printed out from my computer.  Have you ever

23   read these before?

24       MS. RUCOBA: Let me take a look at it.

25       WITNESS: I've never seen this one before.


OFFICIAL COURT REPORTING

1    BY MR. METSCH:

2        Q    Direct your attention to Section 410.100,

3    Sub E which is respiratory therapy services which is

4    one of the types of services which a CORF (which is

5    Comprehensive Outpatient Rehabilitation Facility),

6    which CORF is authorized to give, and started with E

7    you'll notice that there are several subparts under

8    E as to what can be done via CORF and be compensated

9    by the government.

10        Subsection 1 is, subsection E deals with

11    respiratory therapy services and one uses their

12    services for the assessment diagnostic evaluation

13    treatment management in monitoring the patients with

14    deficiencies or abnormalities of cardio pulmonary

15    function.

16        Under that is 2, these services include then

17    you have small (i) application of techniques to

18    support of oxygenation and ventilation of the

19    patient at the pulmonary rehabilitation, and a few

20    others, as well that go on to — have you ever read

21    that before?  This particular section dealing with

22    respiratory therapy services?

23        A    I haven't read this one particularly.  I

24    don't know how, if this one is identical to the one

25    I've seen, again, you've got that from your

OFFICIAL COURT REPORTING

32

1    computer.

2        Q    I'll show you now, I have another one

3    which I think would be involved here as well, which

4    is Section 410.102 which is excluded services, and

5    it says that none of the services specified in

6    410.100 is covered as a CORF service if the service,

7    and you go to "B" is not reasonable and necessary

8    for the diagnosis or treatment of illness or injury

9    or to improve the function of the malformed body

10   member.  You've read that before?

11       A    I haven't read this one, sir.

12       Q    I'll show you now what has been printed

13   out of my computer.  It is Section 410.105 of the

14   Code of Federal Regulations.  It's requirements for

15   coverage of CORF services, I believe, and there is a

16   series of criteria requirements which set up for

17   payments of bills from Medicare Providers for CORF

18   services.  Have you ever read this before?

19       A    I have not read this one, sir, no.

20       Q    This is Section 410.170 of the Code of

21   Federal Regulations.  It deals with payment of SMI

22   benefits which is Supplementary Medical benefits.

23   Have you ever read this before?

24       A    No, sir.  I haven't read that one before.

25       Q    All right.  I'll show you Section 424.27

OFFICIAL COURT REPORTING

33

1   of the Code of Regulations dealing with payment.

2   It's subpart "B" deals with certification of planned

3   treatment requirements.  Have you ever read this

4   before?

5          A     No, I haven't read that one sir.

6          Q     Let me show you what has been marked at

7   485, which came out of my computer as Section 485.51

8   of the Code of Federal Regulations, and it defines a

9   CORF as a facility, a non-residential facility that

10  is established and operated exclusively for the

11  purpose of providing diagnostic therapeutic and

12  restorative services to outpatients for the

13  rehabilitation of injured, disabled or sick persons

14  at a single-fixed location by or under the

15  supervision of a physician, and meets all the

16  requirements of the subpart.  Have you read this

17  before?

18         A     I haven't read that one, sir, no.

19         Q     I have another one here which is Section

20  485.56 of the Code of Federal Regulations which

21  deals with the condition of the participation

22  governing body and administration.  Have you read

23  this before?

24         A     No, sir.

25         Q     Comprehensive outpatient rehabilitation

OFFICIAL COURT REPORTING

34

1    facilities.

2        A    As it appears, I haven't read that one.

3        Q    Section 485.58 of the Code of Federal

4    Regulations deals with the further condition of

5    participation of a -- deals with comprehensive

6    rehabilitation program.  Have you seen this before?

7        A    No.  Those look the same to me, no I

8    haven't read that.

9        Q    Section 485.60 of the Code of Federal

10   Regulations deals with clinical records, condition

11   of the patient to be examined.  Have you seen this

12   before?

13       A    No, sir.

14       Q    Section 485.62 of the Code of Federal

15   Regulations is another condition of participation

16   for CORFs in the program, the Medicare Program, and

17   it deals with physical environment.  Have you ever

18   seen this before?

19       MS. RUCOBA: Please answer out loud.

20       WITNESS:  No, sir.

21   BY MR. METSCH:

22       Q    Section 485.66 of the Code of Federal

23   Regulations deals with another condition for this

24   patient, a utilization review plan.  Have you read

25   this before?

OFFICIAL COURT REPORTING

35

1          A     No, sir.

2          Q     This is a, looks like a part of the catch-

3     all provision.  Section 489.2 of the Code of Federal

4     Regulations deals with provider agreements.  Have

5     you seen this provision before?

6          A     That one, sir?  No, I haven't seen it

7     before.

8          Q     Now, just so, this is very helpful, the

9     Section 1000.20 of the Code of Federal Regulations

10    is a series of definitions specific to Medicare and

11    we'll use this definition for the remainder of the

12    deposition.  It deals with the term carrier.  It

13    says here "Carrier means an entity that has a

14    contract with HCFA, which is a Health Care Financing

15    Administration, to determine to make Medicare

16    payments for Part B benefits payable on a charge

17    basis and to perform other related functions."  In

18    the context of this case, the carrier would be First

19    Coast Service Options; is that correct?

20         A     Correct.

21         Q     I'll show you what came out of my computer

22    as Section 1001.1301 of the Code of Federal

23    Regulations.  It deals with the Office of Inspector

24    General and it's Subpart C of Part 1001 entitled

25    Permissive Exclusions and it deals with that

OFFICIAL COURT REPORTING

36

1    situation.  From what I can tell, the best I can

2    tell, would be that OIG is able to exclude a

3    Medicare provider from participating in the program

4    on certain conditions.  Have you seen this before?

5        A    No, sir.

6        Q    As things stand today, are these corporate

7    Defendants which I represent, and they are two

8    providers, Florida Health Institute and Sample Road

9    Rehabilitation Center, Inc., do they have

10   functioning Medicare provider numbers today, as we

11   are talking to each other?

12       A    You have to define.

13       Q    If a bill were to be submitted under one

14   or both of those provider numbers would it be paid?

15       A    No, it would not be paid, sir.

16       Q    Why not?

17       A    It has been suspended.

18       Q    Under whose authority?  Who suspended it?

19       MS. RUCOBA: Their suspended under the TRO.

20   BY MR. METSCH:

21       Q    That's right.  Now, the TRO is an Order

22   from the Court suspending it, and has the Department

23   of Health and Human Services made some sort of

24   notation on its records or computer files that any

25   bills that were to come in through its either

OFFICIAL COURT REPORTING

37

1     directory or its fiscal intermediary would not be

2     paid because the provider number has been terminated

3     or suspended?

4          A    Who you mentioned --

5          Q    Let's put it this way I'm talking like

6     I've been a bureaucrat for thirty years, I got to

7     stop that.  I love these regulations.

8          If a bill, if a claim were to be submitted

9     today under either of the provider numbers that have

10    been previously assigned to Florida Health

11    Institute, Inc. or Sample Rehabilitation Center,

12    Inc., and went into the system, how would the system

13    process it under the current condition today with

14    the TRO in effect, and whatever other have been

15    taken?

16         A    I cannot tell you exactly what would

17    happen to the claim.  What I can tell you is the

18    claim will not be paid.

19         Q    All right.  So, as we're speaking today,

20    is there any danger given the fact that the TRO has

21    been entered and that the Medicare provider numbers

22    have been suspended at the Uncle Sam, meaning the

23    federal government or its fiscal intermediary, will

24    make any further payments to either of these two

25    providers?

OFFICIAL COURT REPORTING

38

1          MS. RUCOBA: Objection to form.

2          MR. METSCH:  Is it possible that there could be

3     any further payments made under today's environment?

4          WITNESS: I guess anything's possible, but it is

5     my understanding that the payments, the claim could

6     be submitted, but they will not be paid.

7     BY MR. METSCH:

8          Q    So the system has shut down those numbers,

9     we would say in colloquy, it shut down the numbers,

10    right?

11         A    If you want to use that term, I'll let

12    you.

13         Q    You use that term too, don't you?

14         A    I wouldn't use it today.

15         Q    No, but you would in the course of your

16    business, in your activities as an agent, you would

17    say that the numbers have been shut down, wouldn't

18    you?

19         A    Actually I wouldn't use that name.

20         Q    What would you say?

21         A    Suspended.

22         Q    So, would you agree with me when I make

23    the declaration to you that there is no danger at

24    the moment that any further payments would be made

25    to either of these two Medicare providers?

OFFICIAL COURT REPORTING

39

1          MS. RUCOBA: Objection to form.

2     BY MR. METSCH:

3          Q    Do you agree with me?  It won't happen, if

4     they could submit either of these two, or both of

5     these two, providers could submit a claim every ten

6     minutes from now all the way through the rest of the

7     weekend, on and on and on, not one of

8     them would be paid, isn't that correct?

9          A    I can't tell you what happens, it's not

10    within my control.  Computers, as we know, I cannot

11    assert --

12         Q    But certainly, as far as you know, an

13    effort has been made to prevent that from happening,

14    hasn't it?

15         A    We have officially suspended the numbers,

16    if they get paid or don't get paid.

17         Q    Could the Department of Health and Human

18    Services have suspended the numbers without the TRO?

19         Let's assume you hadn't gone to Court, couldn't

20    the agency, the government, had decided for whatever

21    reason that it lost confidence in these providers

22    and could have suspended the provider numbers

23    pending further investigation?

24         A    My office?

25         Q    Yes, your office and the whole Department

OFFICIAL COURT REPORTING

40

1      of Health and Human Services.   Somebody in the

2      Department, which is a very large department, could

3      have made the decision without a Court Order,

4      without a lawsuit, to suspend these provider

5      numbers, isn't that correct?

6           A     Could be a number of people that could

7      make that decision as to why they needed to make

8      that decision, I don't know.

9           Q     What I'm getting at is this:   It is not

10     necessary for HHS to suspend, in order for HHS to

11     suspend Medicare provider numbers to get a Court

12     Order, is it?   It can be done by HHS without a Court

13     Order, isn't that correct?

14          A     I'm not completely sure on that.

15          Q     Well, on the investigations in which

16     you've been involved since joining HHS, have you

17     encountered suspensions of Medicare provider numbers

18     without Court Orders?

19          A     That's correct.

20          Q     So, it can be done, can't it?

21          A     Okay, yeah, we have suspended them.

22          Q     Okay, and who makes that decision if they

23     don't have a Court Order?   At what level, is it made

24     by the OIG or is it made by somebody else?

25          A     I cannot tell you right now exactly who

OFFICIAL COURT REPORTING

41

1      makes the decision, I certainly have recommended it

2      in past cases that they be suspended based on other

3      proceedings.  As far as who actually, ultimately is

4      responsible for suspending while making the

5      determination, I can't say today.

6          Q    Okay.  All right.  Is the investigation

7      into the activities of these Defendants complete?

8      Have you closed the investigation or is it still

9      going on?

10         A    We have continued the investigation, sir.

11         Q    And is this civil action being used to

12     further the investigation?  Are you relying upon the

13     US Attorney's Office and its discovery powers and

14     the Court proceedings to help you in the

15     investigation?

16         A    I didn't understand your question.

17         Q    For example, the US Attorney's Office has

18     gone to the Court and gotten an Order which directs

19     the Defendants to produce certain documents for

20     government inspection and copying, we've already

21     produced some documents, we're producing more this

22     afternoon.  Are you going to get to see those

23     documents?

24         A    I get to see everything that comes through

25     to my office.

OFFICIAL COURT REPORTING

42

1      Q      So the US Department of Justice through

2    its US Attorney's Office in the Southern District in

3    connection with the civil case is assisting you in

4    the investigation, is it not?

5      A      I couldn't do this case without the USA so

6    --

7      Q      Not just the USA in many cases that I've

8    encountered in the past, provides ongoing legal

9    advice and support for an investigation because

10   certainly you want to make that what you're doing

11   will stand up later on if it gets into Court.

12        What I'm talking about is the materials in

13   evidence being generated in this lawsuit will be

14   used by you and your colleagues in the OIG, Office

15   of Investigations, in pursuant of your

16   investigation, isn't that correct?

17     A      Again, sir, we use whatever comes to us,

18   the means of which we obtain them has never been

19   relevant to us.  We get the documents or the records

20   --

21     Q      From whatever source?

22     A      And we do what we need to do with them.

23     Q      You could have, isn't it possible Mr.

24   Rodriguez, that you could have gotten the same

25   documents that we're producing now in a civil case

OFFICIAL COURT REPORTING

43

1    through a search warrant?

2        A    I could have done a number of things, sir.

3        Q    Right.  So, why didn't you use the search

4    warrant?

5        A    Cause the way in which we conduct our

6    investigations we don't always follow every, every

7    investigative technique.  We choose to use different

8    techniques that we deem necessary or appropriate at

9    that present time.  There is no particular reason

10   why we didn't do one or the one, it's just --

11       Q    So hypothetically, if your investigation

12   would result in an indictment, a criminal

13   indictment, of these Defendants and the corporations

14   and perhaps others, it would be safe to say based

15   upon what we've seen today, that some of the

16   information used in furthering that investigation

17   came out of the civil case, wouldn't that be the

18   case?

19       A    I believe that's the case in many other

20   investigations that we have.

21       Q    Have you discussed with your colleagues,

22   I'm not talking about with the government lawyers

23   here, but with your colleagues, the prospect that

24   your investigation of these Defendants and perhaps

25   others will be furthered and helped by the civil

OFFICIAL COURT REPORTING

44

1    suit, has that come up in your discussion, meaning

2    Case No. 00-6143 in the Federal Court?

3        A    The nature of the discussions that we have

4    with our colleagues have been to expedite the

5    investigation.  Any specific to those questions, I

6    understand, is work in progress.  I mean, we have

7    discussed many things.  Where they came from is

8    several, or we develop it by other means.

9        Q    Have you ever met these three gentlemen

10   before?  Have you dealt with them before or had any

11   contact with them?

12       A    Before when?

13       Q    Before today?

14       A    Oh, yes.

15       Q    Under what circumstances?

16       A    I met Elliot on two occasions.  I served

17   him with the TRO and I also served him a Subpoena.

18       Q    How about Mr. --

19       A    I met Mark or Anthony a week ago or two

20   weeks ago and I did not meet Mr. Choi.

21       Q    When you met Mr. Mignott did you serve him

22   with any documents?

23       A    We served him with the TRO.

24       Q    And Mr. Choi you never met before?

25       A    No.


OFFICIAL COURT REPORTING

45

1      Q    Have you met any members of their families

2  in the course of your investigation?

3      A    Not to my knowledge.

4      Q    All right, now let's get to, now that

5  we've covered all that, let's get into the Affidavit

6  because we are very interested in this Affidavit

7  since it is the basis for the injunction that's the

8  temporary restraining order.  And it's obviously the

9  basis for the, at the moment the government's,

10  unless it supplements it, can go forward with the

11  Motion for a Preliminary Injunction.

12     So, let's, -- I think we'll make it easier that

13  we're going to designate the Affidavit as

14  Defendant's composite Exhibit A.  So, if you'll just

15  give me one of your stickers I'll put it on line and

16  we'll use this as an exhibit to the deposition

17  transcript down the road.

18     (Defendants' Exhibit "A" was marked for

19  identification.)

20  BY MR. METSCH:

21      Q    You have a copy of the same Affidavit,

22  don't you, Mr. Rodriguez?  In fact, everybody in the

23  room I think has a copy, so we can go forward.

24  Let's turn now to page 2.

25     In paragrapha 3 you identifed those with whom

OFFICIAL COURT REPORTING

46

1    you are working.  Do these agents have any specific
2    assignments that you can relate to us?  Have you
3    divided this investigation into different areas and
4    each one has a different function, and if so, please
5    tell me what each one's function is.

6        A    Everyone here, I'm making sure I have all
7    the names, have different assignments throughout the
8    investigation.  The extent of the involvement or
9    cooperation has been to the interview that we
10    conducted.  Specifically, Assistant Isel Avila, her
11    main contribution was as a translator.  They have
12    also, and I couldn't point out to you exactly who or
13    when, but they have also served subpoenas for us.

14        If I can mention now, there are several other
15    people who have helped served subpoenas, they are
16    not mentioned here.

17        Q    I'm not so concerned about people who just
18    serve subpoenas, but those that actually conducted
19    interviews.  And when you say interviews, were these
20    interviews with Medicare beneficiaries?

21        A    Some interviews were with Medicare
22    beneficiaries, yes.

23        Q    And who else were interviewed other than
24    Medicare beneficiaries?

25        A    We spoke to two physicians.


OFFICIAL COURT REPORTING

47

1       Q     Who with?

2       A     Estefan, no spelling please, Bloomberg,

3    Dr. Bloomberg, and those are the ones I was

4    personally involved in.

5          I understand that Ariel Rodriguez spoke to Dr.

6    Delamar; I'd been away for a week or so and I know

7    there have been further interviews, I don't know who

8    or when they were interviewed.

9       Q     Have any of these physicians given written

10   statements in connection with these interviews?

11      A     Written statements?

12      Q     Right.  Have they actually signed written

13   statements in which their accounts or their answers

14   to your questions has been reduced to writing and

15   signed by them?

16      A     Signed by the physicians?

17      Q     Yes.

18      A     I'm sorry --

19      Q     Have the agents taken notes of these

20   conversations?

21         MS. RUCOBA: With the physicians?

22   BY MR. METSCH:

23      Q     Yes.

24      A     I can't answer for sure that Ariel took

25   notes of the interview that he did or the meeting

OFFICIAL COURT REPORTING

48

1     that he had with Dr. Delamar.  I personally didn't

2     take notes when I spoke to Dr. Bloomberg or Dr.

3     Estefan.

4          Q     So what kind of record exists of those

5     interviews?

6          A     There's no records at this moment that we

7     have of those interviews.  They're not considered

8     interviews.  They were contacted for purposes of

9     serving subpoenas and there were several

10    conversations that took place.  They were not

11    official interviews, sit down interviews with them.

12         Q     Did the agents write any memorandum for

13    the file as to the substance of the conversation?

14         A     I have not as of this time, sir.  As to

15    the other agents, I cannot answer that.

16         Q     How about Medicare beneficiaries who were

17    interviewed, how were those interviews memorialized?

18    Were they tape recorded?  Were they videotaped?

19    Were they written out?  Were they signed by the

20    beneficiaries, any written statements or notes taken

21    by the agent or any combination of the foregoing?

22    How is it done?

23         A     There's a combination.

24         Q     All right.  Is there a file which consists

25    of statements, written statements, given by Medicare

OFFICIAL COURT REPORTING

49

1    beneficiaries?

2         A    Just files.

3         Q    Signed by these beneficiaries?

4         A    No.  Just points of our interview with

5    them.

6         Q    All right.  Have any of these

7    beneficiaries given affidavits in support of their

8    testimony?  Have you asked them to sign sworn

9    statements?  You, I mean you and your colleagues,

10   have asked any of these beneficiaries who were

11   contacted did they actually execute sworn statements

12   like an affidavit?

13        A    The question is whether they have given

14   sworn statements?

15        Q    Yes.

16        A    No, they have not been given sworn

17   statements.

18        Q    If I wanted to learn what these

19   beneficiaries said, would I have to talk to the

20   beneficiaries or is there some other source I could

21   go to?

22        A    You can talk to Laurie Rucoba.

23        Q    No, she's not going to tell me.

24        MS. RUCOBA:    You can ask him if he remembers.

25        MR. METSCH: What I'm getting at is this, other

OFFICIAL COURT REPORTING

50

1   than the recollection of each agent who interviewed

2   a beneficiary, other than, I would either have to

3   talk to the beneficiary or talk to the agent; is

4   that correct?

5       WITNESS: I don't understand the question, sir.

6   BY MR. METSCH:

7       Q    Let's assume that there was an interview

8   between an agent of your office of investigations

9   and a beneficiary as to whether certain CORF related

10  respiratory service had been rendered at a

11  particular facility or under the auspices of a

12  facility, and the beneficiary said either yes, no or

13  I don't know, I don't remember, whatever it was, the

14  agent would typically write down what the

15  beneficiary told him or her; is that correct?

16      A    That's correct.

17      Q    Is there any other record other than the

18  agent writing it down that I could look at other

19  than that to verify what the beneficiary told that

20  agent?

21      MS. RUCOBA: By record, you're referring to a

22  written record?

23      MR. METSCH: Any record.

24      MS. RUCOBA: Any record.

25  BY MR. METSCH:


OFFICIAL COURT REPORTING

51

1    Q    Any recorded record, videotape, anything,
2    computer disk, whatever.  Other than the agent's
3    recollection of what the beneficiary said reduced to
4    writing in a report, is there any other source I
5    could go to other than the beneficiary himself or
6    herself?
7    A    There's other sources.  I don't know if
8    you can get those sources.
9    Q    What is it?
10    A    We have a request that we do in our office
11    which is an internal report.
12    MS. RUCOBA: It's a what?
13    WITNESS: It's an internal.  It's not internal,
14    it's a report that we do.  It's an office report.
15    BY MR. METSCH:
16    Q    All right, so each time an agent would
17    interview a Medicare beneficiary, that agent would
18    file a report in the office; is that correct?
19    A    That's correct.
20    Q    And where is that report kept, in a file?
21    A    It's a file.
22    Q    What is the file called?
23    A    We have a case file that keeps everything.
24    We --
25    Q    Does this investigation have a name?

OFFICIAL COURT REPORTING

52

1    Operation something?  A lot of times they have very

2    cute names for operations, do you have one for this?

3         A    No, sir.  I call it FHI and Sample.

4         Q    You don't call it like Operation

5    Greenthumb or Pie in the Sky or some other name,

6    nothing like that?

7         A    No, sir.

8         Q    That's too bad.  I was hoping we'd have

9    one.

10        A    You can give it a name if you want.

11        Q    No.

12        MS. RUCOBA: We're taking suggestions.

13   BY MR. METSCH:

14        Q    What I'm really trying to find out is,

15   obviously before I got sidetracked into that

16   attempted humor, was where are these reports kept,

17   in whose office?

18        What I'm trying to do is figure out the next

19   stages.  How do I verify what is on your chart?  How

20   do I know the beneficiary told the agent this or

21   that, or this or that, or this or that, so I can

22   look at the agent's report or I can go talk to the

23   beneficiary, correct?

24        A    Correct.

25        Q    The first thing I'd want to do is look at

OFFICIAL COURT REPORTING

53

1    the agent's report because we're in a civil case and

2    I think it's probably discoverable, so I need for

3    you to tell me what that file is called so I can

4    identify it and make a specific request.

5        MS. RUCOBA: I'll stipulate for the record that

6    the reports of interviews are called OI 3's and that

7    the OI 3's are kept in the case file, and I also

8    note for the record that the government believes

9    that the OI 3's are work product and privileged, but

10    you can make a request for them.

11        MR. METSCH: Well, we sure will.  Consider it

12    done.  We're requesting it right now, and as far as

13    I'm concerned the request we already submitted to

14    you embraces and covers this very area, I just want

15    to make sure we know they exist because we have

16    requested all documents and materials which are

17    discoverable concerning the status of the

18    investigation or the work ordered and accrued during

19    the investigation and this would certainly be in

20    them.

21        Now, we know then there are reports of

22    interviews with beneficiaries, are there any other

23    reports which are in the case file bearing upon this

24    investigation which have been executed and prepared

25    by agents, other than reports of their conversations

OFFICIAL COURT REPORTING

54

1     with beneficiaries?

2          For example, have agents talked to bankers, for

3     example, and had contact with employees of banks?

4          A    We have talked to some of the people.  As

5     to the sources of these documents and the

6     information contained therein, this involves the

7     investigation I don't want to divulge my source at

8     this time.

9          Q    I didn't ask you to, I just want to know

10    if they exist?

11         A    Oh, they exist.

12         Q    So there are reports in the case file of

13    contacts between your office and other parties; is

14    that correct?

15         MS. RUCOBA:    I'll make sure he understands the

16    question.  I think he's asking are there OI 3's of

17    other contacts besides the benes?

18         WITNESS: No.

19         MR. METSCH: Beneficiaries.

20         MS. RUCOBA: Beneficiaries.

21         WITNESS: No OI 3's or the beneficiaries at this

22    point.

23    BY MR. METSCH:

24         Q    There aren't any?

25         A    Not to the best of my recollection at this

OFFICIAL COURT REPORTING

55

1    time.

2         Q    Is the OI 3 the official form that's used

3    for reporting on the progress of an investigation?

4    Is that the internal mechanism that's used, or is

5    there some other form in addition to that that an

6    agent would use?

7         A    The OI 3's are a form that we utilize in

8    my office to report, it's a report of an interview

9    basically.

10        Q    All right.  How about a report of the

11   progress in the investigation?  Is there another

12   form that's used and if so, for example, government

13   agencies which I've had contact with from time to

14   time an agent has to report to his or her superiors

15   progress in an investigation.  Is there a form

16   that's used for that?

17        A    No, we don't have such a thing.

18        Q    All right.  I'd like to take a break for

19   about two minutes.

20             (A BRIEF RECESS WAS TAKEN.)

21   BY MR. METSCH:

22        Q    Before we get into the Affidavit, one more

23   short group of questions I need to ask you.  Do you

24   or any of your colleagues in the Office of

25   Investigations interview any present or past

OFFICIAL COURT REPORTING

56

1    employees or independent contractors or colleagues

2    of any of the Defendants?

3        A    Not to my recollection, sir.

4        Q    I know the other day I provided Ms. Rucoba

5    with a list of employees and contractors, are you

6    going to take an interview any of those people as or

7    speak with them?

8        A    Again the steps that we are taking --

9    well, we're doing an investigation you know, we

10    reserve to answer that question at this moment --

11        Q    But your knowledge of --

12        A    What I have done to this point, I have not

13    contacted them and to my knowledge no one else has.

14    I've been away for a week also, sir.

15        Q    And to your knowledge there are no OI 3's

16    in your office bearing upon contact between agents

17    of the Office of Investigation or any other agents

18    of the US government and any of the past independent

19    contractors or employees of these Defendants?

20        A    To the best of my knowledge.

21        Q    Is there somebody who works at your office

22    who is responsible for maintaining the case file?

23    Do you have someone who might be given the title of

24    Administrative Assistant or management person or

25    something who maintains that file?

OFFICIAL COURT REPORTING

57

1        A    We have Investigative Assistants Avila --

2        Q    But you said earlier that she was

3 primarily assisting as a translator.

4        A    As it related to that interview, to the

5 case, this case in particular.

6        Q    But is she the paralegal in effect who is

7 running, keeping the case file current?

8        A    We report to our boss.  I know she files

9 reports, she has other duties.  I wouldn't call her

10 a paralegal.

11        Q    What I'm getting at is:  I'm trying to

12 identify if there is such a person, a person who is

13 responsible for keeping the file current or indexed

14 or in good order, the case file?

15        A    It is the responsibility of the agent to

16 make sure that all the evidentiary records or what

17 is going to be utilized in an investigation is

18 included in the file.  As to anyone in particular

19 being responsible other than that --

20        Q    All right.  Now, let's look at page 3

21 starting with paragraph 5 of your Affidavit. The

22 information that you're referring to in paragraph

23 5a, 5b, 5c, 5d, 5e, 5f, insofar as it deals with the

24 corporate status of each of these companies, was

25 that downloaded from the State of Florida, Secretary

OFFICIAL COURT REPORTING

58

1    of State's Office, for example?

2         A     Is it regard to, yes.  The website?

3         Q     Right, the website, right.  Notice if you

4    look at your Exhibit 1 to your Affidavit, it says

5    here this is not an official record.  Have you

6    attempted to get the official documents that are

7    behind the website information?

8         A     We have.

9         Q     You filed a request with the Secretary of

10   State's Office for the basic corporate documents?

11        A     I don't know exactly who the request would

12   go to.  I know it goes through the Department of

13   State in Talahassee.

14        Q     Where did you get the information as to

15   when, for example on page 3, the bottom paragraph,

16   "FHI became a Medicare Provider" where did that

17   information come from?

18        A     That comes from the Provider application,

19   Exhibit 2.

20        Q     This is a document, Exhibit 2 of the

21   Affidavit is Disclosure of Ownership and Control of

22   Interest Statement.  Does that give us the date on

23   which the provider number was open?

24        A     No, sir.  It gives the date it was

25   submitted.  As to the date exactly when it was

OFFICIAL COURT REPORTING

59

1      officially approved as a provider, I got from First

2      Options.

3           Q    First Coast.

4           A    I'm sorry.

5           Q    So they provided it to you from their

6      records; is that correct?

7           A    Uh-huh.

8           MS. RUCOBA: Please answer outloud.

9           WITNESS: Yes.

10     BY MR. METSCH:

11          Q    Let's go to page 6, paragraph 6.  At the

12     top it says: "Generally, our investigation has

13     disclosed that FHI and Sample are engaged in the

14     following illegal activities: (1) providing services

15     to Medicare beneficiaries who were not referred by a

16     physician; (2) providing medically unnecessary

17     services to Medicare beneficiaries; (3) services not

18     rendered, and/or services not provided as billed."

19          Let's take them one at a time.  Let's go to

20     "providing services to Medicare beneficiaries who

21     were not referred by a physician."  So, your

22     understanding that a Medicare provider is not

23     authorized to provide services to a Medicare

24     beneficiary who is referred by somebody other than a

25     physician?

OFFICIAL COURT REPORTING

60

1        A     You have to break that down.

2        Q     Well, it seems to be saying in your

3   Affidavit that the first category of illegal

4   activity engaged in by FHI and Sample or as "(1)

5   providing services to Medicare beneficiaries who

6   were not referred by a physician." Well, I can

7   understand that you can't get any payment on a bill

8   unless a physician has signed off on the plan of

9   treatment and the necessity for the service, but we

10  are just talking about referral. Is it your

11  understanding that the only way a Medicare provider

12  is allowed to be compensated for services rendered

13  through a beneficiary is to get the beneficiary

14  referred to by a physician and by nobody else?

15       MS. RUCOBA: Objection to form. By a Medicare

16  provider are you talking about a CORF?

17       MR. METSCH: Yes, a Medicare CORF, right.

18  BY MR. METSCH:

19       Q     Is it your understanding that a CORF, CORF

20  is a subcategory of Medicare provider, are you

21  saying to me that if a CORF got a patient into its

22  system through a method other than a physician, that

23  that's illegal? Is that what you're saying?

24       A     What do you mean by having into its

25  system?

OFFICIAL COURT REPORTING

61

1        Q    Well, for example.  If a CORF, I don't

2    know I may be showing my ignorance here, if a CORF

3    advertised on TV or on a website and said we're a

4    great CORF on its website, and somebody actually

5    walked into the door saying I saw your website and I

6    think you're probably a great CORF, I want service

7    and take me to a physician to make sure that I'm

8    eligible for it.  Is that illegal, for a CORF to

9    have a website?

10        A    I don't know if it's illegal for them to

11   have a website.

12        Q    But you're saying here though that if a

13   Medicare beneficiary went to FHI or Sample

14   other than a physician, that's an illegal activity;

15   isn't that what you are saying?

16        A    That's not what I said.

17        Q    What are you saying?

18        A    I said providing services to Medicare

19   beneficiaries who are not referred by a physician.

20        Q    So, you are saying that services were

21   provided to a Medicare beneficiary who had never

22   seen a physician; is that what you are saying?

23        A    Who were not referred to FHI or Sample by

24   a physician.  Have they seen a physician in their

25   past, I don't know, they know.

OFFICIAL COURT REPORTING

62

1          Q     That's what I'm getting at.  Somebody
2    walks in, walks down the street and sees CORF on the
3    side, and walks in the door and asks what's a CORF,
4    and the receptionist is very pleasant and says well
5    a CORF is a Comprehensive Outpatient Rehabilitation
6    Facility.  It is authorized under the Medicare
7    Provision Social Security Act and we provide the
8    following services, and the patient says "Oh, I
9    didn't know you were in this neighborhood.  I would
10   like to get some service here."  And the lady at the
11   front desk says or the man says, you have to have a
12   physician prescribe this treatment otherwise you
13   can't get it and paid by Medicare.  So, he or she
14   says, the customer says, check that patient, "Well,
15   do you have a doctor?"  "Well, yeah, down the
16   street, there's doctor so and so and you can go see
17   him and it's up to him whether you'll be qualified."
18   Or the patient is told by the receptionist do you
19   have your own doctor.  The patient says yes.  Well,
20   go see your own doctor, and if the doctor says you
21   need it, then you can get a prescription and you can
22   come back here.
23          Isn't it true that the beneficiary given a
24   prescription say for example for respiratory
25   services can go to any provider he or she wants to?


OFFICIAL COURT REPORTING

63

1    They don't have to go to one recommended by the

2    doctor?

3         A    I'm not saying, sir.  I think you're

4    misreading what I wrote here.

5         Q    Well, I'm just trying to see what --

6         A    I wrote that services provided to

7    beneficiaries, that were not referred by physicians.

8         Q    What's illegal about that?

9         A    It has to be the beneficiary or the

10   client, whichever you want to call it, has to be

11   seen by a physician and the service has to be

12   prescribed by the physician.

13        Q    Now I got it.  So what you're saying is

14   that the CORF has been billing the Federal

15   government through its fiscal intermediary for

16   services rendered to beneficiaries for that which

17   has been prescribed by a physician; is that what you

18   are saying?

19        A    That's one of the allegations --

20        Q    Is that what you mean by #1?

21        A    That the services were not originally

22   referred by a physician.

23        Q    Prescribed or referred?

24        A    Referred by a physician.

25        Q    What I'm trying to get at is I can

OFFICIAL COURT REPORTING

64

1      understand there's a requirement for a prescription

2      issued by a physician.  Is that what you are saying

3      or are you saying that the introduction of the

4      patient to the CORF has to be through a physician

5      and through no other source?

6          A      Regardless of what CORF he goes to, the

7      service that he gets provided, they have to be

8      prescribed by a physician.

9          Q      Right.

10         A      The physician has to refer the services

11     and --

12         Q      Prescribe the service.

13         A      I'm sorry, prescribe the services.

14         Q      But you don't use the word prescribe, you

15     use the word refer, but you really mean prescribe in

16     this --

17         A      In this #1, services were not referred by

18     a physician.  They could be under the process there,

19     but in this instance right here, the services were

20     not referred by a physician.  Now, I didn't mean

21     prescribed, I meant referred.

22         Q      So where is the requirement in any of the

23     regulations or statutes that a patient be referred

24     to the CORF by the physician, not by somebody else?

25         A      Now, it is my understanding, that the

OFFICIAL COURT REPORTING

65

1    service has to be referred by a physician.  Now, if

2    it's either categorized as being a prescription, I

3    don't know, but we used to refer as being the

4    physician seeing the patient, and by waiting and

5    determining that the patient needs the services,

6    therefore, then he writes the prescription or

7    referral.

8        Q    What you're saying is the patients were --

9    that bills were submitted to Medicare by FHI and

10   Sample for patients who had not been seen by a

11   physician, and for whom a physician had not made a

12   prescription or a referral; is that correct?

13       A    Right. That's what I mean.

14       Q    Because I was about to get into the next

15   hypothetical whereby let's assume that I'm

16   prescribed, that I go to a CORF pursuant to a

17   prescription and I'm so pleased with the service

18   that I tell my brother-in-law.  So, I have really

19   introduced him to the CORF, and he goes to his

20   doctor and says check me out and see, I'm having

21   these aches and pains whatever, and I want to go to

22   that same CORF if I qualify.

23       So, I've been the referral source there because

24   I was the one who tipped him off.  Right?  I told my

25   brother-in-law about that before the doctor did,

OFFICIAL COURT REPORTING

66

1    about the CORF.

2    We're not saying really that word of mouth about

3    good services is illegal, you're saying that the

4    doctor has to prescribe before Medicare is obligated

5    to pay; isn't that correct?

6        A    I couldn't say it better.

7        Q    Let's go to the next one.  The second

8    category, "providing medically unnecessary services

9    to Medicare beneficiaries."  Are you saying then

10   that services are being provided in excess of those

11   prescribed by the doctor?  Let's assume, let's back

12   up.  Let's assume hypothetically we're dealing with

13   a patient for whom a prescription has been issued by

14   a physician, right.  The physician writes it out and

15   gives it to the patient, and the patient walks into

16   the CORF and says "Here, here's my prescription.

17   This is what the doctor said needs to be done."  Are

18   you suggesting in #2 here, paragraph 6, sub 2, that

19   FHI and Sample then went and provided services in

20   excess of those prescribed by the doctor?

21       A    What I'm saying here is we're providing

22   services that were not needed for that patient.

23       Q    But I'm giving you a hypothetical.  Let's

24   assume the doctor has prescribed certain services,

25   and let's assume that maybe the doctor was wrong or

OFFICIAL COURT REPORTING

67

1    maybe it was not necessary, but the doctor has

2    prescribed it and the patient walks into the CORF

3    with the prescription in hand, and says here's the

4    order from the physician, and then the CORF renders

5    the service prescribed by the doctor.

6        Is there anything illegal insofar as the CORF's

7    activities are concerned if the CORF does that?  If

8    the CORF merely follows the instruction from the

9    doctor is there anything illegal about that?

10       A    I don't think there would be anything

11   illegal if he follows the instruction of the

12   physician.

13       Q    What you're getting at maybe is that the

14   physician and the CORF are in collusion to prescribe

15   services that are unnecessary?  Then, at that point

16   the CORF is no longer an innocent babe in the woods,

17   it's a participant in a fraud.  Is that what you are

18   saying that happened here?

19       A    I want to use the statement that what you

20   said, providing on these medical services as I

21   stated on my Affidavit on the day that I did it, it

22   meant it was services that that particular benie, or

23   beneficiary, I'm sorry, did not need.  That's what I

24   meant on that statement.

25       Q    But if you're talking about illegal

OFFICIAL COURT REPORTING

68

1    activities and some activity which is subject to
2    punishment or sanction or penalty of some sort,
3    wouldn't the CORF or the people who managed or
4    operated the CORF, had to have known in order for
5    them to be subject to penalty if the services were
6    unnecessary?
7        A    If they operate in the CORF, they should
8    know.
9        Q    Let's assume the doctor has prescribed it
10   and is it the duty of the CORF to say to the
11   beneficiary yes, you've given me a prescription.  It
12   says I have to do so many hours of respiratory
13   therapy and this and that and the other, but we
14   don't think it is necessary, the doctor is crazy.
15   Is that the CORF's duty?
16       A    Honestly, I don't know where you're going
17   with that, but what I said in this statement in #2
18   is basically that they are beneficiaries and they
19   don't need the services.
20       Q    But whose responsibility is that?  Is that
21   the CORF's responsibility or the physician's?
22       MS. RUCOBA: Objection to form.  Go ahead.
23   BY MR. METSCH:
24       Q    Assuming the patient didn't need the
25   services, but assuming further that the services

OFFICIAL COURT REPORTING

69

1   were prescribed by the doctor, who's responsibility,

2   who's the party who is primarily at blame in that

3   circumstance if the CORF goes ahead and follows the

4   doctor's instructions?

5        A    I couldn't give you one answer for that, I

6   would have to further my investigation and I would

7   be able to determine by my findings who is

8   ultimately responsible for it.

9        Q    So what you are getting at is, let's

10  assume in the abstract the patient got services

11  which are not medically necessary, which the

12  government is paying for unnecessary services, so

13  it's a fraud on the government.

14       My concern is, obviously since I represent

15  these Defendants, do you have any evidence to show

16  that these Defendants in processing these patients

17  knew that the prescriptions were inappropriate?  If

18  so, what's the evidence?

19       A    You have two questions there.

20       Q    That's right.  First of all, did the

21  Defendants know that the prescriptions were

22  inappropriate?

23       A    There's many things that we follow under

24  the investigation at the present time.  There's many

25  findings that we have come to.  As far as if they

OFFICIAL COURT REPORTING

70

1    know indirectly or any other involvement they might

2    have, I refuse to answer that question right now

3    because it could compromise my investigation or any

4    further consideration for a current investigation.

5         Now, as far as the ownership of the

6    establishment, there's no doubt on that. As far as

7    the responsibilities on their knowledge, I guess

8    we're going to continue with our investigation like

9    I said before.

10        Q    But I have a different focus at the

11   moment.  I've been hired to handle the civil case.

12   Right now there's an injunction in place with a

13   hearing coming up on March 31st, so I need to know

14   whether when that day comes, I will be dealing with

15   a government presentation in which you present

16   evidence, excuse me, the government presents

17   evidence showing that these prescriptions were known

18   by the Courts to have been unnecessary.

19        I'm asking you now, do you have any

20   information, have you developed any information, to

21   date to the effect that the CORFs, FHI and Sample

22   knew that the prescriptions were inappropriate or

23   unnecessary?

24        A    What we have developed is a pattern, let's

25   just say suspicious activity.  That's what we have

OFFICIAL COURT REPORTING

71

1   developed to the present time.  Any further leads or

2   anything else that we point to --

3        Q    Have you developed or had any witnesses

4   come forward and given you either written or oral

5   testimony or statement to the effect that these

6   CORFs or the people who manage and operate or work

7   for the CORFs knew that the prescriptions that were

8   being delivered to them setting forth the course of

9   treatment for the patients were inappropriate, and

10  nevertheless went through with them, that's partisan

11  illegal planning.  Has anyone said that to you?

12       A    We have beneficiaries that stated that

13  they didn't need the services.

14       Q    That they didn't need the services?

15       A    Yes.  We have -- I lost the last part of

16  your question.

17       Q    But you have beneficiaries who said they

18  didn't need the service?

19       A    Correct.

20       Q    And some had also said they didn't get the

21  service; is that right?

22       A    Correct.

23       Q    And you have a record of all that, don't

24  you, somewhere in your OI 3's, right?

25       A    We recorded that for you.

OFFICIAL COURT REPORTING

72

1      Q    And the third one is "services not

2    rendered, and/or services not provided as billed.

3    So, this would be what we were just talking about,

4    that some beneficiaries have said to you and your

5    colleagues that they never got services, at least

6    not services which had been billed to their Medicare

7    accounts; is that correct?

8      A    That's correct, sir.

9      Q    Have you had occasion to deal with

10   beneficiaries who are mentally impaired?

11     A    I cannot make that judgment, sir.

12     Q    You know that some people at advanced age

13   develop either Alzheimer's or some other form of

14   dementia or memory losses; isn't that correct?

15     A    I know people who have developed that,

16   yes.

17     Q    And in interviewing these beneficiaries,

18   did you check their medical backgrounds to see if

19   any of them had any mental, any memory disorders?

20     A    The extent of what we pursued at least,

21   sir, it's information that I cannot disclose at this

22   time.  As doing a particular test on the benes we

23   have not.

24     Q    Right.  So, it is possible, and I know we

25   are speculating for the moment, that one or more of

OFFICIAL COURT REPORTING

73

1    the beneficiaries who told you and your colleagues

2    that he or she did not receive services may have

3    been suffering from a memory disorder and you didn't

4    know about it?

5          A    It could be possible.

6          Q    Well, what's the average age of the

7    population that you are looking at here, it's

8    certainly a retirement age, you are dealing with

9    people for the most part.  I know Medicare can cover

10   disabled people below the retirement age, there are

11   people who qualify for that, but we're not talking

12   about that population here, are we, we are talking

13   primarily older people, aren't we?

14         A    We have people below 65, 62 that we have

15   interviewed that are beneficiaries.

16         Q    But for the most part, they are older than

17   that, aren't they?  They're above 62.

18         A    The typical Medicare recipient is an older

19   patient, correct.

20         Q    And have you ever had an occasion which a

21   Medicare beneficiary over the age of 62 or 65 has a

22   memory disorder, is unable to recall consistently

23   events which occurred in the immediate or in the far

24   past?

25         A    It has happened in the past.


OFFICIAL COURT REPORTING

1      Q    And you consider that testimony reliable?

2  When a patient says to you, no I didn't get service,

3  but then you have reason to believe that the patient

4  is suffering from memory disorder?

5      A    I consider every information that I get.

6  Certainly if I have information that a patient is

7  not reliable because of his dementia or any other

8  type of problems that he might have, certainly I

9  have other techniques to verify that information.

10     Q    Let's assume you interview a person, an

11  elderly woman who is 80 years old and she says to

12  you and your agent I never got that service, I have

13  no recollection of ever getting that service.  Do

14  you then go and attempt to determine whether that

15  person is suffering from memory disorder or do you

16  just take that statement at face value?  What's the

17  procedure in your agency?

18     A    Well, there's many things that we do, sir.

19  Nothing that is witten a certain way, you know, it

20  has to go one step, two step to step four.  There

21  are many things that we have at our disposal that we

22  can do to validate that claim.

23     Q    So, what do you customarily do to validate

24  that claim?

25     A    We check billing patterns of outpatients,

75

1    we check the billing background of that patient, we

2    do a number of things.

3        Q    What I'm getting at is, do you check the

4    medical history of that patient?

5        A    Personally, I don't do that.

6        Q    I'm sorry, who does?  Do you ever do that

7    or have you ever done that?

8        A    If there's anything else in that patient's

9    background medically that needs to be verified or

10   checked, we refer that to the corporate -- let me

11   see what I'm going to say, a specialty, a doctor.

12       Q    How would you be alerted to that?

13       A    I'll give you an example.  I have one

14   patient here that I interviewed, I didn't interview

15   him or her, I interviewed the daughter, and the

16   daughter mentioned to me that that beneficiary had,

17   that her mother had suffered, I forget what word she

18   used, but some type of dementia since she was

19   little, I believe.  If I were to use that

20   beneficiary or if I went by that beneficiary's

21   statement had that beneficiary given me a statement,

22   I would certainly check the background.  I don't do

23   it, I don't just check their background just because

24   I think they're old.

25       Q    Well, that's the concern we have from our

OFFICIAL COURT REPORTING

1   side of it, is that we don't know whether somebody

2   who is old, and I have a lot of respect for older

3   people, I'm getting there myself, just had a

4   birthday the other day, I'm 57 so I know what's

5   going on as I get older, nevertheless we're talking

6   about the lives and security of these Defendants

7   here.

8        So, what I'm trying to find out is you're

9   dealing with an older population and with the

10   statements and recollections of these people, is

11   there a procedure which your office has put in place

12   to deal with the possibility that one or more of

13   these beneficiaries suffers from a mental disorder,

14   and if so, what's the procedure?

15        A    I don't have the knowledge of the

16   particular procedure that we have to follow or a

17   regulation that covers that.  I never had that

18   situation, I never encountered that situation in my

19   short experience with health care.  I can tell you

20   that if that were the case, in this situation, I'd

21   make sure that we had explored every area that we

22   had to explore to determine whether that's a valid

23   statement or not.

24        Q    So what we're getting at, I think that if

25   you are given some reason to believe that the

OFFICIAL COURT REPORTING

77

1    patient is suffering from a memory disorder, then

2    you would be alerted.  Otherwise, you don't

3    routinely check for that; is that correct?

4         A    I cannot assume that someone has some

5    disorder just because of age.  No, I don't do that.

6         Q    Is it customary for an agent in

7    interviewing an elderly Medicare beneficiary to ask

8    the patient or beneficiary, "Do you have problems

9    remembering things?"  Do you ever ask that?

10        A    We ask them, we ask them questions that

11   relate to their health.  You can't just ask them

12   like that, that type of question.  You wouldn't

13   answer that question.  They normally tell you if

14   they have some problems, they are going to tell you.

15   If they want to lie to you, regardless of what

16   question you ask, they are going to lie to you.  So,

17   we ask a question as to their background and

18   anything that relates to medical.

19        Q    Then you customarily check the patient's

20   statement against the patient's records.  So, if the

21   patient denies receiving service and then the next

22   step would be to go look at the patient's records

23   and see whether the patient got service and signed

24   for service on more dates, isn't that what you would

25   customarily do to verify it?

OFFICIAL COURT REPORTING

78

1    A    No, sir, not that way, not in that order.
2  We don't do that.

3    Q    We delivered some documents the other day
4  to your counsel, Ms. Rucoba, patient files.  Have
5  you gone through the process yet of taking the 30
6  and 30 the two groups, you had 30 from one and 30
7  from the other, on examining their patient files,
8  and matching it against the statements they made to
9  you?

10    A    I understand you have not provided
11  everything that we need.

12    Q    I probably have, but I've been working on
13  that I suppose, what I'm getting at is if it has the
14  30 and 30, 30 from Sample and 30 from FHI, and you
15  have OI 3's for each of the people who were
16  contacted, presumably, so then you would look at the
17  OI 3's where the patient denied having received
18  service, according to the agent's account of the
19  interview.  Then, you'd go through the patient's
20  file to see whether there is a written record signed
21  by the patient of having received service on a
22  particular date; wouldn't that be the next step?

23    A    Like I said before, we do a number of
24  things.  There is nothing that tells me that I have
25  to abide as to the order I have to do --


OFFICIAL COURT REPORTING

79

1    Q    I know, but wouldn't you believe it

2    appropriate as an agent of the US Government, the

3    greatest government the world has ever seen, to want

4    to verify the statement made by the beneficiary

5    against records which he or she may have signed

6    showing the receipt of services?

7    A    Like I said, sir, yes, we do.  We check

8    many things.

9    Q    Not that specific —

10   A    We check that --

11   Q    Now that I have delivered these records,

12   assuming that the 60 patients who were part of the

13   survey, this random survey are in that group, have

14   you looked at those yet or any of your colleagues

15   looked at it yet?  Pulled those out and attempted to

16   match the 30 and 30 versus the records?

17   A    I briefly looked at the first box that you

18   provided. What has been provided since then, I have

19   --

20   Q    You were out?

21   A    Yeah, I was out; I wasn't here.

22   Q    But I have provided another eight or nine

23   boxes a couple days later.

24   A    I haven't looked at that, no.

25   Q    But that would be appropriate for an

OFFICIAL COURT REPORTING

80

1    investigation of this type, wouldn't it?

2        A    Certainly, you don't take anything likely,

3    I mean.

4        Q    You want to make sure that the 30 and 30

5    which we are statistical samples are reliable?

6        A    Certainly.

7        Q    And you'd want to make sure that there are

8    no documents in there which would have their

9    signatures on them in which they attested to having

10   received services which they denied having received

11   at a later date; is that correct?

12       A    Yes.

13       Q    All right, let's go on to the second

14   paragraph of paragraph 6 of page 6 of your

15   Affidavit.  You indicate that the Medicare payments

16   made to FHI and Sample were drawn and deposited into

17   PENNACLE, NATIONAL, GATEWAY and WEMAC business

18   accounts.  To your knowledge, sir, is there anything

19   illegal about transferring payments like that?

20       A    Illegal about --

21       Q    Just moving money from one account to

22   another.  Assuming that the services are rendered

23   and that the patients qualify and all that stuff,

24   the mere moving of the money from one account to

25   another would not implicate any type of criminal

OFFICIAL COURT REPORTING

81

1     statute, would it?

2          A     Not to my knowledge.

3          Q     Let's go back the previous sentence which

4     is in the first paragraph of paragraph six.  "It has

5     also been discovered that FHI and Sample have

6     engaged in the recruitment of Medicare

7     beneficiaries, which is prohibited."  First of all,

8     what is the nature of that prohibition about

9     recruiting Medicare beneficiaries?  Where is that

10    prohibition found?

11         A     I couldn't do what you did earlier, point

12    out the numbers and all that stuff.  There's a

13    regulation and there's also Medicare.  In fact you

14    can help me with this, another portion of it, I can

15    remember --

16         Q     Are you talking about the policies?

17         MS. RUCOBA: Policies and procedures.

18         WITNESS: Policies and procedures.

19         MS. RUCOBA: It's in the carrier bulletin, FI

20    bulletin.

21         WITNESS: The FI bulletin has also the HIP

22    regulations which outlines the way the service has

23    to be provided and what could be done.

24    BY MR. METSCH:

25         Q     Let me understand this, go back to the

OFFICIAL COURT REPORTING

82

1    analogy I had before.  If a CORF takes out a
2    website, and in the senior citizens home people are
3    amused by computers and they somehow get on the
4    website and they see this beautiful portal page,
5    front page, for the CORF, and then they are
6    motivated to go ask their doctors whether they
7    qualify, and they go through the procedure; is that
8    illegal?  That's a form of recruitment, isn't it?
9    That's called advertising.
10        A    You be the judge of that, sir.  I can't
11   tell you if that's illegal or not; I don't know
12   right now.
13        Q    So, what are you talking about here?  Are
14   you talking about someone paying for Medicare --
15        A    I'm talking you being a barber shop and if
16   you aren't needing any medical services before that
17   pertained to the CORF, and then because your friend
18   told you to go there, you went there, you have no
19   history of any rehabilitary services, that's what
20   I'm talking about.
21        Q    All right, but if, one of the firewalls
22   that's assigned to prevent a raid on the federal
23   treasury is a doctor evaluating that patient, and
24   deciding whether the patient needs the services;
25   isn't that true?


OFFICIAL COURT REPORTING

1    A    Mostly, yeah.

2    Q    So, assuming that a bill is submitted to

3  Medicare by a CORF for services rendered and

4  prescribed by a doctor, assuming all the paperwork

5  is there, the doctor has done it, that is what the

6  system envisions as a way of protecting itself, by

7  having a doctor make the evaluation; isn't that

8  correct?

9    A    I don't think it's envisioned as being the

10  protection, that's certainly the way it should

11  happen.

12    Q    So, what happened here that you say

13  should, what happened here which you claim is

14  prohibited?  What was done when you referred to

15  recruitment of Medicare beneficiaries?  What are you

16  talking about?

17    A    I just gave you an example.

18    Q    It's specifically with respect to these

19  patients.

20    A    That example came from one of the

21  beneficiaries that was --

22    Q    Tell me again so I understand it.

23    A    There were patients that were being called

24  at home and offered services of which the patient

25  never had any type of services before.  A patient

OFFICIAL COURT REPORTING

84

1    that didn't need the services before, let me put it

2    that way.  They were advertised, to put it the way

3    you said it, they were solicited that way.

4        Q    To your knowledge, were the patients paid

5    anything to go get services?

6        A    Not to my knowledge right now, sir.

7        Q    So, your position is that it is illegal or

8    prohibited, is what word you used, for a CORF or

9    someone acting on behalf of the CORF, to call the

10   patient and suggest to the patient, maybe your

11   quality of life could be improved if you got the

12   services we offer; that's not allowed, is that what

13   you are saying?

14       A    What is prohibited is for someone that

15   received services regardless of whether they were

16   contacted or not that did not need it, and there has

17   not been a proper evaluation of such patient.

18       Q    But I'm talking about something else.  You

19   make a statement in your Affidavit that FHI and

20   Sample have engaged in the recruitment of Medicare

21   beneficiaries which is prohibited, so I'm asking you

22   what is illegal or prohibited about recruitment?

23   Assuming that the patient needs the service, which

24   is the assumption I have, so just bear with me for a

25   minute.  Is there anything illegal about recruiting

OFFICIAL COURT REPORTING

85

1     a patient who qualifies for the service, and if so,

2     why is it illegal?

3          A     Going back to my statement in this

4     instance, when I wrote this and when I was

5     investigating, this investigation, the recruitment

6     was that which occurred before.  They were solicited

7     and they never needed services before.  When you put

8     that whole picture together, that's what is

9     prohibited.

10         Q     You and I obviously are using two

11    different sets of hypotheticals here.  My set of

12    hypothetical is that the patient needs the service,

13    but just wasn't aware of the fact that he needed the

14    service, or wasn't aware of the fact that the

15    service was available.  Somebody comes to him and

16    says "You know, you have a hacking cough, and I

17    think you could sure use some respiratory therapy

18    because you're hacking all the time at dinner, and

19    I'm tired of listening to you coughing.  You ought

20    to go see a CORF cause they do great respiratory

21    service."  Is that illegal?

22         A     I'm not using hypothetical situations

23    here, I'm telling you the facts that were presented

24    to me at this point.

25         Q     So, what are those facts?

OFFICIAL COURT REPORTING

86

```
 1        A      I just mentioned to you --
 2        Q      Some of these people were called up?
 3        A      If somebody told me that they needed —
 4   yes.
 5        Q      And these were people that didn't need the
 6   service?
 7        A      They were people that had no history of
 8   such conditions that would need for them to receive
 9   the services.
10        Q      Is it possible that a patient can go for
11   many, many years not knowing that he or she is
12   suffering from some affliction, only to be told
13   later on in life, you know all these years you've
14   had chronic obstructive pulmonary disorder or
15   something like that, and you didn't know it, and the
16   fact that you're always short of breath, you thought
17   was because you had a short diaphragm or something,
18   it turns out you got lung disorder.  Isn't it
19   possible that the patient could be educated as to
20   some problem after many years and realized for the
21   first time, years down the road, that he or she has
22   a problem?
23        A      I would not tell you a possibility in a
24   medical field of which I have no expertise on.  I'll
25   tell you that what I've been, people have discussed
```

OFFICIAL COURT REPORTING

1    that are experts, certain amount of experts, tell me

2    that in order for a client or for a beneficiary to

3    use your words, COPD, chronic obstructive pulmonary

4    disease, there are certain, there are steps that

5    need to be taken.  I mean, you aren't diagnosing the

6    COPD on the first visit.

7         Q    So, who told you this?

8         A    We have spoken to the nurse that we

9    mentioned before.

10        Q    Who's that?

11        MS. RUCOBA: Brenda Heck.

12        WITNESS: Brenda.  So I have relied on their

13   expertise and their --

14   BY MR. METSCH:

15        Q    Brenda, who works for First Service

16   Options?

17        A    Correct.

18        Q    This is a good time to take a break, it's

19   five minutes to one.  I know you want to take a

20   break for lunch.  I think we can do it pretty

21   quickly.  Can we do it in 25, 30 minutes for lunch?

22        MS. RUCOBA: Yeah, 1:30?

23        MR. METSCH: 1:30.

24             (Lunch break was taken)

25   BY MR. METSCH:


                    OFFICIAL COURT REPORTING

88

1    Q    We are proceeding now on page six of your

2    Affidavit, second half of the page starting with the

3    words "The undersigned affiant has reviewed the

4    following records and documents." The first one is

5    "a. Medicare billing and payment information from

6    January 5, 1998 through and including November 12,

7    1999, provided by First Coast Services Options,

8    Inc....the fiscal intermediary for these providers;

9    See Attachment #15." So, was Attachment #15 what

10   we're talking about? When you say "See Attachment

11   #15" does that mean those were the records that you

12   examined?

13   A    Some of the records were effects on this.

14   Q    What I have for Attachment #15 of your

15   Affidavit is something called "Daily Summary

16   Workload Report, Sample Road Rehabilitation \10-

17   3238. That must be the provider number. So this is

18   prepared by Debbie Williams, MAFB Data Analysis.

19   What is MAFB, it's got to be McClure Air Force Base,

20   right?

21   A    Yeah.

22   Q    Maxwell Air Force Base?

23   A    No, it's not air base. I don't think it's

24   a base, where are you reading that, sir?

25   Q    I just like Air Force Base. What is it?

OFFICIAL COURT REPORTING

89

```
 1          A    I'll have to defer that question to her, I

 2    mean --

 3          Q    It's not an Air Force Base? No?  Not

 4    Maxwell?  Not Montgomery? Not McDill, nothing?  All

 5    right.  So where did you get this information from?

 6    This Attachment #15?

 7          A    From the provider.  I'm sorry, from the

 8    carrier.

 9          Q    And this is a printout based on a computer

10    sort and printed out, something, what does it show

11    me?  What is this?  It shows, oh, I got you.  I

12    don't have it.  Can you explain what the information

13    is that's on there?  I don't understand what this

14    is.

15          A    It says a summary, it's basically that

16    the, looking for the right word here, the

17    beneficiaries, I take it back.  Let me look at this

18    first.  Okay, it is -- it tells us the service

19    dates, the physician that referred the services, I'm

20    sorry, attending physician, the number of claims for

21    that physician for that particular time frame

22    submitted, HICN's --

23          Q    What's an HICN?

24          A    That's a HICN number; that's the bene

25    number, the beneficiary number.
```

OFFICIAL COURT REPORTING

90

1          Q    And that tells the amount paid?  So this
2    would show for example, the first entry on Exhibit
3    15 to your Affidavit, is the date 01/05/98 to
4    01/05/98, the very top one, all right.  It shows Dr.
5    Bodden's number; that's his identifying number?
6          A    Correct, I think it's the same, yeah.
7          Q    So, in one day he had on 1/15/95 claims
8    for eight different beneficiaries; is that it?
9          A    Correct.
10          Q    And it shows $8,850.00 billed and
11    $3,740.00 paid; is that correct?
12          A    Correct.
13          Q    So you reviewed all this.  So what
14    imprints did you draw from all these numbers that
15    are here?  What do they mean to you?
16          A    Well, sir, the only information that I
17    reviewed.
18          Q    What else did you review?
19          A    I reviewed the other exhibits.
20          Q    Let's make it real clear, okay.  If you
21    look under "a" on page six you say "See Attachment
22    #15."  These are the medical billing, the Medicare
23    billing and payment information for these two
24    providers, FHI and Sample, for that period, "See
25    Attachment #15."  Does Attachment #15 deal with

OFFICIAL COURT REPORTING

91

1     those two providers for that period?

2          A     Correct.

3          Q     Did you look at any other Medical payment

4     information for that period for these two providers,

5     other than what's on Attachment #15?

6          A     I'm not completely sure it was the same

7     period.  I have looked at other billing information,

8     maybe for different periods.

9          Q     The next one is, you referred me to #16,

10    which is records of complaints received against FHI

11    and Sample.  So, if we look at, make sure that we've

12    got Exhibit 16 to the Affidavit, this is a listing

13    of ten different complaints?

14         A     Correct.

15         Q     Who prepared this document?

16         A     This comes from the provider, I mean, I'm

17    sorry, from the carrier, as well.

18         Q     And did you review each of the complaints?

19         A     I don't review each one of them.

20         Q     Did you review any of them?

21         A     I looked at some of them that I can recall

22    right now.  I can tell you the paper I reviewed.

23         Q     If you look at this,can you tell me what

24    the complaints mean?  There's a code here.  Does it

25    mean --

OFFICIAL COURT REPORTING

92

1       A    If you look at the type I couldn't tell

2    you what it means, but NRS means non-rendered

3    services.

4       Q    I'm looking here. Where is -- okay I see

5    that.  All right so all but two say non-rendered

6    services and the other two say other; is that right?

7       A    That's correct.

8       Q    Are these the people who called up and

9    said they didn't get service, but it showed up on

10   their Medicare report they got in the mail from

11   Medicare; is that right?

12      A    Everyone, if it was a sickness like that

13   for everyone, I know they called and they complained

14   about the claim, that it hasn't been billed or it

15   was billed under their name.

16      Q    So they called the Medicare Fraud Hotline

17   in all liklihood and they made a complaint that

18   these items weren't theirs?

19      A    There's another line they can call also.

20   The carrier has another number.

21      Q    And what kind of backup records are there

22   for this summary sheet that we have here, Exhibit

23   16?  Do you have a file on each one of these

24   complaints?

25      A    They are complaints; we requested them,

OFFICIAL COURT REPORTING

93

1    but I couldn't tell you right now if we got all of

2    them.

3        Q    So what are they, let's take for example,

4    typically, just pick any one of them.  Let's say

5    Hoffman what would be -- would there be a file of a

6    complaint for Hoffman or was it just a phone call?

7    Is there a written complaint; is there a follow up;

8    is there an investigation?  What is it?

9        A    My experience is that they keep a record

10   of the conversation that takes place between the

11   complaintant and the person who takes the complaint,

12   and I don't know what kind of a report it generates.

13   I've seen computer printouts, the screen printouts,

14   they outline what the complaint was.  I've seen

15   other pages that they generate that it's like an

16   inhouse report for them.  Exactly how the file

17   should look like, I couldn't tell.

18       Q    Have these complaints been independently

19   investigated to see if they were well taken?

20       A    We have reviewed the complaints.  We have

21   determined, wait a second, personally, I looked at

22   one complaint that I can remember right now.  Any

23   other steps that we have taken with these

24   complaints, I refrain from answering at this moment

25   as it might jeopardize the investigation, but we

OFFICIAL COURT REPORTING

94

1    have all the complaints at hand.  I'm almost

2    positive that they requested the natural file on the

3    complaint.

4        Q     Somebody calls up and says I just got my

5    Medicare statement and it shows service rendered at

6    Sample Road Rehab Facility, and I never went

7    anywhere near Sample Road, so I think that is fraud

8    here, and that's tape recorded, that's a telephone

9    conversation that was tape recorded, assumably, or

10    somebody is sitting at the other end typing

11    something into a computer reflecting that a phone

12    conversation was had.  Do you know what the

13    procedure would then be to verify the complaint, or

14    is it just logged in as a complaint and nothing was

15    done?

16        A     That responsibility -- I don't know what

17    that responsibility would be to review that.  I

18    can't answer that.

19        Q     You don't know?

20        A     For them, meaning the carrier.

21        Q     Right.

22        A     There's many steps I would take once I

23    received this, and one will be to request the actual

24    complaint.

25        Q     But you haven't gotten it yet?

OFFICIAL COURT REPORTING

95

1        A    To the best of my recollection at this

2    moment I don't believe we have gotten it yet.

3        Q    So when you refer to records and

4    complaints received against FHI and Sample which is

5    on your Affidavit, page 6, you're just talking about

6    this printout, a summary, just a listing of people

7    who called in without any knowledge of specifically

8    what each one complained about, isn't that correct?

9        A    On this, yes, I referred to this.

10       Q    And that's all this refers to is records

11    of complaints refers to #16 and to nothing else; is

12    that correct?

13       A    Correct, at this time, yes.

14       Q    And you have not talked to any of the

15    complainants listed in Exhibit #16, have you?

16       A    Personally, I haven't talked to anyone at

17    all.

18       Q    Have any of your colleagues at the OIG

19    talked to any of them?

20       A    To the best of my recollection nobody has

21    talked to them right now, sorry, no.

22       Q    We do know that somebody working for the

23    carrier, which is the fiscal intermediary, talked to

24    them because that's how the complaints were lodged;

25    is that correct?

OFFICIAL COURT REPORTING

96

1        A      Correct.

2        Q      Have any of your people talked to the

3    people, the carrier, who took these complaints?

4        A      Have they talked to the complainant, no we

5    have not talked to them.

6        Q      All you know is, at the moment, is that

7    the carrier characterized the complaint, as in all

8    but two of the cases, as no rendered services.

9    That's all you know, isn't it?

10        A      At the moment that I looked at when I

11    drafted my Affidavit, yes, sir.

12        Q      And today do you know any more about these

13    complaints than what you knew when you did the

14    Affidavit a few weeks ago?

15        A      I know one in particular that --

16        Q      Which one was that?

17        A      Hold on, let me go back.  The only one

18    that comes to mind right now that I reviewed or

19    anything was Draper, and you're looking at the

20    complaint, but right now I don't have any more

21    information.  Again, I've been gone and they should

22    have, somebody should have done something else about

23    this.

24        Q      You don't know if anybody in your office

25    has contacted Mr. or Ms. Draper to find out the

OFFICIAL COURT REPORTING

97

1    details of the complaint?

2        A    I don't know right now, sir, no.

3        Q    As we sit here today you don't know what

4    kind of service was billed to which these people

5    objected, do you?

6        A    I cannot recall the services. We went

7    back and checked some of this compared to the

8    billing data and we can elicit what services were

9    billed. As to the validity of the complaint any of

10   the stuff we, I haven't done anything yet.

11       Q    So what significance does these complaints

12   have if you haven't verified them?  What does it

13   mean?  It's just items on a piece of paper?

14       MS. RUCOBA: Objection.  Argumentative, but you

15   can answer.

16       WITNESS: The significance because anyone that

17   takes the time to call, as long as it takes to be on

18   that line to complaint about services not rendered,

19   that has a lot of validity to me on the face of it,

20   and of course, that's not the only thing I do with

21   it.

22   BY MR. METSCH:

23       Q    What else do you do with it?

24       A    We investigate it.  We talk to those

25   people.  We talk to the people about it.

OFFICIAL COURT REPORTING

98

1     Q    Have you talked to these people yet?

2     A    No, I have not talked to them yet.

3     Q    Has any of your people talked to them yet?

4     A    I answered that before.  I said --

5     Q    No, I don't know.

6     A    All right.

7     Q    We looked at State of Florida corporate

8 records and I think your testimony, we looked at

9 bank account information.  You said here the bank

10 account information was that information obtained

11 from the financial institutions through subpoena?

12    A    The financial institution provided me

13 information.  As to the means of how I obtained the

14 information, that's information that I refuse to

15 disclose.

16    Q    All right.  Got 'cha.  And the State of

17 Florida corporate records, and I believe your

18 testimony earlier was that you would have downloaded

19 information from the Secretary of State's website

20 through the internet, but you were waiting for the

21 original corporate records; is that correct?

22    A    Yes, sir.

23    Q    The next one "E." The "Health Care

24 Financing Administration...regulations that

25 govern...CORF services."  At the beginning of the

OFFICIAL COURT REPORTING

99

1    deposition I showed you a series of Regulations

2    dealing with that, but I think you stated you were

3    not familiar with any of them.   Which Regulations

4    did you review if not the ones I showed you?

5         A    I didn't say I wasn't familiar with them.

6    That wasn't the question you asked me.

7         Q    Well, it says here --

8         A    I understand --

9         Q    I've reviewed the following records and

10   documents.   So what have you reviewed in Health Care

11   Financing Administration Regulations?

12        A    If I can I want to make something clear.

13   When you showed me the records before I said I had

14   never seen those ones.

15        Q    That's right.

16        A    Because they are not valid government

17   records, and Department records.

18        Q    That's true.

19        A    That's what my answer was.

20        Q    That's right.   You haven't seen it printed

21   in that format?

22        A    Correct.

23        Q    Because that's from the West Publishing

24   Company from West Law?

25        A    Correct.


OFFICIAL COURT REPORTING

100

1    Q    So, when your doing it you've reviewed

2    those same Regulations before, but in a different

3    printed format; is that correct?

4    A    I reviewed Regulations and procedures that

5    were given to me by the carrier in the form of a

6    fax, and they did research for me because they know

7    where to go, and I reviewed some of those records to

8    date, the same as those, I'm assuming that.

9    Q    So, you relied on the carrier which is the

10   government contractor, to alert you as to which

11   Regulations apply and how they are implicated here;

12   is that correct?

13   A    Correct, sir.

14   Q    Who is your primary contact at the carrier

15   for this investigation?  Who do you deal with

16   mostly?

17   A    Eva Jean McRae, she's an investigator.

18   Q    All right.  The next one is "F."  "FHI's

19   and Sample's 1998 Cost Report."  You haven't

20   attached the Cost Report to the Affidavit, have you?

21   A    No.  I didn't.

22   Q    Where is the Cost Report, where are those

23   Cost Reports?  Do you have them in your file?

24   A    We have the records we received --

25   Q    But I understand with CORFs that each year

101

1  they are required to file cross reports of the

2  preceding calendar year to determine if they had

3  been overpaid or underpaid; is that correct?

4       A    They are required to consolidate their

5  payments.  I guess, yeah, you can say whether

6  overpaid or underpaid.

7       Q    Right.  So if it's retrospective analysis

8  of the cost experience of each CORF provider is done

9  by a Cost Report, and the government reserves the

10  right to audit the Cost Report to make sure it's

11  accurate; is that correct?

12       A    I understand that's the way it's done.

13       Q    So, you had not, what I'm getting at is

14  that in this Affidavit you have not attached as an

15  Exhibit, either the 1998 FHI Cost Report or Sample's

16  Cost Report, have you?

17       A    No, not at this time.

18       Q    But you do have copies of them available

19  in your files because you made reference to them,

20  isn't that correct?

21       A    I had to have copies, exactly.

22       Q    All right.  Let's go to paragraph 7.  I

23  take it that the "A," "B," and "C were derived from

24  the Cost Report, or actually #17.  Let's look at

25  #17.  This is #17.  Is that her name?


OFFICIAL COURT REPORTING

102

1      A     Yeah.

2      Q     Eva Jean McRae, okay.  I've looked at

3   these documents which compose Government's Exhibit

4   #17, and I don't understand what I'm looking at.

5   First of all, the print is very small, but secondly,

6   do you understand what this means?

7      A     That's the reason the name is there.

8      Q     If I were to ask you to take the first

9   page of Exhibit #17 and tell me what all this means,

10  could you decipher this for me?

11     A     I would not give you that.  I cannot tell

12  you without any doubt that the information here or

13  the information that I might give you is completely

14  accurate.  I can read where it says "physical

15  therapy" and it says "units" which is claims and the

16  amount that was charged, at least that much.  It

17  gives you the time prints on top.

18     Q     You know, I see this.  Here's one for

19  January 7, 1998 to 12/11/98, and there's one January

20  1, 1999 to 12/31/99.  So, I think the deduction you

21  made out of this was that '98, this one, Florida

22  Health Institute, submitted mostly physical therapy,

23  and then in '99 did respiratory service primarily;

24  is that correct?

25     A     I verified that for that report, yes.

OFFICIAL COURT REPORTING

103

1    Q    So that's for the purpose of having this

2    here; is that correct?

3    A    Correct.

4    Q    To show a shift from physical therapy to

5    respiratory?  Is that why you put this as an

6    Exhibit?

7    A    Actually, so you know where I'm coming

8    from on this, sir.

9    Q    All right, good.  Let's get back.  If you

10   go to "d" on your Affidavit on page 7, paragraph 7,

11   that's in fact the deduction you come to.  In 1999

12   FHI and SAMPLE claims consisted of ninety-nine

13   respiratory therapy?

14   A    Yes.

15   Q    Then, the next statement is "According to

16   FIRST COAST auditors and investigators, the main

17   reason for this shift is due to the fact that

18   respiratory therapy has no capitation fee."

19   Whereas, the "...$1,500.00 capitation fee imposed on

20   the other types" versus the $1,500.00 capitation fee

21   imposed on the other types of therapy.  It's really

22   not capitation in the HMO sense, it means there is a

23   cap on how much you get paid for each patient, for

24   example, physical therapy; is that correct?

25   A    It's a yearly capitation fee.


OFFICIAL COURT REPORTING

104

1        Q     Yearly limits?

2        A     Limit.

3        Q     Right, cap or limitation, but with respect

4    to respiratory, there wasn't any; is that right?

5        A     Respiratory therapy, as I understand, it

6    has no cap.  Okay?  And it is also cost base.

7        Q     All right.  Is there anything illegal

8    about entreprenuers changing from a line of work in

9    which their income potential is limited to one which

10   is based where there is no government limitation,

11   assuming everything else is legal?

12       A     That's nothing illegal on the base of it

13   when you add everything, you know.

14       Q     These financial records show that the only

15   source of income for FHI and SAMPLE are the Medicare

16   payments deposited into the respective business

17   accounts, that's paragraph "E" of your page 7,

18   paragraph 7 of your Affidavit.  In your experience

19   in dealing with CORFs, do CORFs typically bill other

20   payers other than the government?  Do they bill

21   insurance companies, or do they get paid from

22   private sources, or from trusts and estates, or in

23   most part most CORFs are paid almost entirely from

24   Medicare; isn't that correct?

25       A     In this case, yes --

OFFICIAL COURT REPORTING

105

1       Q    What other CORFs have you dealt with?

2       A    I haven't dealt with other CORFs.

3       Q    Is this the first time you have ever dealt

4  with CORFs?

5       A    Yes, sir.

6       Q    Who is, on your team, who is considered

7  the leading CORF veteran?  You're not obviously,

8  this is your first CORF case.  Is there somebody who

9  is the CORF jock on this thing?

10      A    No, not really.

11      Q    No one has ever done CORFs before?

12      A    I wouldn't say no one has ever done CORFs

13  before, I am saying that no one is designated as

14  being the --

15      Q    CORF, the head honcho of the CORF, right?

16      A    Well, you said it.

17      Q    There are other terms I learned in the

18  service, I'm not going to use them now, all right?

19      A    Of course.

20      Q    All right, let's go down to "F" which is

21  "Once the Medicare checks are" you can read that as

22  well as I do, but this is on the bottom of page 7,

23  the top of page 8, assuming that everything else was

24  lawful, meaning that all the services were properly

25  described and rendered and all that, was there

OFFICIAL COURT REPORTING

1     anything illegal about the way the money moved out

2     of the providers into these other accounts?

3          A     Assuming everything else was --

4          Q     Assuming everything else was legal?

5     There's nothing illegal about moving money, correct?

6          A     No.

7          Q     What is, I look here at the next one "G."

8     "On November 18, 1999, Nations Bank erroneously

9     failed to lift a hold placed on Medicare

10    deposits.... This hold caused checks written from

11    those accounts to HOUSLEY's, CHOI's, and MIGNOTT's

12    investment accounts to bounce."  Why is this in the

13    Affidavit, what's the relevance of that?

14         A     The relevance was that it was Medicare

15    money that was going elsewhere.

16         Q     Well, if the Medicare money went into the

17    providers, the providers paid all the workers,

18    everybody who had done the work, and there was money

19    left over, that's called profit, isn't it?  Isn't

20    that what profit's all about in this country?  Is

21    there any restriction on what they do with that

22    money?

23         A     No, I never implied there have to be any

24    restrictions.

25         Q     So, what is the implication, if any, from

OFFICIAL COURT REPORTING

1    putting "G" in there?

2         A    What is the question again?

3         Q    Why is "G in here?

4         A    The purpose of the whole Affidavit was to

5    put a hold on all their accounts.

6         Q    I know.

7         A    And in order to do so, I have to show that

8    all the accounts were related to this particular

9    situation.

10        Q    But don't you also have to show that there

11   was a danger that the claims were all going to

12   disappear and that's what --

13        A    I showed my probable cause and the Judge

14   gave me the TRO.

15        Q    Probable cause for what, to believe what?

16        A    To believe that there were problems with

17   these claims, and there was illegal activities

18   happening in these situations.

19        Q    So, subparagraph "G" of paragraph 7 refers

20   to an incident in which Nations Bank dishonored some

21   checks and apologized for it?

22        A    Uh-huh.

23        Q    There's nothing illegal about that event;

24   is there?

25        A    No, there isn't anything illegal about

OFFICIAL COURT REPORTING

108

1    that.

2         Q     Let's go to the next one "H." "On January

3    1, 2000" Defendant Choi who is sitting here today,

4    "wire $100,000 from the GATEWAY business account to

5    the Bahamas."

6         Assuming everything else was in order, and I

7    know it's an assumption you dispute, but that's

8    okay, is there anything illegal about wiring

9    $100,000 to the Bahamas?

10        A     There's nothing illegal with that.

11        Q     Also, the next one "I." "January 7, 2000"

12   same thing "HOUSLEY wire $250,000 from the NATIONAL

13   business account to Canada" is there anything

14   illegal about that assuming everything else is

15   proper?

16        A     Assuming everything is proper, there is

17   nothing illegal to anywhere.

18        Q     All right.  Let's look at "J."  "On June

19   22, 1999, Diane Nieto, the Assistant Administrator

20   for FHI, certified in FHI's 1998 Cost Report that

21   FHI had no related organizations" so, let's look at

22   Exhibit #21.  This is, would you please look at

23   Exhibit #21 on your Cost, on your Affidavit.  This

24   is a Cost Report questionnaire, right?  This is

25   called a Provider Cost Report Reimbursement

OFFICIAL COURT REPORTING

109

1    Questionnaire.   Provider name, Sample Road
2    Rehabilitation Center.
3         A     This is actually part of the Cost Report.
4         Q     This was prepared in May of '99 covering
5    the period 01/01/98 to 12/31/98; isn't that correct?
6         A     I can see what --
7         Q     But in this case the government alleges
8    that in some time the middle of '99 is when these
9    three gentlemen took over these two providers; isn't
10   that what you're saying in this case?
11        A     I didn't say -- I didn't say here they
12   took over in the middle of the year.
13        Q     When did they in your understanding, did
14   these three gentlemen take over the providers?
15        A     At the moment that I deducted this I had
16   no knowledge as to when within that year or anywhere
17   before that.
18        Q     So, what I'm getting at, I'm having a
19   problem with the connection here, in June of '99 in
20   the '98 Cost Report there was a certification by the
21   Assistant Administrator for FHI that FHI had no
22   related organizations.  Then you move into the next
23   year, and your Affidavit says that in 1999 PENNACLE,
24   WEMAC, GATEWAY and NATIONAL opened business accounts
25   in 1999.  Isn't that what you say in your Affidavit?

110

1      A    What is your question?

2      Q    Well, what's the relationship between a

3  certification from '98 and something that happened

4  in '99?  Why is there --

5      A    Well, probably it shouldn't have been

6  done, but I still don't understand your question.  I

7  mean, is it in the wrong place?

8      Q    What is the relevance of the fact that --

9  let's -- in '98 there's a certification that there

10  was no related party?

11      A    Correct.

12      Q    Now, you are saying there is a related

13  party, and the related parties are PENNACLE, WEMAC,

14  GATEWAY and NATIONAL, okay?  Are you suggesting here

15  that the Cost Report for '98 was incorrect or

16  correct?

17      A    The Cost Report for '98 was prepared, I

18  don't think I have a date on this --

19      Q    There's a date up here.

20      A    Is it?  In the middle of '99 asked whether

21  you have related parties that certain organizations

22  that you have dealt with and you have Financial

23  Trust and if you are the owner or not.  That wasn't

24  reflected here.

25      Q    But this report only dealt with 1998?  So,

OFFICIAL COURT REPORTING

111

1    let's assume as of the date that this report,

2    Exhibit #21 was prepared, and there were related

3    parties, it wouldn't show up in this report because

4    the report only dealt with the previous calendar

5    year?

6        A    That's possible.

7        Q    Then ask for '99 and ask for '98, am I

8    correct?

9        A    That's what it says here, yes.

10       Q    All right, let's go to the next one, "8."

11   We looked before paragraph 8 at "...a total of ten

12   beneficiaries contacted the Fraud Control Hotline"

13   we've already worked that over, right?

14       A    Uh-huh.

15       Q    Your testimony, the way I remember it now,

16   is you may have examined one of those complaints,

17   but you haven't yet interviewed, you or your

18   colleagues have not interviewed the ten

19   complainants; is that correct?

20       A    To the best of my recollection.

21       Q    Attachement #16, paragraph 9 of your

22   Affidavit then refers to Attachment #16 again.  Let

23   me see if I can find the sentence.

24       A    There's a second behind that we looked at.

25       Q    I'm going to look at it now.  The second

OFFICIAL COURT REPORTING

112

1      page, this is one complaint that was received in

2      January, 2000, NRS, no rendered service or

3      non-rendered service; is that it?

4          A    NRS, correct.

5          Q    And has anybody from your team interviewed

6      beneficiary Paxton?

7          A    To the best of my recollection, to the

8      best of my knowledge, no.

9          Q    So, what's the relevance of this other

10     than the fact that someone made a complaint?

11         A    It was a complaint.

12         Q    It's, I know we're not going to get a

13     definitive answer from you, but it's conceivable

14     that somebody sitting around, just someone who may

15     have a grudge against the world, could pick up a

16     phone and just call in and say I didn't get this

17     service and just want to make life miserable for

18     somebody; isn't that possible?

19         A    That's possible, sir.

20         Q    All right.  Let's look at paragraph "10."

21     "On January 12, 2000 at 10:00 AM, FIRST COAST and

22     HCFA auditors visited the FHI location."  Who were

23     they?

24         A    I cannot recall the names.  I can give

25     them to you.  I know there was an auditor for sure,

OFFICIAL COURT REPORTING

1    but for the life of me I cannot remember the names.

2        Q    So, how do you know what happened here?

3    You now talk about a representation by a Lyn Prado

4    that Un Young Choi was the owner of FHI.  Where did

5    this come from, this information?  So that's #22.

6    This is a document provided to you by whom?  Who

7    filled this out?

8        A    According to this, it's signed by Eddie

9    Vila.

10       Q    So this is Exhibit #22.

11       A    You have it.

12       Q    I have it right here.  Had you personally

13   talked to Eddie Vila?

14       A    I have not.

15       Q    And Eddie Vila works for whom?  I'm trying

16   to read this, it says Sr. Auditor, but who does he

17   work for?  The intermediary, right?

18       A    Blue Cross/Blue Shield. I don't think he

19   falls under the First Options portion of it.

20       Q    Has Eddie Vila given a sworn Affidavit

21   other than this provider type visit report?

22       A    No, he hasn't, sir.

23       Q    Do you know if any of your members of your

24   team have interviewed Mr. Vila?

25       A    Not to my knowledge.

OFFICIAL COURT REPORTING

114

1      Q     So, the only thing you have is this piece

2   of paper which is in your files?

3      A     Correct.

4      Q     And that's what this paragraph 10 is based

5   on this piece of paper and nothing else; is that

6   correct?

7      A     Correct.

8      Q     All right, let's go to paragraph 11.  It

9   refers to "A stratified random sample."  What is a

10  stratified random sample?

11     A     A state guideline of Sample.

12     Q     Yes, what does it mean?

13     A     That's a process that a carrier, actually

14  it is a computer program that has been developed.

15  It was developed by HCFA, Health Care Financing

16  Administration given to the carriers, and they used

17  that to take an inquiry of the universe or the

18  beneficiaries provided service by a particular

19  provider, and they have a way of coming out with a

20  representative of that universe, and normally it's

21  30, and that's what this is.

22     Q     So the computer randomly picks 30

23  beneficiaries by a provider and then the team goes

24  out and uses these 30; is that correct?

25     A     That's correct.

OFFICIAL COURT REPORTING

1          Q      And we were talking earlier about the

2     truths of those interviews recorded in the OI 3's;

3     is that right?

4          A      That's right.

5          Q      But you sitting here today, you weren't

6     able to tell me which beneficiaries said what, cause

7     look at 11 "a", you really don't know that here, do

8     you?

9          A      That's the reason for this.

10         Q      Show me what you have because we are going

11    to mark that as an exhibit to this.  This will be

12    Defendant's Exhibit "B."

13         (Defendant's Exhibit "B" was entered as

14    evidence.)

15         MS. RUCOBA: That's fine.  Mark a copy.

16         MR. METSCH: Let's make some copies right now.

17         MS. RUCOBA: I don't think the color coding will

18    come out.

19         MR. METSCH: I don't care about the color

20    coding.  Let's just get them through. Let's take a

21    break for a minute.

22              (A brief recess was taken.)

23    BY MR. METSCH:

24         Q      Exhibit "B" has just been copied and it is

25    a two-page document.  The first page we'll use

116

1     Florida Health Institute, Provider 10-3251, and the

2     second one will be Sample Road Rehabilitation, 10-

3     3238.  It will be a composite of two pages.  I

4     notice you have color coding on your sheet, Mr.

5     Rodriguez.  What does the color coding represent?

6          A    To make it easier for me.

7          Q    So, you have categorized which ones did

8     not receive services, could not be located, or

9     receive services, or out of town, and referred by

10    friends?  So we go back to your Affidavit on page 9,

11    paragraph 11, subsection "a", subparagraph "a",

12    we're dealing with the first page of Exhibit "B"

13    which deals with Florida Health Institute.  This

14    survey, just to refresh our recollection, was

15    conducted by your team; is that correct?

16         A    That's correct, sir.

17         Q    And there are OI 3 reports which were

18    backed up, all the conclusions that were reached; is

19    that correct?

20         A    Yes, sir.

21         Q    Where on this sheet other than the coding

22    you've had, is there any notation as to received,

23    not received, could not be located?  It doesn't

24    appear on the sheet, does it, other than the

25    notations you made?

OFFICIAL COURT REPORTING

1      A     That's what the actual code is for, red is

2      received services, the green is did not receive

3      services, and the pink is could not be located.

4      Q     The problem I have is that on my copy, I

5      have black and white, so I can't tell the colors.

6      So the only way to tell is through your color code

7      since the copies did not come out in color; is that

8      right?

9      A     You can mark them.

10     Q     That's work.  I'll have to do that after

11     the deposition.  I don't want to take up your time.

12     MS. RUCOBA: I'll provide you with a color copy

13     after the deposition.

14     MR. METSCH: Fine, I appreciate it.

15     MS. RUCOBA: I knew they wouldn't copy.

16     BY MR. METSCH:

17     Q     I was asking for that in a around about

18     way.  Very good.  And just again to confirm this,

19     you have not yet, we had this discussion during the

20     break, you have not had the opportunity to check

21     these beneficiaries who reported no receipt of

22     service against the patient files because some fo

23     the patient files are missing; is that correct?

24     A     Right.

25     Q     Have you had a chance to check any of them

OFFICIAL COURT REPORTING

118

1    against any of the no received services against

2    patient files; have you found any yet?

3          A    I personally haven't done that.

4          Q    Has anybody on your team done that yet?

5          A    Not to my, the best of my knowledge.

6          Q    Let's look at the second page.  We have

7    the same situation; is that correct?  Have you had

8    the chance at the Sample Road Rehabilitation to do a

9    check from the patient records and the result of

10   this survey?

11         A    The same as the one before it.

12         Q    Just so I know exactly who conducted the

13   interviews, these were OIG agents as opposed to

14   being employees of the contractor?

15         A    That's correct.

16         Q    Is that right?

17         A    Yes, sir.

18         Q    These are OIG agents?

19         A    Yes.

20         Q    Let's go to paragraph 12.  "At the present

21   time, SAMPLE has approximately $7,215.00 in pending

22   Medicare payments."  What does that mean?  Those are

23   claims that are pending and nothing ruled on yet?

24         A    Payments that have not been -- determined

25   and not have been made in that amount.  I cannot

OFFICIAL COURT REPORTING

1    recall right now whether they were claims that had

2    not been processed, or what stages the claim was at,

3    but there's monies that have not been released by

4    the carrier.

5         Q    What about FHI?  Anything pending on them?

6         A    As of this Affidavit, there was nothing

7    pending at that time.

8         Q    Let's look at paragraph 13.  It says "Your

9    affiant" meaning you, Mr. Rodriguez,"has reviewed

10   the data supplied as to the application and payments

11   received by FHI and SAMPLE, and assures that the

12   information in this Affidavit is accurate."  Which

13   data are you talking about?

14        A    I recognize it here on my information that

15   I reviewed and it says that I provided.

16        Q    How do you know this is accurate?  Say,

17   for example, you look at you got these printouts,

18   random.  We pick one.  Just let's look at Exhibit

19   #23.  You were relying upon a computer telling us

20   this information; is that correct?

21        A    Actually, it was provided to me, yes.

22   That's what I have right here.

23        Q    All you are saying is that somebody else

24   provided you with this information, but you have not

25   conducted an individual verification or audit of the

OFFICIAL COURT REPORTING

120

1      information given to you by the carrier, have you?

2          A    No, I have not.

3          Q    How do you know that it's accurate, other

4      than the fact that you relied on what they gave you?

5          A    I relied on what they gave me, it was

6      accurate, it was not tampered with, nothing was done

7      with it, as far as that is concerned, it's accurate,

8      as to going back to that.

9          Q    You don't know whether they did it right

10     or did it wrong, do you?  You don't know whether the

11     carrier, First Coast Service Options, which is Blue

12     Cross/Blue Shield of Florida compiled the

13     information correctly?

14         A    I would like to believe that they did it

15     right.

16         Q    That's right, but you don't know.  All I'm

17     saying is that you don't know, you don't have

18     personal knowledge that they compiled it correctly?

19         A    Nothing led me to believe that it was any

20     other way.

21         Q    But all you have to say is yes.  You have

22     no way of knowing, you're relying on them, right?

23         A    Yes.

24         Q    So for all we know today, in the absence

25     of somebody who can tell us that is how the data was

OFFICIAL COURT REPORTING

1    compiled and verified, we don't know if it's

2    accurate or not, other than the fact that you

3    believe that they are credible, reliable, and

4    wouldn't knowingly give you anything that was

5    inaccurate?

6        A    Correct.

7        MR. METSCH:  Counsel, do you have a copy of the

8    Complaint in this case available?  I just want to

9    ask the witness a few questions.  All I have is my

10   copy.  I do have an extra one.  In your packet of

11   materials, do you have a copy of the Complaint?

12   Yeah, now.  My version of it here is Exhibit "A",

13   this is Exhibit "B", these documents will be

14   included in the transcript as attachments to the

15   transcript, all right?  Here we go.  This is marked

16   as Exhibit "C."  This is a copy of the government's

17   complaint in this case.

18     (Defendant's Exhibit "C" was marked as evidence.)

19   BY MR. METSCH:

20       Q    I have given you, Mr. Rodriguez, a copy of

21   the government's complaint in this lawsuit, which is

22   the basic pleading which initiated the case.  Have

23   you ever seen this before?

24       A    Yes, I did, sir.

25       Q    When was the first time you saw it?

OFFICIAL COURT REPORTING

122

1         A     When I was -- this was included in the
2    whole package I was filing to the Court.
3         Q     And did you deliver it to the Court?
4         A     Yes, I did.
5         Q     The filing?
6         A     I did.
7         Q     You also served these, among other
8    documents, on several of the Defendants, didn't you?
9         A     Correct.
10        Q     And you've read this before, haven't you?
11        A     I went through it, yeah.
12        Q     Did you play a role in drafting this in
13   any way?
14        A     No.
15        Q     To your knowledge did Ms. Rucoba draft
16   this?
17        A     To my knowledge, Ms. Rucoba drafted it.
18        Q     We've omitted many of the allegations, so
19   we've narrowed it down by -- just want to ask you a
20   few questions in the areas we have not admitted.
21        Turn to page 9, paragraph 27.  If you look at
22   the last sentence in paragraph 27 of page 9 of the
23   Complaint, it makes reference also to your
24   declaration, which is your Affidavit, in the last
25   sentence, "Based upon a review of billing patterns,

OFFICIAL COURT REPORTING

1     First Coast determined that the shift in billing for

2     SAMPLE and FHI is due to the fact that respiratory

3     therapy has no capitation fee, versus the $1,500

4     capitation fee imposed on the other types of

5     therapy."

6          Do you know whether First Coast made that

7     determination only from billing patterns or did they

8     actually talk to somebody at the providers and get

9     that information based solely upon your review of

10    billing patterns?

11         A     I don't know what they based that

12    information on I know they told me that, and that's

13    one of the things I looked at.  How they came to

14    that conclusion, I couldn't say.

15         Q     The sentence does say, "Based upon a

16    review of billing patterns" so I was wondering if

17    you knew whether First Coast had anything in

18    addition to a review of the billing patterns on

19    which it bases determination that the shift in

20    billing was due to the absence of a cap?

21         A     I don't have anything else on it.

22         Q     Let's go to paragraph 30, on page 10.

23    "Based upon the information gathered, the random

24    sampling data and the records reviewed by S/A

25    Rodriguez, the investigation has disclosed that FHI

OFFICIAL COURT REPORTING

124

1    and SAMPLE are engaged in the following illegal

2    activities."

3         Then, it lists the three in your Affidavit, and

4    is there anything other than what we have discussed

5    today included in that first sentence of paragraph

6    30, that you know?  Is there anything else that FHI

7    and SAMPLE or its principals were alleged to have

8    done other than what we have discussed today?

9         A    Only what is in my Affidavit, that's

10   pretty much of it here.

11        Q    When it comes to recruiting which is

12   mentioned in the next sentence.  "It has been

13   discovered that FHI and SAMPLE have engaged in the

14   recruitment of Medicare beneficiaries which is

15   prohibited."  Have you developed any specific

16   information about recruiting, and if so, what is it?

17   What exactly were you talking about when it says

18   recruiting?  Who did the recruiting and how was it

19   done?

20        A    What question do you want to ask first?

21        Q    Both.  Who did the recruiting and then

22   after you identified who the recruiters were, how

23   was it done?

24        A    You asked a question before that.

25        Q    Let's just do this one right now.  How was

OFFICIAL COURT REPORTING

125

1     the recruitment done?

2          A     As we discussed before.  We were

3     discussing about the phone calls and something of

4     that nature.

5          Q     Who did it?  Who did the recruiting?

6          A     Who did that?

7          Q     Yes, who did that?

8          A     That's information I cannot disclose at

9     this moment.

10         Q     Why not?

11         A     Because it is part of the investigation.

12         Q     Well, I would just like the record to

13    reflect that we're obviously very interested in

14    knowing that because that's part of our defense in

15    this case.  So I have a little homework to do,

16    counsel, to see whether that comes under the work

17    product and privilege, or I'm sure you're aware of

18    it, back in the days of the Fair Labor Standards

19    Act, the Labor Department had a privilege, because

20    you're a Labor Department lawyer, there was an

21    informer's privilege or complaining witness

22    privilege and the government didn't have to disclose

23    that for fear of retaliation.

24         Are we dealing with that right now, is that the

25    kind of privilege we are talking about in that he

OFFICIAL COURT REPORTING

126

1    refuses to answer the question or is it just

2    a work product privilege?

3        MS. RUCOBA: I believe it's just a work product

4    privilege.  I'm not entirely sure.

5        MR. METSCH: Because I would like to know before

6    I go off doing something that's an embarrassment,

7    which would embarrass me if we have a privilege for

8    an informant or whether we have a privilege here for

9    work product.

10        MS. RUCOBA: I'll let you know.

11        MR. METSCH: Thank you, because we are not by

12    being courteous, we are not acquiescing in your

13    stonewalling us, even though you are doing it very

14    nicely, and very professionally, and I appreciate

15    it, we still have to know this information.  So with

16    respect to every question that you have declined to

17    answer because of ongoing investigation, we will

18    pursue the matter or at least we will seriously

19    consider pursuing the matter and try and get the

20    information.

21    The next sentence it says here "Recruitment allows

22    FHI and SAMPLE to submit claims on behalf of

23    Medicare beneficiaries without possibly obtaining an

24    appropriate physician referral as required."

25        The hypothetical that I proposed to you earlier

OFFICIAL COURT REPORTING

127

1    were situations in which patients may have been

2    recruited, but then went through a physical

3    evaluation by a doctor.

4        If a patient was actually recruited by a

5    recruiter, assuming there is such a thing as a

6    recruiter here, if he then went through a physical

7    evaluation and the doctor said yes, this patient

8    needs therapy, respiratory therapy or pulmonary,

9    whatever it is, then there wouldn't be a danger, at

10   that point.  The danger would have been corrected,

11   it would have been dealt with, isn't that correct?

12       If the only -- let me take it this way: is it

13   true that the only danger from recruitment is that a

14   patient would get services without a physician

15   prescription, is that what you are concerned with?

16       A    My concern is that nobody should be

17   recruited.  If anyone needs services, I wouldn't

18   think they had to wait untils someone comes to them

19   and say this is a nice location, let's go here.

20       Q    I'm going to give you a hypothetical and

21   show you why we have a problem with that.  Let's

22   assume you have an elderly person who has got some

23   disorders, can't breathe, coughs and coughs, refuses

24   to see a doctor, and his or her grandchild says to

25   him, grandpa, I can't stand your coughing like this

OFFICIAL COURT REPORTING

128

1    every time I come, I know you can get some therapy

2    and I know some people who live in our project whose

3    elderly relatives have been treated successfully.

4    I'm going to take you if you like it or not because

5    I want to keep you around a few more years.  Is

6    there anything illegal about that?

7        A    That situation is perfect.

8        Q    What you object to is where someone is

9    acting on behalf of the agency or CORF would make

10   the call and suggest to the patient or the prospect,

11   come on in and get service; is that right?

12       A    If they don't need the services, nothing

13   else.

14       Q    But if it turns out they do need the

15   service then there is no problem here is there?

16       A    I would have to say the totality of the

17   circumstances to determine that.

18       Q    You say in the last sentence of that

19   paragraph, it says "These individuals" meaning

20   HOUSLEY, CHOI AND MIGNOTT "are connection to the

21   illegal activities of FHI and SAMPLE."  Just to make

22   it clear, the illegal activities we are talking

23   about are the ones in paragraph 30 which are

24   providing services to Medicare beneficiaries that

25   were not referred by a physician, providing services

OFFICIAL COURT REPORTING

129

1   to Medicare beneficiaries that were not medically

2   necessary, and services not rendered and/or services

3   not provided as billed.  Those were what you were

4   talking about, correct?

5        A    Correct.

6        Q    But sir, isn't it true that the only

7   actionable aspect of this that would really cause

8   the government concern is not the rendition of

9   service, or the rendition of service to someone who

10  is not qualified, but the presentation of a claim to

11  the government for payment.  Isn't it theoretically

12  possible that a CORF could render services to

13  someone who is not qualified, and not bill it, and

14  the government have no interest in it; isn't that

15  correct?

16       A    I mean, my job is to assess claims,

17  investigations for the government, that situation --

18       Q    That's right.

19       A    That situation --

20       Q    That situation the government doesn't get

21  hurt does it?

22       A    It's not our jurisdiction to look at that.

23  Somebody else might.

24       Q    Who else would look at it?

25       A    I couldn't answer that question.


OFFICIAL COURT REPORTING

1      Q    Maybe some state licensing board or

2   something, but as long as the government is not

3   called upon, the federal government, is not called

4   upon to pay for a service, then from the federal

5   government's perspective there is nothing illegal;

6   would you agree with that?

7      A    I don't agree with that that's it's not

8   illegal.  I might agree that I might not be

9   investigating it.

10     Q   But it would not be illegal under federal

11   law, it might be questionable under state law for

12   example, but under federal law, which you are

13   responsible for investigating, but it would not be a

14   problem if no bill was submitted to the federal

15   government?

16     A    I wouldn't be involved in the

17   investigation, no.

18     Q   Right, and so not until we get these three

19   things in paragraph 30 in connection with paragraphs

20   31 through 35 that we have a problem and thereafter

21   under the False Claims Act, so that's what we are

22   really talking about today, isn't it?  This is like

23   putting together a puzzle and the first 30

24   paragraphs of the Complaint set forth the factual

25   predicate, and now we can see the actual claims in

OFFICIAL COURT REPORTING

1    starting with paragraphs 31 and on; is that correct?

2        Look at paragraph 31, we don't have to worry

3    about that, that's just a reallegation of 1 through

4    30.  Let's go to paragraph 32, here's an allegation

5    that all the Defendants, the corporate and

6    individual Defendants "have presented or caused to

7    be presented false and fraudulent claims upon the

8    United States in violation of 18 USC, Section 287.

9    Defendants have knowingly and wilfully presented or

10    caused to be presented false and fraudulent claims

11    to First Coast, the fiscal agent administering the

12    Medicare program."

13        So we have two different sentences; the first

14    one is an allegation of a presentation to the United

15    States of a false claim, and the second sentence

16    there is one of a false claim to First Coast; is

17    that correct?

18        A    That's the way I read it.

19        Q    I notice that Section, 18USC, Section 287

20    is only signaled on the first sentence of those two,

21    but not on the second.  Do you know why?

22        A    Sir, I didn't draft that document.

23        Q    Now, paragraph 33 says "Defendants' fraud

24    upon the United States constitutes a continuing and

25    substantial injury to the United States and its

OFFICIAL COURT REPORTING

132

1      citizens."

2          Now, earlier in the deposition you confirmed to

3      me that the provider numbers for these two

4      providers, Florida Health Institute and Sample Road

5      have been suspended; is that correct?

6          A    Yes.

7          Q    So what is the continuing and substantial

8      injury to the United States that we're facing that's

9      alleged in paragraph 33?

10          A    Sir, you are asking me questions on a

11      document I didn't draft.

12          Q    That's right.  I'm asking you if you know?

13      Is there any danger or injury, I'm sorry, at the

14      moment with those two provider numbers were

15      suspended, does there exist a continuing and

16      substantial injury to the United States and its

17      citizens as a result of these activities as apparent

18      under these present circumstances, and if so, what

19      is it?

20          A    By FHI and Sample certainly not because

21      they are suspended.

22          Q    And anybody else?  That was the sole

23      source of their money was Medicare, wasn't it?

24          A    Correct.

25          Q    So if they're not getting any money and

OFFICIAL COURT REPORTING

133

1    their claims aren't being processed and they won't

2    be paid, where is the danger or the injury?

3         A    I never said it was a danger or injury,

4    sir.  Again --

5         Q    That's what this pleding says.

6         A    Right, it is --

7         Q    I'm just asking.  Let's go to paragraph

8    34.  It says here "The United States brings this

9    action to protect Medicare funds by restraining

10   Defendants' unlawful fraudulent conduct and to

11   protect and restrain the transfer of funds and

12   assets now in Defendants' hands as ill-gotten gains

13   from their fraud upon the Medicare program."

14        So, do you know sir, what the government's

15   position is notwithstanding or even, let's put it

16   this way.  Is it the government's position, to your

17   knowledge in this case, that even though the

18   Medicare provider numbers for Florida Health and

19   Sample Road have been shut off, that there's still a

20   danger to the United States of funds being

21   transferred, and that's what

22   we're talking about?

23        A    Those two accounts?  No.

24        Q    So what is the position on that?  Those

25   funds are, whatever happened to those funds,

OFFICIAL COURT REPORTING

134

1    happened to those funds?  Nothing more is going to

2    happen the government stopped, the government got a

3    freeze order on those funds, didn't they?

4         A    I suppose, yes.

5         Q    So there is no continuing danger to the

6    United States as to the funds that were frozen; is

7    that correct?

8         MS. RUCOBA: Let me state for the record, that

9    the government's position is the Defendants have

10    failed to comply with the TRO and identify all

11    assets in its possession.  There are accounts, we

12    believe, that were unaware of.  That's the danger.

13    We believe Medicare money has been transferred to

14    other accounts that we were unable to freeze.

15    That's the continuing danger.

16         MR. METSCH: That's what I need to know.  Thank

17    you.

18    BY MR. METSCH:

19         Q    Let's look at paragraph 35, first

20    sentence.  "Upon a showing of a reasonable and

21    substantial likelihood that Defendants are violating

22    18 U.S.C., Section 287, the United States is

23    entitled, under 18 U.S.C., Section 1345, to a

24    preliminary injunction, and a permanaent injunction

25    restraining furture fraudulent conduct and any other

OFFICIAL COURT REPORTING

135

1     action which this Court deems just in order to

2     prevent a continuing and substantial injury to the

3     United States," but there is, again I know it sounds

4     like I'm beating a dead horse, but at the moment

5     there is no danger of further violation of 18

6     U.S.C., Section 287 by these providers, is there?

7          A    We don't know that, sir.

8          Q    Well, we got two providers each one with a

9     provider number that's been suspended, how can the

10    government possibly be hurt by a violation of 18

11    U.S.C., Section 287 under these circumstances?

12         MS. RUCOBA: Well, we state that the

13    government's position is that the individual

14    Defendants may be operating other CORFs and may be,

15    in fact, submitting false and fraudulent claims

16    through other CORFs.  We didn't have enough evidence

17    to bring an action against those other CORFs at the

18    time that we filed the Complaint.

19    BY MR. METSCH:

20         Q    Let's go to Count II, paragraph 37.  We've

21    admitted 37, that the government has asserted a

22    claim for treble damages under the False Claim Act,

23    and then it says, paragraph 38, "From June 1, 1999,

24    Defendants have presented or caused to be presented

25    claims for payment to the United States knowiong

OFFICIAL COURT REPORTING

136

1      such claims were false, fictitious, or fraudulent,

2      or with reckless disregard or deliberate ignorance

3      of the truth or falsity of the claims."

4          What evidence do you have as the case agent or

5      one of the co-case agents in this thing, that the

6      Defendants knew that the claims they submitted to

7      the United States were false, fictitious or

8      fraudulent?  How do you know that?

9          A     Well, the information we have developed by

10     violation of their being the controlling parties of

11     the bank accounts as well as the companies.  This

12     led us to believe they have knowledge of what went

13     on during, by filing those claims.

14         Q     What I'm asking you specifically has

15     anybody told you, anybody who worked for or with or

16     had contact with these Defendants, corporate or

17     individual, told you that these claims were

18     knowingly, false, fraudulent or fictitious and that

19     the Defendants knew that they were so when they

20     submitted them, have you had anyone testify to that

21     or give you information to that or is it an

22     inference that you derived from the documents

23     reviewed?

24         A     I derived that from the documents that I

25     reviewed.

OFFICIAL COURT REPORTING

137

1        Q     But you have no other testimony or

2   statement from anybody else to support that

3   allegation at this time?

4        A     At this time, to the best of my knowledge,

5   I don't have that.

6        MR. METSCH:  What I would like to do now is

7   take a five minute break.  I need to confer with my

8   clients because I think we are about finished.

9              (A brief recess was taken.)

10       MR. METSCH:  We have no further questions.  I

11   thank the witness for his courtesy.  I would just

12   like to reiterate that we'll probably pursue those

13   areas of inquiry where the witness declined to

14   answer on the basis of an ongoing investigation, and

15   we also request that the Assistant US Attorney

16   provide us with a color coded Exhibit B because we

17   can't determine which ones are which without color

18   coding.  So, Ms. Rucoba was very gracious and agreed

19   to do that.  At this time our questions are

20   finished, so you can question the witness if you

21   like.

22       MS. RUCOBA: I have no questions and we'll read.

23       MR. METSCH: Fine, no problem. I've asked the

24   Court Reporter to get us the transcript at her

25   earliest convenience.


OFFICIAL COURT REPORTING

138

1        THIS CONCLUDES THE ABOVE PROCEEDING.

2        THREUPON: THE READING OF THE DEPOSITION WAS WAIVED.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


OFFICIAL COURT REPORTING

139

1                    REPORTER'S CERTIFICATE

2      STATE OF FLORIDA        )

3      COUNTY OF DADE           )

4          I, Melanie Stinson, Shorthand Reporter, certify

5      that I was authorized to and did stenographically

6      report the foregoing following proceeding of the

7      deposition of S/A Bernardo Rodriguez, and that the

8      transcript is a true and complete record of my

9      stenographic notes.

10         I further certify that I am not a relative,

11     employee, attorney, or counsel of any of the

12     parties, nor am I a relative or employee of any of

13     the parties' attorney or counsel connected with the

14     action, nor am I financially interested.

15         Dated this 24 day of February, 2000.

16

17         _____

18                    MELANIE STINSON

19                    SHORTHAND REPORTER

20     My Commission Expires:

21                          MELANIE STINSON
                            COMMISSION # CC 644967
22                          EXPIRES MAY 7, 2001
                            BONDED THRU
23                          ATLANTIC BONDING CO., INC.

24


                    OFFICIAL COURT REPORTING