UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6143-CIV-
FERGUSON/SNOW

UNITED STATES OF AMERICA,

          Plaintiff,

v.

FLORIDA HEALTH INSTITUTE,
INC., etc., et al.,

          Defendants.
_____/



### NOTICE OF SUPPLEMENTAL AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PLAINTIFF TO PRODUCE AND PERMIT THE INSPECTION AND COPYING OF COMPLETED FORMS OI-3

(Fla. Bar No. 133162)

Defendants, by their undersigned attorneys, in connection with the above styled civil action, hereby give notice of the following supplemental authorities which support their March 3, 2000, Motion To Compel Plaintiff To Produce And Permit The Inspection And Copying Of Completed Forms OI-3:

    (1)    *United States v. O'Neill*, 619 F. 2d 222 (3rd Cir. 1980), a copy of which is attached hereto as Exhibit "A".

    (2)    *United States v. Ernstoff*, 183 F.R.D. 148 (D.N.J. 1998), a copy of which is attached hereto as Exhibit "B".

                                                           Respectfully submitted,

>METSCH & METSCH, P.A.
>Attorneys for Defendants
>1385 N.W. 15th Street
>Miami, Florida 33125
>(305) 545-6400
>FAX: (305) 545-7224
>
>by _____
>   LAWRENCE R. METSCH
>   FBN 133162

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing notice was delivered this 6th day of March, 2000, to:

>Laurie E. Rucoba, Esq.
>Assistant U.S. Attorney
>500 East Broward Blvd.
>Suite 700
>Fort Lauderdale, FL 33394
>FAX: (954) 356-7180

_____
LAWRENCE R. METSCH

2

LAW OFFICES OF METSCH & METSCH, P.A.
1385 NW 15 STREET, MIAMI, FLORIDA 33125 • TELEPHONE 305-545-6400 • TELECOPIER 305-545-7224

619 F.2d 222                           **Page 1**
6 Fed. R. Evid. Serv. 643
**(Cite as: 619 F.2d 222)**
H

UNITED STATES of America, Appellant,
v.
Joseph F. O'NEILL and Frank A. Scafidi, Appellees.

No. 79-1665.

United States Court of Appeals,
Third Circuit.

Argued December 11, 1979.

Decided March 13, 1980.

United States moved for enforcement of subpoena duces tecum issued upon Philadelphia police department pursuant to the Civil Rights Act. The United States District Court for the Eastern District of Pennsylvania, 81 F.R.D. 664, denied motion, and United States appealed. The Court of Appeals, Sloviter, Circuit Judge, held that: (1) where city's claim of executive privilege was invoked orally although there had been ample opportunity to prepare written formal claim of privilege, and where there was no indication that department heads made type of personal careful examination which must precede invocation of privilege, manner of invoking privileges was unsatisfactory, and (2) city did not have unqualified privilege not to disclose matters relating to on-going criminal investigations and pending litigation.

Vacated and remanded.

[1] FEDERAL CIVIL PROCEDURE ⚙=1600(4)

170Ak1600(4)
Formerly 170Ak1600.3
Where Philadelphia police department commissioner's and chief inspector's claim of executive privilege was invoked orally although there had been ample opportunity to prepare a written formal claim of privilege, and where it was invoked by an attorney rather than the department head, manner in which city asserted its claim of privilege after it was subpoenaed by the United States Civil Rights Commission which sought documents relating to allegations of police brutality, was unsatisfactory. Civil Rights Act of 1957, § 105(f, g), 42 U.S.C.A. § 1975d(f, g).

[2] FEDERAL CIVIL PROCEDURE ⚙=1558.1
170Ak1558.1
Formerly 170Ak1558
Under ordinary circumstances, objection to production of documents on ground of privilege should be made in writing. Fed.Rules Civ.Proc. Rule 34(b), 28 U.S.C.A.

[3] MUNICIPAL CORPORATIONS ⚙=58
268k58
Although city solicitor's legal opinion is binding on department heads, Philadelphia home rule charter does not operate to substitute city solicitor's legal judgment for departmental responsibility of city official.

[4] WITNESSES ⚙=306
410k306
Fifth Amendment privilege is personal to person invoking it. U.S.C.A.Const. Amend. 5.

[5] FEDERAL CIVIL PROCEDURE ⚙=1600(3)
170Ak1600(3)
Formerly 170Ak1600.2
It is clearly inappropriate to invoke work product protection for documents which are not product of any attorney preparation, such as complaints filed by citizens, records of action taken by police department in disposing of those complaints, and, indeed, any records of department's own investigations into such complaints.

[6] FEDERAL CIVIL PROCEDURE ⚙=1600(1)
170Ak1600(1)
Formerly 170Ak1600
If valid claim of privilege is properly invoked, party who seeks information must show need for it so that court can balance on one hand the policies which give rise to the privilege and their applicability to the facts at hand against need for evidence sought to be obtained in the case at hand.

[7] CIVIL RIGHTS ⚙=341
78k341
Formerly 78k31
In absence of any evidence to the contrary, requested material is presumptively relevant and the United States Civil Rights Commission is presumptively entitled to enforcement of subpoena. Civil Rights Act of 1957, § 105(f, g), 42 U.S.C.A. § 1975d(f, g).

[8] ADMINISTRATIVE LAW AND PROCEDURE ⚙=464
15Ak464

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works


EXHIBIT A

619 F.2d 222 **Page 2**
(Cite as: 619 F.2d 222)

Courts traditionally give wide latitude in determining relevance in context of administrative subpoena.

[9] CIVIL RIGHTS ⚖️345
78k345
Formerly 78k31
In proceedings wherein the United States Civil Rights Commission subpoenaed commissioner and chief inspector of Philadelphia police department for documents relating to allegations of police brutality, relevance and need for information sought were established, thus, shifting inquiry to nature of protection from discovery claimed by city. Civil Rights Act of 1957, § 105(f, g), 42 U.S.C.A. § 1975d(f, g).

[10] FEDERAL CIVIL PROCEDURE ⚖️1600(4)
170Ak1600(4)
Formerly 170Ak1600.3
Executive privilege comprehends military and state secrets and the deliberative process of high executive officials.

[11] FEDERAL CIVIL PROCEDURE ⚖️1600(4)
170Ak1600(4)
privilege.
Formerly 170Ak1600.3
There is a privilege or protection against disclosure of certain government documents which are made confidential by statute. Federal Aviation Act of 1958, § 701(e), 49 U.S.C.A. § 1441(e); Social Security Act, § 1106(a), 42 U.S.C.A. § 1306(a).

[12] FEDERAL CIVIL PROCEDURE ⚖️1600(4)
170Ak1600(4)
Formerly 170Ak1600.3
In proceedings wherein United States Civil Rights Commission subpoenaed commissioner and chief inspector of Philadelphia police department for documents relating to allocations of police brutality, city did not have unqualified executive or governmental privilege not to disclose information with regard to matters subject to ongoing criminal investigations and pending criminal and civil litigation at the state and federal level. Civil Rights Act of 1957, § 101 et seq., 42 U.S.C.A. § 1975 et seq.; U.S.C.A.Const. Amends. 5, 14.

\*224 Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Division, Theodore A. McKee (Argued), Asst. U. S. Atty., Philadelphia, Pa., for appellant.

Sheldon L. Albert, City Sol., James M. Penny, Jr., Deputy City Sol., Ralph J. Teti (Argued), Asst. City Sol., Philadelphia, Pa., for appellees.

Before ROSENN, MARIS and SLOVITER, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

The United States has appealed from the district court's denial of the Government's motion for enforcement of administrative subpoenas issued by the United States Civil Rights Commission upon Joseph O'Neill, then Commissioner of the Philadelphia Police Department, and Frank A. Scafidi, then Chief Inspector, Internal Affairs Bureau of the Philadelphia Police Department. The portions of the subpoenas at issue here requested the production of documents and records by the City of Philadelphia relating to investigations into reports of alleged brutality on the part of named police officers. The district court denied enforcement of the subpoenas on the basis of executive or "governmental" privilege.

II.
Facts

On February 6, 1979, the United States Commission on Civil Rights (the "Commission") began a series of public hearings in Philadelphia as part of the Commission's ongoing inquiry concerning denials of equal protection of the law under the Constitution and in the administration of justice. The hearings were part of a broader national inquiry by the Commission into the possible need to revise federal legislation to deal more effectively with the problem of police abuse. The Commission was created by Congress in 1957 and empowered to investigate, study, and collect information concerning denials of constitutional rights and equal administration of justice. Civil Rights Act of 1957, Pub.L.No.85-315, 71 Stat. 634. The Commission has the authority to hold hearings and issue subpoenas for the attendance of witnesses and for the production of written material. 42 U.S.C. s 1975d(f). If any person refuses to obey the subpoenas, the Commission may apply to a United States district court for an enforcement order. 42 U.S.C. s 1975d(g).

Prior to the scheduled February 6 hearings in

Philadelphia, the Commission served subpoenas upon Police Commissioner O'Neill and Chief Inspector Scafidi. The subpoenas called for the production of extensive documents relating to training, investigation and discipline in the Philadelphia Police Department. O'Neill and Scafidi supplied most of the requested material but refused to comply with Paragraph IV of the O'Neill subpoena and Paragraphs 1 through 7 of the Scafidi subpoena calling for the production of material on the Police Department's response to allegations of police brutality on the part of thirty-one named officers. Paragraph IV of the O'Neill subpoena requested, inter alia:

> All records, documents, reports, notes, of any description whatsoever from any *225 source pertaining to the investigation by the Homicide Division, the Internal Affairs Bureau, or any other part of the Philadelphia Police Department into any actions which resulted in allegations of excessive, inappropriate, deadly or illegal use of force by the following current or former police officers listed on pages 3 and 4.

The section of the Scafidi subpoena to which the City objected corresponded to Paragraph IV of the O'Neill subpoena.

Following the City's refusal to supply the requested information, the Government filed a motion to enforce the subpoena pursuant to 42 U.S.C. s 1975d(g) giving the district courts jurisdiction to require the production of "pertinent, relevant and non-privileged" subpoenaed material. Following several conferences with the district court at which some additional material was produced by the City, the Government's motion to enforce was argued on February 16, 1979.[FN1] The court denied the motion to enforce in an opinion delivered from the bench. The Government's subsequent motion to reconsider was also denied.

> FN1. The number of officers whose investigating files are at issue has been reduced from 31 to 22. The City brief notes that there were no files as to some of the named officers, and the City withdrew its objection as to disclosure of certain other files.

### III.
### Manner of Assertion of Privilege

The City's refusal to comply with paragraph 4 of the subpoena was asserted orally by the City Solicitor when he appeared together with and on behalf of Commissioner O'Neill and Inspector Scafidi at the Commission's executive session on February 6, 1979, the date listed in the subpoena for compliance. At that time the City claimed compliance would violate the officers' fifth amendment privilege against self-incrimination, the attorney-client and work product privileges, and the police officers' due process rights, and that the nature of much of the material sought would tend to degrade and defame individual officers.

The City also claimed in oral argument before the district court that the police officers named in the subpoena were the subject of 13 criminal actions, 30 civil actions, and potential future indictments stemming from federal and state grand jury investigations. The City claimed that release of the subpoenaed information would "materially interfere with the City's ability to properly defend outstanding lawsuits versus the City and versus the individual officers." The defense of "governmental" privilege was alluded to in the City's legal memorandum submitted to the district court. When pressed on the point during oral argument the City Solicitor stated that he would "claim executive privilege, too . . . ."

[1] We find unsatisfactory the manner in which the City has asserted its claim of privilege. In the first place, it was invoked orally, although there was ample opportunity to prepare a written formal claim of privilege. In the second place, it was not invoked by the department head, but by the attorney for the City. There was no affidavit, and no indication that the privilege was being invoked by the responsible public official on the representation that he had personally examined the documents and determined nondisclosure was required. In the third place, it was a broadside invocation of privilege, which failed to designate with particularity the specific documents or file to which the claim of privilege applied.

[2] When a request for relevant documents or information is made, a claim of privilege should be interposed judiciously and not casually. Under ordinary circumstances, objection to production of documents on the ground of privilege should be made in writing. The same rationale for requiring that a party objecting to a request for production of documents under Fed.R.Civ.P. 34(b) must submit a written response specifying the objection to each category applies equally to the response to a subpoena duces tecum. This gives each party the opportunity to analyze the request and the corresponding objection, and gives the court a fuller record on which to *226 base its

ruling. It also provides some assurance that the party asserting the privilege has directed his or her attention to the scope of the claim being asserted.

The appropriate manner in which privilege should be invoked was set forth by the Supreme Court in United States v. Reynolds, 345 U.S. 1, 7-8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953), where the Court said:

> There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for a claim of privilege....

Although the Court in that case was dealing with the claim of privilege for state and military secrets, "its prerequisites for formal invocation of the privilege have been uniformly applied irrespective of the particular kind of executive claim advanced." Carter v. Carlson, 56 F.R.D. 9, 10 (D.D.C.1972).

In Smith v. Federal Trade Commission, 403 F.Supp. 1000 (D.Del.1975), Judge Schwartz held that the FTC improperly invoked executive privilege with respect to certain documents, noting that to support a claim of executive privilege at least three requirements must be satisfied. The head of the agency claiming the privilege must personally review the material, there must be " 'a specific designation and description of the documents' claimed to be privileged," and there must be "precise and certain reasons for preserving" the confidentiality of the communications. Usually such claims must be raised by affidavit. Id. at 1016; see also Black v. Sheraton Corp. of America, 184 U.S.App.D.C. 46, 57-58, 564 F.2d 531, 542-43 (D.C.Cir.1977); Pierson v. United States, 428 F.Supp. 384, 392-96 (D.Del.1977); Center on Corporate Responsibility, Inc. v. Schultz, 368 F.Supp. 863, 872-73 (D.D.C.1973) (claim of executive privilege involving Nixon tape rejected because not invoked personally by President who had custody of allegedly privileged matters).

[3] The City contends that the privilege was properly invoked in this case because Commissioner O'Neill and Inspector Scafidi accompanied the City Solicitor when the City Solicitor invoked the privilege on their behalf before the Commission. Although the City Solicitor's legal opinion is binding on the department head, Philadelphia Home Rule Charter 4-400, this does not operate to substitute the City Solicitor's legal judgment for the departmental responsibility of the city official. It has been suggested that it is inappropriate for the privilege to be invoked by attorneys instead of by the department head. See Thill Securities Corp. v. New York Stock Exchange, 57 F.R.D. 133, 138 (E.D.Wis.1972); Carter v. Carlson, 56 F.R.D. at 11; but see Frankenhauser v. Rizzo, 59 F.R.D. 339, 342 n.6 (E.D.Pa.1973). We need not decide if this is always the case, but there was no indication here that the department heads made the type of personal careful examination which must precede invocation of the privilege.

[4][5] It is patent from the record in this case that wholesale claims of privilege were made by the City without discrimination as to the grounds for the claims and their applicability to the documents requested. For example, the claim of the Fifth Amendment privilege was interposed, although such a claim could not conceivably apply to many of the documents requested such as all citizen complaints involving the named officers, the names of all individuals charged with the responsibility of investigating any complaint against the specified police officers, and records of administrative measures taken by the Philadelphia Police Department in investigating and disposing of any complaints against the named officers. Furthermore, the Fifth Amendment privilege is personal to the person invoking it, Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 440, 95 L.Ed. 344 (1951); Bowman v. United States, 350 F.2d 913, 915-16 (9th Cir. 1965), and there is no indication that either Commissioner O'Neill or Inspector Scafidi was claiming the privilege of self-incrimination on his own behalf. Another example of the City's summary assertion of privilege is its claim of work product "privilege," in actuality not a privilege *227 at all but a protection of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of the party concerning the litigation. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); United States v. Amerada Hess Corp., 619 F.2d 980, at 987 (3d Cir.1980). It is clearly inappropriate to invoke the work product protection for documents which were not the product of any attorney preparation, such as complaints filed by citizens, records of action taken by the Police Department in disposing of those complaints, and, indeed, any records of the Department's own investigations into such complaints.

The indiscriminate claim of privilege may in itself be sufficient reason to deny it. The court when faced with

such a claim cannot make a just or reasonable determination of its validity. Even when the privilege has been asserted by the President of the United States, the Supreme Court has rejected it when it depended "solely on the broad, undifferentiated claim of public interest in the confidentiality of . . . conversations" and has refused to extend deference to a President's "generalized interest in confidentiality." United States v. Nixon, 418 U.S. 683, 706, 711, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) (emphasis added). See also Senate Select Committee on Presidential Campaign Activities v. Nixon, 370 F.Supp. 521 (D.D.C.), aff'd, 162 U.S.App.D.C. 183, 498 F.2d 725 (D.C.Cir.1974) (President's assertion of executive privilege rejected because President did not permit in camera inspection or provide particularized description of applicability of privilege). Accordingly, the district court erred in accepting the City's claim of privilege in the form and manner in which it was interposed in this matter.

IV.
Commission's Assertion of Need

[6] If a valid claim of privilege is properly invoked, the party who seeks the information must show the need for it so that the court can "balance on one hand the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case at hand." Riley v. City of Chester, 612 F.2d 708 at 716 (3d Cir. 1979).

The functions and purposes of the Commission were summarized in the report of the House of Representatives recommending passage of legislation to extend the life of the Commission to at least 1983 and broaden its scope to cover discrimination against the handicapped. The report stated:

> The Commission investigates complaints alleging the denial of the right to vote by reasons of race, color, religion, sex or national origin, or by reason of fraudulent practices. It studies and collects information concerning legal developments and also appraises Federal laws and policies with respect to the denial of equal protection of the laws which fall within its jurisdiction or in the administration of justice. The Commission further serves as a national clearinghouse for information concerning denials of equal protection of the laws because of race, color, religion, sex or national origin.

House Comm. on the Judiciary, Civil Rights Commission Act of 1978, H.R.Rep.No.95-1140, 95th Cong., 2d Sess. 2-3, reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 2639, 2641.

According to the Government's Motion for Reconsideration filed in the district court, the Government was prepared to introduce evidence to show that the purpose of the Commission's hearings in Philadelphia was to investigate allegations of police misconduct, ascertain the nature of that misconduct, identify formal department policies and procedures relating to police conduct and discipline, identify the officials in agencies legally responsible for investigating and resolving allegations of police misconduct, and evaluate the availability and effectiveness of existing systems of accountability, both internal and external.

*228 The Commission then planned to determine whether its findings reflected discrimination or a denial of equal protection under the Constitution, appraise the laws and policies of the Federal Government with respect to discrimination or denials of equal protection particularly as such relate to police practices, and disseminate pertinent and appropriate information. The Commission planned that its inquiry would include a case study of those particular incidents and/or officers which have received extraordinary notoriety so as to determine the effectiveness and the manner in which the internal complaint procedures have operated or failed to operate. The Commission asserts this case study is important in allowing the Commission to determine whether certain types of complaints or complaints about certain police officers are handled in a manner which is inconsistent with the stated police policies or with the manner in which other complaints are handled.

[7][8] In the absence of any evidence to the contrary, the requested material is presumptively relevant and the Commission is presumptively entitled to enforcement of the subpoenas. Courts traditionally give wide latitude in determining relevance in the context of an administrative subpoena. See United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950); Endicott Johnson Corporation v. Perkins, 317 U.S. 501, 507-509, 63 S.Ct. 339, 342-343, 87 L.Ed. 424 (1943); Federal Trade Commission v. Texaco, Inc., 180 U.S.App.D.C. 390, 555 F.2d 862 (D.C.Cir.), cert. denied, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). In

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Perkins, the Court stated that administrative subpoenas must be enforced if the documents sought could be pertinent to a legitimate agency inquiry. The Court found:

> The evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the (agency) . . . and it was the duty of the District Court to order its production for the (agency's) consideration.

317 U.S. at 509, 63 S.Ct. at 343.

[9] It appears the trial court gave too little weight to the needs of the Commission, holding its need was less important than that of a private litigant. The background for the formation of the Commission and the significance of its investigation were fully considered in Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), where the Court stressed the legitimacy of its function as an investigative and fact-finding body. Thus, the relevance and need for the information sought in this case were established, and the inquiry must shift to the nature of protection from discovery claimed by the City.

V.
City's Claim of Privilege

In refusing to grant the Government's motion to enforce, the district court held the City had a qualified executive or governmental privilege not to disclose information with regard to matters subject to ongoing criminal investigations and pending criminal and civil litigation at a state and federal level.

[10][11] An exhaustive consideration of the parameters of executive privilege is not required here because as discussed previously, the precise claims of the City have not been fully developed. It suffices to note that not only the proper designation of the privilege but its origin and scope have been the subject of disagreement.[FN2] It is accepted that executive privilege comprehends military and state secrets, United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and the deliberative process of high executive officials. United States v. *229 Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). There is also a privilege or protection against disclosure of certain government documents which are made confidential by statute. See, e. g., Federal Aviation Act, 49 U.S.C. s 1441(e) (1976), Social Security Act, 42 U.S.C. s 1306(a) (1976). None of these aspects of executive privilege are applicable here.

> FN2. It has been suggested that the appropriate terminology would divide the privilege claim into a state secret privilege and an official information privilege. Comment, Discovery of Government Documents and the Official Information Privilege, 76 Colum.L.Rev. 142 (1976). The statements in United States v. Nixon, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) that the executive privilege claimed by the President is "inextricably rooted in the separation of powers" has been challenged in Berger, The Incarnation of Executive Privilege, 22 U.C.L.A.L.Rev. 4 (1974).

Another basis on which the Government can withhold information from discovery is usually referred to as the informer's privilege, "in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). The reason given by the Court for such a privilege is instructive:

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.
> The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

Id. at 59-60, 77 S.Ct. at 627 (footnotes omitted).

The City contends and the district court agreed that material relating to ongoing civil and criminal investigations were the subject of a privilege against disclosure. We know of no Supreme Court case which provides support for such a broad amorphous Government privilege. One of the proposed Rules of Evidence, Rule 509, would have protected, in addition to "secrets of state", "official information" defined as
> information within the custody or control of a

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

department or agency of the government the disclosure of which is shown to be contrary to the public interest and which consists of: (A) intragovernmental opinions or recommendations submitted for consideration in the performance of decisional or policymaking functions, or (B) subject to the provisions of 18 U.S.C. s 3500, investigatory files compiled for law enforcement purposes and not otherwise available, or (C) information within the custody or control of a governmental department or agency whether initiated within the department or agency or acquired by it in its exercise of its official responsibilities and not otherwise available to the public pursuant to 5 U.S.C. s 552.

See H.R. 5463, 93d Cong., 1st Sess. (1973). The proposal elicited adverse reaction. The American Bar Association's Special Committee on Federal Practice reported that "(t)he Committee urges that Rule 509 be reviewed and reconsidered to make it consistent with the Freedom of Information Act with the view of placing the government in the same position as any other percipient witness insofar as the imposition of a duty to disclose relevant evidence is claimed." Rules of Evidence (Supplement), Hearings before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 93d Cong., 1st Sess. 339, Ser. No. 2 (1973). A statement on behalf of the Association of American Publishers, Inc. was particularly critical of Rule 509 and contained the following comment:

> With respect to other official information, we question whether such a category for privilege was ever before in existence. Its broadness and lack of compelling need for non-disclosure is indicated by the Rule itself, which allows any attorney representing the government to assert the privilege. The mere requirement that the disclosure be shown to be contrary to the public interest does not begin to bring it within the realm of genuine national security requirements. Indeed, *230 it could be argued that any information which might be embarrassing to government officials could be contrary to the public interest by weakening the public's confidence in its officials. Yet, that is exactly the kind of information to which the public, let alone any parties in litigation with the government, is entitled.

Id. at 24.

Congress refused to accept the privilege formulations contained in the proposed rules of evidence and substituted instead Rule 501 which requires that in civil actions as to which state law does not supply the rule of decision, "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.

[12] Despite language in some lower court opinions which appears to accept the concept of general confidentiality of investigatory files, closer analysis shows that most of the cases relied upon by the district court were really instances dealing with the applicability of one of the aspects of Executive Privilege heretofore acknowledged by the Supreme Court.[FN3] Thus, for example, in United States ex rel. Jackson v. Petrilli, 63 F.R.D. 152 (N.D.Ill.1974), and Gaison v. Scott, 59 F.R.D. 347 (D.Hawaii 1973), the courts were being asked to protect the identity of informers and sources of information deemed necessary to encourage the full disclosure of information to Government investigators. In Carter v. Carlson, 56 F.R.D. 9 (D.D.C.1972), the court was considering a variation of the privilege for the decision making process recognized in United States v. Nixon under which internal government communications offering opinions and recommendations are protected. This protection recognizes the need to safeguard free expression in giving intragovernmental advice by eliminating the possibility of outside examination as an inhibiting factor. See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 326 (D.D.C.1966), aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark, 128 U.S.App.D.C. 10, 384 F.2d 979 (D.C.Cir.), cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). Other courts, while articulating the existence of a privilege of the Government to withhold documents in the "public interest", found that such interest did not justify the resistance to disclosure, see Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D.Pa.1973), cf. Dos Santos v. O'Neill, 62 F.R.D. 448 (E.D.Pa.1974), and thus are questionable precedent on which to base the existence of such a privilege.[FN4]

> FN3. The cases cited by the district court which are in reality cases involving internal security investigation, such as Kinoy v. Mitchell, 67 F.R.D. 1 (S.D.N.Y.1975) and Jabara v. Kelley, 75 F.R.D. 475 (E.D.Mich.1977), are on their face inapplicable here.
>
> FN4. In the oft cited case of Brown v.

> Thompson, 430 F.2d 1214 (5th Cir. 1970), the issue of a privilege for investigatory files was not raised on appeal. The only issue was whether dismissal should have been with prejudice.

We do not deem it appropriate to extend the scope of Executive Privilege in this case beyond the lines drawn to date by the Supreme Court.[FN5] There is an anomaly in the assertion of a public interest "privilege" by the City to justify withholding information from a federal Commission charged by Congress to investigate in the public interest the possible denial of equal protection by, inter alia, local governmental units. Obviously, the court cannot accept the City's assertions of public interest ipse dixit. We note that the district court made its ruling without examination of the files.

> FN5. In light of the posture of this case, we express no view as to whether the scope of Executive Privilege available to a state or municipality in a federal cause of action is comparable to that applicable to the federal government. Cf. In re Grand Jury Proceedings, 563 F.2d 577 (3d Cir. 1977).

On remand, if the City persists in its resistance to discovery of the files by interposing specific claims of privilege in an appropriate manner, the district court will be obliged to balance the need of the Commission against the concerns of the City, if they are found to be legitimate, because *231 Executive Privilege is, at most, a qualified one. The court must give more consideration to an appropriate method by which that which is legitimately privileged, such as the identity of confidential informers, if any, or intragovernmental policy discussions, may be shielded while the relevant factual data is disclosed. In this connection, the court may want to use the in camera examination device, considered sufficiently protective of the sensitive material involved in United States v. Nixon, 418 U.S. at 706, 94 S.Ct. at 3106.

After an in camera investigation the court will be in a position to ascertain whether the files contain primarily factual data which can be disclosed. Thus, for example, in Wood v. Breier, 54 F.R.D. 7, 10 (E.D.Wis.1972), the court refused to shield a police investigatory file from disclosure, holding: "All the material in the file is of a factual as opposed to a policy discussion nature, and nowhere in the file are there any recommendations made for future action or criticisms of past actions."

Even if the City could legitimately seek to shield from discovery information relating to police officers who are defendants in pending criminal actions, a claim on which we express no view, the Commission's offer to take some evidence in executive session may provide adequate protection from excessive publicity which might interfere with a fair trial. The Commission also agreed to accept the documents with the excision of the identity of the police officers involved and we are therefore puzzled by the district court's failure to accept that offer on the grounds that the information in that form would negate the Commission's purposes. Since it is the Commission's inquiry, we assume the utility of the information is best left to it. The Commission has indicated that the thrust of its inquiry is not directed to allegations that a particular officer may have been guilty of police brutality but to the procedure followed by the Police Department in cases where police brutality was alleged. Thus the identity of the individual police officer is far less relevant to the Commission than documents showing whether an investigation was made, when it was made, how it was conducted, and what subsequent action was taken.

Finally, we note that more than a year has now elapsed since the information was originally requested. It may be possible that subsequent events and the passage of time have caused some modification in the City's position. We are confident that the district court will direct its attention to this matter promptly so that the Commission's investigation, long delayed, can proceed expeditiously.

Accordingly, we will vacate the district court's order refusing the Commission's motion to enforce and will remand for further proceedings consistent with this opinion.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

183 F.R.D. 148 Page 9
(Cite as: 183 F.R.D. 148)
C

UNITED STATES of America, Plaintiff,
v.
Robert M. ERNSTOFF, d/b/a Westfield Manor Apartments, Leslie Thompson, and Jean Thompson, Defendants.

Civ. No. 97-3115(JCL).

United States District Court,
D. New Jersey.

Oct. 16, 1998.

After Department of Justice brought housing discrimination action against apartment owners, owners' sought discovery of Department's test file review forms and summary memoranda containing preliminary analysis of evidence obtained through random race discrimination testing. On owners' application to compel discovery, the District Court, Chesler, United States Magistrate Judge, held that such forms and memoranda were not protected by deliberative process privilege or work product doctrine.

Application granted.

[1] WITNESSES ⚖═216(1)
410k216(1)
Materials that are factual in nature are not protected by deliberative process privilege.

[2] WITNESSES ⚖═216(1)
410k216(1)
In order to assert the deliberative process privilege, three procedural requirements must be satisfied: there must be a formal claim of privilege lodged by the head of the department which has control over the matter, the responsible agency official must provide precise and certain reasons for asserting the confidentiality of government information or documents, and the government information or documents sought to be shielded must be identified and described.

[3] WITNESSES ⚖═216(1)
410k216(1)
Balancing test for deliberative process privilege weighs the benefit of preserving the integrity of internal governmental deliberations against the need for free and open discovery.

[4] WITNESSES ⚖═216(1)
410k216(1)
Deliberative process privilege did not apply to Department of Justice test file review forms and summary memoranda containing preliminary analysis of evidence obtained through testing of race discrimination in rental housing at specific locations, as such forms and memoranda contained nothing but factual information regarding what was said and done during testing, with no opinions or evaluations by the testers.

[5] WITNESSES ⚖═216(1)
410k216(1)
Summaries of documents, by themselves, are insufficient bases for an assertion of deliberative process privilege.

[6] WITNESSES ⚖═216(1)
410k216(1)
Balancing test for deliberative process privilege weighed in favor of finding that the privilege did not apply to Department of Justice test file review forms and summary memoranda containing preliminary analysis of evidence obtained through testing of race discrimination in rental housing at specific locations; Department routinely prepared such forms and memoranda in ordinary course of business and regularly used such forms and memoranda to engage in affirmative litigation.

[7] FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
"Work product doctrine" provides protection to materials prepared by an attorney or his or her agent in anticipation of litigation or for use in trial.
See publication Words and Phrases for other judicial constructions and definitions.

[8] FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
The purpose of the work product doctrine is to encourage careful and thorough preparation for litigation by a party's attorney.

[9] FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
Unlike the attorney-client privilege, which is absolute, the work-product privilege is qualified and depends on the information being sought and the adversary's need

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works


EXHIBIT B

for the information.

**[10]** FEDERAL CIVIL PROCEDURE ⚖═1600(5)
170Ak1600(5)
Like any other qualified privilege, the work product doctrine may be waived by the holder.

**[11]** FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
The crime-fraud exception and the at-issue exception to the attorney-client privilege are also applicable to the work product doctrine.

**[12]** FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
Courts require a party seeking to overcome the work product protection to show that they failed at all attempts to discover the material through alternative sources.

**[13]** FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
The party asserting work product protection has the burden of demonstrating that the documents were prepared in anticipation of litigation. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[14]** FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
The mere fact that litigation did in fact occur, that a party has consulted or retained an attorney, that a party has undertaken investigation, or that a party has engaged in negotiations over the claim is not enough to establish a reasonable "anticipation of litigation" when documents were prepared, as element of work product protection. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.
See publication Words and Phrases for other judicial constructions and definitions.

**[15]** FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
When documents and materials are not prepared for litigation, but merely in the ordinary and regular course of a party's business, they are outside the scope of work product protection. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[16]** FEDERAL CIVIL PROCEDURE ⚖═1600(3)
170Ak1600(3)
Department of Justice test file review forms and summary memoranda, containing preliminary analysis of evidence obtained through testing of race discrimination in rental housing at specific locations, were not prepared in reasonable "anticipation of litigation," as element of work product protection; the forms and memoranda were prepared under system of random testing rather than in response to specific complaint. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.
See publication Words and Phrases for other judicial constructions and definitions.

*150 Joan A. Magagna, Jennifer C. Cass, Je Yon Jung, United States Department of Justice, Civil Rights Division, Housing & Civil Enforcement Section, Washington, DC, for Plaintiff.

Jonathan E. Levitt, Charles Xavier Gormally, Brach, Eichler, Rosenberg, Silver, Berstein, Hammer & Gladstone, P.C., Roseland, NJ, for Defendants.

OPINION

CHESLER, United States Magistrate Judge.

I. INTRODUCTION

This matter comes before the Court on the application of Defendants, Robert M. Ernstoff, d/b/a Westfield Manor Apartments, Leslie Thompson, and Jean Thompson ("Defendants"), to compel Plaintiff, the United States of America ("Plaintiff"), to provide discovery. Defendants' application was referred to the undersigned by the Honorable John C. Lifland, U.S.D.J. The parties were directed to submit letter briefs on the issues in contention and the Court heard oral argument during a telephone conference on the record on July 29, 1998. For the reasons set forth below Defendants' application will be granted.

II. BACKGROUND

In May of 1995, the Department of Justice began testing the rental markets in Westfield in order to identify any race discrimination against African Americans. One of the multi-family housing units selected for testing was Westfield Manor Apartments ("WMA"). The department conducted six rental tests at WMA in order to determine whether the complex was employing any discriminatory practices in their rental decisions. [FN1]

> FN1. The first test was conducted by the North Jersey Fair Housing Council pursuant to

a contract with the Civil Rights Division of the Department of Justice. All of the remaining tests were conducted by the Department of Justice using volunteer federal employees as "testers."

After the rental tests were completed, the Department of Justice concluded that WMA was in fact using discriminatory practices in their selection of tenants. Accordingly, the government initiated this action, pursuant to 42 U.S.C. § 1981, [FN2] by filing a complaint in the United States District Court for the District of New Jersey.

> FN2. Section 1981 of Title 42 States in relevant part that
> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
> 42 U.S.C. § 1981(a).

On May 28, 1998, Defendants requested that they be provided with copies of certain documents known as Test File Review Forms and the summary memoranda compiled by the government which analyzed the data in these forms. The Test File Review Forms contain each test coordinators' preliminary analysis of the evidence obtained through the tests conducted at a specific location. See Lee Decl. ¶ 9. In these documents, each test coordinator identifies and discusses the differences that they observed in the treatment that the testers of different races received during the visits to a particular housing development. Id. The analysis contained in these documents initially serves as a basis for the Housing & Civil Enforcement *151 Section to determine whether to authorize additional testing at a given location.

The data compiled from these forms is the basis for a separate summary memorandum outlining the findings in one particular housing complex. Id. ¶¶ 6, 11. This document incorporates all of the analysis contained in the individual Test File Review Forms, "summarizes the differences in treatment between the black and white testers over the course of the testing noted by the test coordinator, and states [his or] her opinion as to whether or not those differences noted indicate, in [his or] her judgment, the existence of a pattern of differential treatment by the housing provider." Id. ¶ 11. [FN3]

> FN3. It appears that an additional "summary report" is also prepared using the information contained in the Test File Review Forms. Id. ¶ 10. This memorandum also contains analysis of tests at other sites and recommendations to the Supervisory Test Coordinator with respect to further testing at each of the various sites discussed in the document. Id. This document, entitled "Summary of Rental Testing in Union County New Jersey," dated February 12, 1996, was not presented to the Court for an in camera review and this discussion does not deal with it. Plaintiff will be directed to produce this memorandum for an in camera review so that the Court may evaluate the contents and decide the privilege issues as they pertain to this document.

The various test coordinators regularly prepare these forms and memoranda in order to assist the Civil Right Division in determining whether suit should be filed against housing providers pursuant to 42 U.S.C. § 3514(a). Id. ¶ 12. Initially, the Chief or Deputy Chief of the Housing & Civil Enforcement Section reviews all these documents to determine whether to send them to an attorney in the Section to prepare a litigation recommendation. Id. When these documents are forwarded to an attorney in the Housing & Civil Enforcement Section, the attorney would review all of the documents and, in substantial measure, rely on the analysis contained therein in deciding whether to recommend that a lawsuit be filed. Id. The Justice Department, through the declaration of Bill Lann Lee, Esq., the Acting Assistant Attorney general in the Civil Rights Division, asserts that the disclosure of the materials "would hinder the free flow of ideas and opinions that should precede the Department of Justice's procedure for reviewing testing evidence and determining whether to initiate testing." Id. ¶ 13. "In addition, disclosure of the Summary of Testing could reveal information about the Department's confidential internal law enforcement procedures and policies used in the testing program and could compromise the effectiveness of the testing program." Id.

On June 5, 1998, Plaintiff asserted the work product privilege and the deliberative process privilege in connection with these documents. On June 11, 1998, Defendants submitted a letter application requesting a telephone conference with this Court so that the

privilege issues could be resolved. A telephonic conference was held on the record on June 17, 1998, during which the Court requested that Plaintiff present a certification by someone at the Department of Justice who had personal knowledge as to at what point in time litigation could reasonably have been anticipated in this case.

Responding to the Court's request, the government submitted a letter brief on June 30, 1998, along with a certification of Fred Freiberg of the Department of Justice Civil Rights Division. The Freiberg certification stated that the government anticipates that litigation may result from any and all tests which it undertakes. Defendants submitted an additional letter brief in support of its application on July 15, 1998.

The Court held a second telephone conference on the record on July 29, 1998. As a result of this conference, Plaintiff was instructed to submit a supplemental certification from someone who possessed personal knowledge as to when litigation in this case could have reasonably been anticipated. On August 12, 1998, Plaintiff submitted its third set of papers addressing the privilege issue, consisting of a supplemental letter brief as well as a declaration of Bill Lann Lee, Esq. In addition, all of the documents to which the privilege has been asserted have been provided to the Court for an in camera review, except for a document entitled "Summary of Rental Testing Conducted in Union County, N.J." dated February 12, 1996. See supra note 3.

*152 III. DISCUSSION

Plaintiff contends that the Test File Review Forms and the summary memoranda which analyze the data contained in these forms are protected from discovery under the work product doctrine and the deliberative process privilege. Defendants, however, contend that these documents are not subject to either privilege and that they should be produced immediately. Alternatively, Defendants argue that even if the documents are subject to protection under one or both of the privileges, they should still be produced because Defendants have shown a substantial need for the material and undue hardship in obtaining it from other sources. Each argument will be discussed in turn.

A. Deliberative Process Privilege

[1] The purpose of the deliberative process privilege is to "prevent injury to the quality of agency decisions which could result from premature or indiscriminate disclosure" of "deliberations comprising part of a process by which government decisions and policies are formulated." Resident Advisory Board v. Rizzo, 97 F.R.D. 749, 751 (E.D.Pa.1983); see also National Labor Relations Board v. Sears, Roebuck & Co., 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); Conoco Inc. v. United States Dep't of Justice, 687 F.2d 724, 727 (3d Cir.1982). Only predecisional communications are privileged and protected. Id. Materials that are exempt from discovery in civil actions include advisory opinions, recommendations, and communications relating to policy formulations. See Hopkins v. United States Dep't of Hous. and Urban Dev., 929 F.2d 81, 84 (2d Cir.1991). Subjective materials that "reflect the personal opinion of the writer, rather than the policy of the agency" are also privileged because they are considered predecisional. Lee v. Federal Deposit Ins. Corp., 923 F.Supp. 451, 456 (S.D.N.Y.1996) (quoting Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 866 (D.C.Cir.1980)). Materials that are factual in nature, on the other hand, are not privileged. Philadelphia Newspapers, Inc. v. Department of Hous. and Urban Dev., 343 F.Supp. 1176, 1178 (E.D.Pa.1972); LNC Investments, Inc. v. Republic of Nicaragua, 1997 WL 729106, *2 (S.D.N.Y.).

[2] In order to assert the deliberative process privilege, three procedural requirements must be satisfied. First, "there must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual consideration by that officer." United States v. Reynolds, 345 U.S. 1, 7-8, 73 S.Ct. 528, 97 L.Ed. 727 (1953); Resident Advisory Bd. v. Rizzo, 97 F.R.D. at 752. Second, the responsible agency official must provide "precise and certain reasons" for asserting the confidentiality over the government information or documents. **United States v. O'Neill, 619 F.2d 222, 226 (3d Cir.1980)**; Rizzo, 97 F.R.D. at 753. Third, the government information or documents sought to be shielded must be identified and described. Id. Once these procedural requirements are met, the court then must determine whether or not a prima facie case for assertion of the privilege has been made out.

[3] The inquiry into whether or not the deliberative process privilege applies, however, does not end here. Sister courts have held that even if a government agency establishes that such a demonstration has been

made, courts must apply a balancing test. See LNC Investments, Inc. v. Republic of Nicaragua, 1997 WL 729106 at *2; In re Franklin Nat'l Bank Securities Litig., 478 F.Supp. 577, 583 (E.D.N.Y.1979); Federal Deposit Ins. Corp. v. Hatziyannis, 180 F.R.D. 292, 293-94 (D.Md.). The balancing test weighs the benefit of preserving the integrity of internal governmental deliberations against the need for free and open discovery. See id. In balancing these interests, courts must consider the interests of the private litigant, the need for accurate judicial fact finding, the public's interest in learning how effectively the government is operating, the relevance of the evidence sought, the availability of other evidence, the role of the government in the litigations and issues involved, and the impact on the effectiveness of government employees. See id. Thus, even if the material at issue falls within the scope of privilege, the balancing test determines whether the material merits protection. *153 Federal Deposit Ins. Corp. v. Hatziyannis, 180 F.R.D. at 293-94.

[4][5] In the present case, the government agency, the Department of Justice Housing and Enforcement Section, has not presented sufficient evidence that the materials presented to the Court for an in camera review fall into the deliberative process privilege. [FN4] The government has satisfied the formal procedural requirements for establishing the deliberative process privilege. It issued a formal claim of privilege through Bill Lann Lee, the Acting Assistant Attorney General. It also fulfilled the second procedural step by stating precise and certain reasons for asserting confidentiality over the matter. The government fulfilled the third step by identifying and describing the materials. While Plaintiff has fulfilled the procedural requirements, however, they have nevertheless failed to meet their substantive burden to sustain the privilege. In particular, as previously noted, documents that are factual in nature generally are not considered privileged material. See Philadelphia Newspapers, Inc. v. Department of Housing and Urban Dev., 343 F.Supp. 1176, 1178 (E.D.Pa.1972); LNC Investments, Inc. v. Republic of Nicaragua, 1997 WL 729106 at *2. The test file review forms contain nothing but descriptions as to what was said and done during the testing. They do not include opinions or evaluations of the testers. The test summary memoranda merely serve as compilations of the test file reviews and do not carry any opinions or evaluations in them. Summaries of documents, by themselves, are insufficient bases for an assertion of privilege. See Rizzo, 97 F.R.D. at 753.

> FN4. As discussed in footnote 3, the February 12, 1996, memorandum was not submitted for review and the Court reserves decision as to that document pending an in camera review.

[6] Even assuming, arguendo, that the Housing and Civil Enforcement Section fulfilled the requirements of the deliberative process privilege, the balancing test would still weigh in favor of disclosing the material to Defendants. In recent cases, courts have severely restricted the use of the privilege by government agencies that are seeking affirmative judicial relief. See Hatziyannis, 180 F.R.D. at 293-94; E.E.O.C. v. Citizens Bank and Trust Co. of Maryland, 117 F.R.D. 366, 366 (D.Md.1987). These courts have held that "when the Government seeks affirmative relief, it is fundamentally unfair to allow it to evade discovery of materials that a private plaintiff would have to turn over." Hatziyannis, 180 F.R.D. at 293 (quoting E.E.O.C. v. Citizens Bank and Trust Co. of Maryland, 117 F.R.D. at 366). The courts look to whether the government agency is frequently a plaintiff and whether the materials in issue are case-specific. See Hatziyannis, 180 F.R.D. at 293-94; E.E.O.C. v. Citizens Bank and Trust Co. of Maryland, 117 F.R.D. at 366; see also E.E.O.C. v. Los Alamos Constructors, Inc., 382 F.Supp. 1373, 1383 (D.N.M.1974).

In the present case, the Housing and Civil Enforcement Section does frequently find itself playing the role of a plaintiff. Indeed, it concedes that "every site selected to be tested is a potential defendant in a future lawsuit." See Freiberg Cert. ¶ 2. Further, the materials sought at issue in this case are case-specific and do not describe the deliberative process by which the government determines whether to prosecute their case. Rather, they are routine reports produced in the ordinary course of business by an organization which regularly engages in affirmative litigation. Common sense and basic fairness requires that these reports receive no greater protection than they would in the hands of a private litigant.

B. Work Product Doctrine

[7][8][9][10][11][12] The work product doctrine provides protection to materials prepared by an attorney or his or her agent in anticipation of litigation or for use in trial. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The purpose of the work product doctrine is to encourage careful and

thorough preparation for litigation by a party's attorney. See United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); George v. Siemens Indus. Automation, Inc., 182 F.R.D. 134, 139-40 (D.N.J.1998); Harding v. Dana Transport, Inc., 914 F.Supp. 1084, 1097 (D.N.J.1996). The Supreme *154 Court in Hickman clarified the fundamental principles of the work product doctrine. The Court stated that

> [h]istorically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways--aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

Hickman, 329 U.S. at 511, 67 S.Ct. at 393-94. The doctrine has been codified in Federal Rule of Civil Procedure 26(b)(3) and states in pertinent part that

> a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Fed.R.Civ.P. 26(b)(3). The Supreme Court has described the doctrine as an "intensely practical one, grounded in the realities of litigation in our adversary system." Nobles, 422 U.S. at 238, 95 S.Ct. at 2170. Unlike the attorney-client privilege, however, which is absolute, the work-product privilege is qualified. Id. at 239, 95 S.Ct. at 2170; George, 182 F.R.D. at 140-41. The qualified privilege depends on the information being sought and the adversary's need for the information. [FN5] See Hickman, 329 U.S. at 512, *155 67 S.Ct. at 394; Nobles, 422 U.S. at 238, 95 S.Ct. at 2170; George, 182 F.R.D. at 140-41.

> FN5. Like any other qualified privilege, the work product doctrine may be waived by the holder of the privilege and there are exceptions to the doctrine. Rockwell, 897 F.2d at 1266; Westinghouse v. Republic of the Philippines, 951 F.2d 1414, 1424-25 (3d Cir.1991); In re Subpoenas Duces Tecum (Fulbright & Jaworski), 738 F.2d 1367 (D.C.Cir.1984); United States v. AT & T, 642 F.2d 1285, 1299 (D.C.Cir.1980); George, 182 F.R.D. at 140-41; Zapata v. IBP, Inc., 175 F.R.D. 574, 577 (D.Kan.1997); Maertin v. Armstrong World Indus., Inc., 172 F.R.D. 143, 147-48 (D.N.J.1997); Harding, 914 F.Supp. at 1098. For example, the crime-fraud exception and the at-issue exception to the attorney-client privilege are also applicable to the work product doctrine. See, e.g., In re Sealed Case, 107 F.3d 46, 51 (D.C.Cir.1997) (crime-fraud exception); In re Grand Jury Proceedings, 102 F.3d 748, 751 (4th Cir.1996) (crime-fraud exception); In re Grand Jury Proceedings, 87 F.3d 377 (9th Cir.) (crime-fraud exception), cert. denied sub nom. The Corp. v. United States, 519 U.S. 945, 117 S.Ct. 333, 136 L.Ed.2d 246 (1996); In re Richard Roe, Inc., 68 F.3d 38, 39-40 (2d Cir.1995) (crime-fraud exception); In re Grand Jury Proceedings, 43 F.3d 966, 972 (5th Cir.1994) (crime-fraud exception); Cox v. Administrator United States Steel & Carnegie Pension Fund, 17 F.3d 1386, 1422 (11th Cir.) (crime-fraud exception), opinion modified on reh'g, 30 F.3d

1347 (11th Cir.1994), cert. denied, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); In re Grand Jury Proceedings, 604 F.2d 798, 802-03 (3d Cir.1979) (crime-fraud exception); see also Insurance Corp. of Ireland, Ltd. v. Board of Trustees of So. Ill. Univ., 937 F.2d 331, 334, n. 3 (7th Cir.1991) (at-issue exception); Pfohl Bros. Landfill Lit., 175 F.R.D. 13, 28 (W.D.N.Y.1997) (at-issue exception); Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465 (S.D.N.Y.1993) (at-issue exception). Likewise, the privilege can be waived through certain types of disclosures to the opposing and third parties. Westinghouse, 951 F.2d at 1428; George, 182 F.R.D. at 141.

Additionally, the qualified immunity enjoyed by the work product doctrine can be overcome upon a showing of substantial need and undue hardship. Sporck v. Peil, 759 F.2d 312, 316 (3d Cir.), cert. denied, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985); Conoco, Inc. v. United States Dep't of Justice, 687 F.2d 724, 730 (3d Cir.1982); George, 182 F.R.D. at 141-42. Courts require a party seeking to overcome the work product protection to show that they failed at all attempts to discover the material through alternative sources. See Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1255 (3d Cir.1993); In re Grand Jury, 633 F.2d 282, 290 (3d Cir.1980); George, 182 F.R.D. at 141-42.

[13] The party asserting work product protection has the burden of demonstrating that the documents were "prepared in anticipation of litigation." Conoco, Inc. v. United States Dep't of Justice, 687 F.2d 724, 730 (3d Cir.1982); George, 182 F.R.D. at 140-41. The mainstay of work product protection lies in the deceivingly simple phrase, "in anticipation of litigation." See, e.g., United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir.1990) ("[t]he question whether a document was prepared in anticipation of litigation is often a difficult factual matter"); Leonen v. Johns-Manville, 135 F.R.D. 94 (D.N.J.1990) ("[t]he phrase, 'anticipation of litigation' is incapable of precise definition").

To determine whether a document was "prepared in anticipation of litigation," the appropriate inquiry is "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir.1993) (citing Rockwell, 897 F.2d at 1266); In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir.1979); George, 182 F.R.D. at 140-41. To make this determination, many courts have applied the "reasonable anticipation test" together with determining causation. Harper v. Auto-Owners Insurance Co., 138 F.R.D. 655, 659 (S.D.Ind.1991). The "reasonable anticipation" test requires that the court determine at what point in time litigation could reasonably have been anticipated. Id.

[14] Although there is no clear-cut rule as to the point in time when an investigation or evaluation of a claim is considered preparation for litigation, courts generally find that a "party must show more that a 'remote prospect', an 'inchoate possibility,' or a 'likely chance of litigation.' " Id. at 660; Mission Nat'l Ins. Co. v. Lilly, 112 F.R.D. 160, 163 (D.Minn.1986); Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 604 (8th Cir.1977); Airheart v. Chicago and North Western Transp. Co., 128 F.R.D. 669, 671 (D.S.D.1989); see also Rockwell, 897 F.2d at 1266; United States v. El Paso Co., 682 F.2d 530, 542-43 (5th Cir.), reh'g denied, 688 F.2d 840 (5th Cir.1982), cert. denied, 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984); United States v. Davis, 636 F.2d 1028, 1040 (5th Cir.), reh'g denied, 645 F.2d 71 (5th Cir.), cert. denied, 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981). A party should demonstrate that there existed "an identifiable specific claim or impending litigation when the materials were prepared." Id.; Leonen v. Johns-Manville, 135 F.R.D. 94, 97 (D.N.J.1990). Thus, the mere fact that litigation did in fact occur, see Leonen, 135 F.R.D. at 97, that a party has consulted or retained an attorney, see Henderson v. Zurn, 131 F.R.D. 560, 571 (S.D.Ind.1990), that a party has undertaken investigation, see Taroli v. General Elec. Co., 114 F.R.D. 97, 98 (N.D.Ind.1987), or engaged in negotiations over the claim, see Hydramar, Inc. v. General Dynamics Corp., 115 F.R.D. 147 (E.D.Pa.1986), is not enough to establish a reasonable anticipation of litigation under Rule 26(b)(3). See Leonen, 135 F.R.D. at 97; George, 182 F.R.D. at 140-41.

*156 [15] In addition to the requirement that the documents produced be composed in reasonable anticipation of litigation, "the material must have been produced because of th[e] prospect of litigation and for no other purpose." Auto-Owners Ins. Co., 138 F.R.D. at 660; see Diversified Industries, 572 F.2d at 604. When documents and materials are not prepared for litigation, but merely in the ordinary and regular course

of a party's business, they are outside the scope of work product protection. See Diversified Industries, 572 F.2d at 604; Henderson, 131 F.R.D. at 570; Binks Mfg. Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1119 (7th Cir.1983); see also Rockwell, 897 F.2d at 1266; George, 182 F.R.D. at 140-41. The Third Circuit has accepted this addition to reasonable anticipation test and quotes Professors Miller and Wright:

> Prudent parties anticipate litigation, and begin in preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.

In re Grand Jury Investigation, 599 F.2d 1224, 1229 (3d Cir.1979) (quoting 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2024, at 198 (1970)).

"[T]he fact that documents prepared for a business purpose were also determined to be of potential use in pending litigation does not turn these documents into work product or confidential communications between client and attorney." Hardy v. New York News Inc., 114 F.R.D. 633, 646 (S.D.N.Y.1987). Thus, case law and the language of Rule 26(b)(3) maintain that although the point at which litigation of a case can be reasonably anticipated is legitimate, the work product rule depends primarily on the reason or purpose for the documents' production. In re Grand Jury Investigation, 599 F.2d at 1229; Auto-Owners Ins. Co., 138 F.R.D. at 661. Even if litigation was reasonably anticipated under the "reasonable anticipation" test, routine or ordinary investigations or reports are not work product and can be obtained through normal discovery procedures without a special showing of need. Auto-Owners Ins. Co., 138 F.R.D. at 661; Pete Rinaldi's Fast Foods v. Great American Ins. Co., 123 F.R.D. 198, 202 n. 4 (M.D.N.C.1988); Mission Nat'l Ins. Co., 112 F.R.D. at 163.

Accordingly, "[b]oth components of the [work product] standard must be satisfied." Auto-Owners Ins. Co., 138 F.R.D. at 661. "[A]n investigative or evaluative report shown to have been produced for litigation purposes when the prospect for litigation is determined to be remote is not work product." Id. Additionally, "a report produced at a time when litigation was justifiably anticipated is not work product if the report was produced in the ordinary course of the party's business." Auto-Owners Ins. Co., 138 F.R.D. at 661.

[16] In the present case, the materials in question, test file review forms and test summary memoranda, were prepared before the point that litigation could reasonably be anticipated. Although the precise point in time where reasonable anticipation of litigation occurs is impossible to pinpoint, it is clear that there was no specific claim or impending litigation when the materials were prepared in the present case. The Department of Justice conducts an abundance of testing in both the rental and sales markets. It is ridiculous to presume that, as Mr. Freiberg stated in his certification, litigation is reasonably anticipated every time the Department of Justice conducts one of these tests. Reasonable anticipation of litigation cannot result from a system of random testing when the testing has resulted in nothing more than a few review forms and summary memoranda. Reasonable anticipation is more likely to have occurred once these materials were reviewed by staff attorneys in the Housing & Civil Enforcement Section who in turn made the recommendation to begin the litigation process.

Additionally, these forms and memoranda amount to nothing more than materials prepared in the ordinary course of the Housing & Civil Enforcement Section's business. Defendants were not targeted by the Department *157 of Justice because of a specific complaint, but rather, they were part of a random testing scheme. Multi-family housing in Westfield, including the Westfield Manor Apartments, was apparently selected for rental testing as part of our systematic rental testing investigation in northern New Jersey. Plaintiff's ultimate determination that it had enough cause to prosecute the present claim against Defendants, and that litigation did eventually occur, do not bring the documents within the ambit of reasonable "anticipation of litigation." Accordingly, the work product privilege does not extend to these materials.

IV. CONCLUSION

For the reasons set forth above, Defendants' application to compel the production of documents will be granted. An appropriate order will issue.

ORDER

This matter comes before the Court on the application of Defendants, Robert M. Ernstoff, d/b/a Westfield

Manor Apartments, Leslie Thompson, and Jean Thompson ("Defendants"), to compel Plaintiff, the United States of America ("Plaintiff"), to provide discovery. Defendants' application was referred to the undersigned by the Honorable John C. Lifland, U.S.D.J. The parties were directed to submit letter briefs on the issues in contention and the Court heard oral argument during a telephone conference on the record on July 29, 1998 and consistent with this Court's opinion of even date;

IT IS, therefore, on this 16th day of October, 1998, hereby

ORDERED that Plaintiff is to provide Defendants' copies of all test file review forms for Westfield Manor Apartments and a copy of the Summary Memorandum for Westfield Manor Apartments within twenty (20) days of the date of this Order; and it is further

ORDERED that Plaintiff is to provide the Court with a copy of the "Summary of Rental Testing in Union County New Jersey," dated February 12, 1996, for an in camera review within twenty (20) days of the date of this Order.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works