UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6143-CIV-FERGUSON/SNOW

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FLORIDA HEALTH INSTITUTE, INC.,
SAMPLE ROAD REHABILITATION
CENTER, INC., PENNACLE REHAB
SERVICES OF FLORIDA, INC.,
NATIONAL MEDICAL SYSTEMS and
SUPPLIES, INC., GATEWAY TO
HEALTH REHABILITATION, INC.,
WEMAC, INC., ELLIOT HOUSLEY,
RICARDO CHOI, and ANTHONY
MIGNOTT, a/k/a MARK A. MIGNOTT,
individually,

        Defendants.

_____/

NIGHT BOX
FILED

MAR 2 4 2000

CARLOS JUENKE
CLERK, USDC / SDFL / FTL

UNITED STATES OF AMERICA'S MOTION FOR ENTRY OF PRELIMINARY
INJUNCTION BASED ON SUBSTANTIAL EVIDENCE, AND RESPONSE TO
DEFENDANTS' MOTION TO VACATE TEMPORARY RESTRAINING ORDER

    Plaintiff, United States of America ("United States"), through the undersigned United States

Attorney for the Southern District of Florida, hereby files this Response to Defendants' Motion to

Vacate Temporary Restraining Order ("TRO"), and moves for entry of a Preliminary Injunction

based upon the Exhibits attached hereto.

    Defendants Elliott Housley ("Housley"), Anthony Mignott ("Mignott"), Ricardo Choi

("Choi"), Florida Health Institute, Inc. ("FHI"), Sample Road Rehabilitation Center, Inc. ("Sample

Rehab"), and the other corporate defendants, request that this Court allow them to take control of



funds which they fraudulently acquired by submitting false claims to the Medicare Program. This Court must not allow the further dissipation of wrongfully acquired funds. Defendants' arguments to this Court disregard the injunction provisions of 18 U.S.C. § 1345 and invite this Court to ignore Eleventh Circuit precedent.

On January 28, 2000, the United States filed this civil action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq. The Complaint asserts that the defendants submitted false, fictitious, or fraudulent claims to the Medicare Program. On January 31, 2000, this Court granted the government's ex parte motion for entry of a TRO to prevent further losses from being suffered by the Medicare program. On February 11, 2000, this Court granted the parties' joint motion to extend the TRO until March 31, 2000. A hearing on the United States' request for a preliminary injunction pursuant to 18 U.S.C. § 1345 is scheduled for March 31. Based on the limited discovery taken since the entry of the TRO, the United States moves this Court to enter the preliminary injunction based on the affidavits and depositions attached hereto.

I. BACKGROUND AND
PROCEDURAL HISTORY

Since the entry of the TRO, the United States has determined that the defendants acquired FHI and Sample Rehab without notice to the Medicare Program or the state of Florida. On June 9, 1999, Mignott purchased FHI. [Exh. 1; FHI Purchase Documents]. On May 13, 1999, Choi purchased Sample Rehab. [Exh. 2; Sample Rehab Purchase Documents]. At the time the United States filed the Complaint, the previous owners of FHI and Sample Rehab were listed with the Medicare fiscal intermediary, First Coast Services Options, Inc. ("First Coast"), and the state of Florida.

The United States verified that the defendants were owners of FHI and Sample Rehab by information contained in bank records and the sales contracts. On August 27, 1999, FHI opened a bank account listing its officers as follows: president Housley, vice-president Mignott, and treasurer Choi. [S/A Rodriguez TRO Aff., attachment 3]. In addition, Sample Rehab opened a bank account on May 28, 1999, listing Mignott, Housley, and Choi as signatories. [S/A Rodriguez TRO Aff., attachment 6]. As discussed below, these three individuals defendants have filed numerous false claims with First Coast resulting in a substantial loss to the Medicare program.

Pursuant to the terms of the TRO, $1,505,303 of defendants' assets are frozen. This total includes $1,033,746.71 in accounts at NationsBank, $182,556.45 in accounts at BankAtlantic, and $289,000 in accounts at Pershing. Between May 13, 1999 and December 31, 1999, FHI and Sample Rehab billed the Medicare program for approximately $11,000,000. [Exh. 3, Williams' Affidavit ("Aff") ¶¶ 6-7]. Of that amount billed, the defendants received approximately $6,237,179. Id. Defendants have failed to provide the United States with any information identifying the location of the over four and one-half million dollars not frozen pursuant to the TRO.

## II. PRELIMINARY INJUNCTION
## UNDER 18 U.S.C. SECTION 1345

The United States seeks entry of a preliminary injunction pursuant to 18 U.S.C. § 1345 ("§ 1345" or "fraud injunction statute"). In 1996, the fraud injunction statute was amended to make it specifically applicable to health care fraud cases. See United States v. DBB, Inc., et al., 180 F.3d 1277, 1283 (11th Cir. 1999); United States v. Fang, 937 F. Supp. 1186, 1192 (D. Md. 1996). The 1996 amendment enables the United States to freeze the proceeds of health care fraud and enjoin ongoing violations. The statutory section at issue in this matter, 1345(a) reads as follows:

> (a)(1) If a person is --
> (A) violating or about to violate this chapter or section 287 . . . of this title; . . .
> (C) committing or about to commit a Federal health care offense the *Attorney General may commence a civil action* in any Federal court to enjoin such violation.
>
> (a)(2) If a person is alienating or disposing of property, or *intends to alienate or dispose of property, obtained as a result of . . . (a Federal health care offense)* or property which is traceable to such violation, *the Attorney General may commence a civil action in any Federal court --*
> (A) to enjoin such alienation or disposition of property;  or
> (B) *for a restraining order to --*
>> (i) *prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value*; and
>> (ii) appoint a temporary receiver to administer such restraining order.
>
> (a)(3) A permanent or temporary injunction or restraining order shall be granted without bond.

18 U.S.C. § 1345 (1996) (emphasis added).  The United States moves this Court to enter a preliminary injunction freezing the defendants' assets pursuant to § 1345(a)(2)(B).

In their Motion to Vacate the TRO, defendants argue that the TRO should be vacated because the United States cannot show that the frozen funds are related to on-going fraud or that there is a danger that the defendants will continue to commit fraud absent the injunction. As discussed below, there is an on-going danger that the defendants will continue to defraud the Medicare program. However, Section 1345(a)(2)(B) expressly authorizes this Court to freeze wrongfully acquired assets. Fang, 937 F. Supp. at 1194, and 1197-98.  The Fang opinion provides that assets derived from Medicare fraud need not bear a relation to "ongoing or likely future fraud" in order to be frozen. Id. at 1194.

-4-

Although the United States seeks a preliminary injunction pursuant to § 1345, the conventional analysis is availing. In the Eleventh Circuit, the issuance of a preliminary injunction requires this Court to analyze four factors:

> (1) the likelihood of *irreparable harm* to the United States if the preliminary injunction is not granted;
>
> (2) whether the threatened harm to the United States *outweighs* the potential harm to the defendants if the preliminary injunction is granted;
>
> (3) the *likelihood plaintiff will succeed on the merits*; and
>
> (4) whether granting the preliminary injunction will serve the *public interest*.

See, e.g., Panama City Med. Diagnostic, Ltd v. Williams, 13 F.3d 1541, 1545 (11th Cir.), cert. denied, 513 U.S. 826 (1994). In this traditional analysis, no particular standard of proof is required. See, e.g., Louis v. Meissner, 530 F. Supp. 924, 925 (S.D. Fla. 1981).

With regard to the first factor, irreparable harm to the public is presumed for preliminary injunctions sought pursuant to § 1345. Fang, 937 F. Supp. at 1199; United States v. Quadro Corp., 916 F. Supp. 613, 617 (E.D. Tex. 1996); United States v. William Savran & Associates, Inc., 755 F. Supp. 1165, 1179 (E.D.N.Y. 1991). This is also true for the fourth factor since law enforcement serves the public interest. With regard to the second factor, to the extent the United States can show "a reasonably probability that criminally fraudulent activity has in fact occurred, . . . the balance of hardships tips decidedly in favor of the Government." Fang, 937 F. Supp. at 1199-1200. Therefore, the remainder of this motion addresses the third factor under the terms of § 1345. That factor may be articulated as whether there is a "reasonable probability" that the defendants violated 18 U.S.C. § 287.

A.    United States Must Establish a "Reasonable Probability" that Defendants presented
      claims to First Coast Knowing such Claims to be False, Fictitious or Fraudulent

For the issuance of a preliminary injunction under § 1345, the United States must establish "probable cause" or a "reasonable probability" that defendants presented false, fictitious or fraudulent claims to First Coast. See DBB, Inc., 1809 F.3d at 1280 ( "reasonable probability" that defendants were disposing of fraudulently obtained funds); Fang, 937 F. Supp. at 1197 ("'reasonable probability' standard . . . equates with 'probable cause'" and applies to issuance of preliminary injunction under § 1345); Savran, 755 F. Supp. at 1177 (probable cause standard).

Since the issuance of the TRO, the United States has discovered the following facts, in addition to the results of the random beneficiary sample, which establish a reasonable probability that the defendants knowingly submitted false, fictitious, or fraudulent claims in violation of 18 U.S.C. § 287:

> (1) three of the four top referring doctors state under oath, that their signatures have been forged on prescriptions or plans of treatment used by the defendants to bill the Medicare Program;
>
> (2) Dr. de Lamar states that while employed for defendants he never prepared a plan of treatment and rarely prescribed therapy, even though a plan of treatment and a prescription or referral is required before Medicare will pay for services;
>
> (3) First Coast's medical investigator states that therapy and physician records produced by the defendants for the top twenty beneficiaries serviced by FHI and Sample Rehab were inadequate and evidence a lack of medical necessity for the services allegedly rendered; and
>
> (4) Dr. de Lamar produced medical records for patients he alleged evaluated, notwithstanding the fact that the defendants billed Medicare upon the prescription and plan of treatment of Dr. Blumberg.

The United States has attached affidavits, depositions, and supporting documents which are sufficient for entry of the preliminary injunction. The Eleventh Circuit held that "[h]earsay statements are admissible to support the existence of probable cause." Nnadi v. Richter, 976 F.2d 682, 686-87 (11th Cir. 1992) (citing United States v. One Parcel of Real Estate, 963 F.2d 1496, 1501 (11th Cir. 1992); United States v. Single Family Residence, 803 F.2d 625, 629 n. 2 (11th Cir. 1986); United States v. Kirk, 781 F.2d 1498, 1504-05 (11th Cir. 1986)). In addition, courts have concluded that a preliminary injunction may issue based on affidavits, documents, business records, sworn statements, the pleadings, and defendants' failure to provide discovery. See generally Federal Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 558 (5th Cir. 1987); Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d 545 (5th Cir. 1993)(court can accept evidence in the form of deposition transcripts and affidavits); Quadro Corp., 916 F. Supp. at 617 (for issuance of preliminary injunction, "the district court may rely on otherwise inadmissible evidence, including hearsay evidence"). The individual defendants asserted their Fifth Amendment privilege against compelled self-incrimination to every substantive question posed to them. [Exh. 4; Housley Deposition ("Depo"); Exh. 5, Mignott Depo.; Exh. 6, Choi Depo.].

1.    Forged Physician Signatures on Prescriptions and Plans of Treatment

Three doctors allegedly referred the vast majority of Medicare beneficiaries to FHI and Sample Rehab. [Exh. 3, Williams aff., ¶¶ 6-12]. Those doctors are Rene D. de Lamar, M.D. ("de Lamar"), Gary Blumberg, D.O. ("Blumberg"), and Joseph Anthony Astaphan, M.D. ("Astaphan") (collectively the "doctors"). Dr. de Lamar has been deposed. [Exh. 7, de Lamar Depo.]. Dr. Blumberg and Dr. Astaphan have provided affidavits [Exh. 8, Blumberg Aff.; Exh. 9, Astaphan

<u>Aff.</u>]. The doctors testified that their signatures have been forged on prescriptions and treatment plans.

Dr. de Lamar testified that he worked for Choi for "[n]o more than seven months" at a comprehensive outpatient rehabilitation facility. [Exh. 7, <u>de Lamar Depo.</u>, p. 14-15]. Dr. de Lamar said that he "never prepared any treatment plan for any of these patients" because he would never see the patients after his initial evaluation. <u>Id.</u> at 55. When presented with a plan of treatment bearing his signature, Dr. de Lamar testified as follows:

> Q:    . . . Have you ever seen any forms that look like this?
>
> A:    Never.
>
> Q:    Has anyone at Mr. Choi's facility ever shown you any document that even resembles this?
>
> A:    No. I didn't even know these existed. . . .
>
> Q:    Turn the page to page five. Is this your signature, sir?
>
> A:    No, that is not my signature. A very poor imitation. . . .
>
> Q:    If you would take a few moments and look through the rest of the pages. Is there the name of any other physician or doctor or any other prescription for any sort of physical, occupational or respiratory therapy of any kind? . . .
>
> A:    I don't recognize any, and that signature is not mine.

<u>Id.</u> at 133-35. Dr. de Lamar was presented with several additional treatment plans and for each he testified that his signature was forged. <u>Id.</u> at 133-40. Federal regulations require that a physician establish a "plan of treatment" prior to the defendants providing therapy. 42 CFR § 485.58(b)(1)-(5).

Based on Dr. de Lamar's testimony, every bill submitted to First Coast for a beneficiary referred by Dr. de Lamar would be fraudulent as the defendants forged his signature on plans of

treatment in order to bill the Medicare program. Based on Dr. de Lamar's referrals and plans of treatment, FHI and Sample Rehab have been paid by First Coast approximately $ 2,823,521 between May 13, 1999 and December 31, 1999.  [Exh. 3, Williams' Aff. ¶ 10].

Dr. Blumberg was employed by the defendants for 3 months from August 1, 1999 through October 31, 1999. [Exh. 8; Blumberg Aff. ¶ 4].  At the request of OIG, Dr. Blumberg reviewed all of the patient and therapy files produced by the defendants for Medicare beneficiaries allegedly seen by him for which FHI or Sample Rehab billed Medicare.  Id. at ¶ 5.  Dr. Blumberg reviewed 259 patient and therapy files.  Id. at ¶ 6.  Dr. Blumberg testified that only 79 out of 259 files contained his original signature on the prescription.  Id. at ¶ 7.  Dr. Blumberg identified 106 files that contained his forged signature on a prescription.  Id.  In addition, the remaining 74 files contained a photocopy of signature.  Id.  Federal regulations require that a physician refer beneficiaries to FHI and Sample Rehab for therapy.  42 CFR § 485.58(d)(1)(i)-(iv).

Based on Dr. Blumberg's testimony, a majority of bills submitted to First Coast for beneficiaries referred by Dr. Blumberg would be fraudulent as his signature was forged in order to bill the Medicare program.  Based on Dr. Blumberg's prescriptions and plans of treatment, FHI and Sample Rehab were paid by First Coast approximately $2,360,033.  [Exh. 3, Williams' Aff. ¶ 11].

As an independent contractor from June of 1998 through January of 2000, Dr. Astaphan evaluated patients referred to him by the defendants.  [Exh. 9; Astaphan Aff. ¶ 4].  The defendants would tele-fax lists of beneficiaries who resided at Assisted Living Facilities ("ALF") or Nursing Facilities ("NF") to Dr. Astaphan.  Id.  Dr. Astaphan, or his licensed nurse practitioner, would travel to the ALF or NF to evaluate the patients.  Id.  The defendants paid Dr. Astaphan for those Medicare beneficiaries for whom he prescribed therapy.  Id.

At the request of OIG, Dr. Astaphan reviewed all of the patient and therapy files produced by the defendants for Medicare beneficiaries allegedly seen by him, or his nurse practitioner, for which FHI or Sample Rehab allegedly provided therapy. Id. at ¶ 5. Dr. Astaphan reviewed 300 patient and therapy files. Id. at ¶ 6. Dr. Astaphan discovered that his signature had been forged 35 times while 5 files contained no signature. Id. at ¶ 7. Based on Dr. Astaphan's testimony, some of the bills submitted to First Coast for beneficiaries referred by Dr. Astaphan would be fraudulent as FHI and Sample Rehab forged his signatures. In addition, FHI and Sample Rehab were paying Dr. Astaphan directly for prescribing and referring Medicare beneficiaries. Based on Dr. Astaphan's prescriptions and plans of treatment, FHI and Sample Rehab have been paid by First Coast approximately $475,804. [Exh. 3, Williams' Aff. ¶ 12].

2.    Dr. de Lamar Never Prescribed Therapy or Prepared a Plan of Treatment

With respect to the random sample of beneficiaries, Dr. de Lamar testified that he personally performed the medical examination of each beneficiary for which FHI and Sample Rehab billed First Coast listing him referring doctor. [Exh. 7, de Lamar depo]. During each medical examination, Dr. de Lamar stated that he ordered tests for patients based on his evaluation, but he never reviewed the results nor would he ever see the patient again. Id. Dr. de Lamar testified that he believed another doctor employed by Choi reviewed test results and ordered therapy. Id.

When questioned about individual beneficiaries, Dr. de Lamar's testimony repeated the following pattern:

Q:    What tests did you order for Miss Vilas?

A:    The same tests that are ordered to anyone with pulmonary disorders and evaluation and let me explain to you, sir, that I did not perform this evaluation, and at this point my duties concluded. What

the institution did later on is not because I ordered it, not because I intervened in this for any reason whatsoever.

Q:    When you say you didn't perform this evaluation, what did you mean?

A:    I did not perform the evaluation because I did not see the results from the different tests from the x-ray, from the pulmonary function, the blood gas test. I did not receive the results of these tests.

Q:    Can you tell me where in this medical record you ordered those tests?

A:    In what place in the medical records?  In my prescription.

Q:    So where it says PTOT evaluation, your testimony is that that means you were ordering pulmonary function tests, x-rays, and arterial blood gas tests?

A:    Exactly. . . .

Q:    Was it your impression that a medical doctor would review the test results?

A:    Yes, sir.

Q:    Who would that be?

A:    I don't know because Mr. Choi told me that there were 20 other physicians at his institution, but I never met any of them.

Q:    If pulmonary therapy was performed without conducting those tests, would that be a mistake?

A:    In my opinion, yes.  At least I wouldn't do it.

[Exh. 7, de Lamar depo., pgs. 49-50].  Dr. de Lamar also testified as follows:

Q:    So for occupational therapy, physical therapy, and pulmonary or respiratory therapy, for this patient, Mr. Cisneros, like all the other patients we've discussed, you would not prescribe therapy until you reviewed the full medical tests?

-11-

A:    You're right.

Q:    And you did not prescribe therapy?

A:    No.

Id. at 66. Finally, Dr. de Lamar responded to the following question, "What would you say if I told you that Choi and his companies billed Medicare for all of the patients that we reviewed today for therapy that you ordered? A: I did not order it. . . ." Id. at 129-31.

Federal regulations require that a physician refer beneficiaries to FHI and Sample Rehab for therapy. 42 CFR § 485.58(d)(1)(i)-(iv). Based on Dr. de Lamar's testimony, it is clear that FHI and Sample Rehab used him to sign off on the forms they thought necessary in order for them to bill the Medicare program. Based on his testimony, Dr. de Lamar never could have diagnosed a disorder requiring therapy because he never reviewed test results. In addition, Federal regulations required that Dr. de Lamar prepare a Plan of Treatment for these beneficiaries. 42 CFR § 485.58(b)(1)-(5). He did not prepare any treatment plans. Id. at 55. Based on Dr. de Lamar's prescriptions and plans of treatment, FHI and Sample Rehab have been paid by First Coast approximately $ 2,823,521. [Exh. 3, Williams' Aff. ¶ 10].

3.    First Coast Discovered That FHI and Sample Rehab's Therapy and Medical Records Failed to Contain Adequate Physician Evaluations and Diagnosis, Failed to Meet Medicare's Admission Criteria, or Evidenced that Services Provided Were Medically Unnecessary

The OIG requested that First Coast review therapy and medical records for the top twenty Medicare beneficiaries allegedly serviced by FHI and Sample Road. [Exh. 10, Heck aff. ¶ 7]. Thereafter, a First Coast medical investigator evaluated the patient files produced by the defendants

and the records provided under subpoena by the doctors. <u>Id.</u> at ¶ 9. The medical investigator concluded as follows:

> no payment should have been made by First Coast to FHI or Sample Rehab for any of the services allegedly provided because the services were not supported by adequate physician evaluation and diagnosis, failed to meet Medicare's admission criteria, or were facially medically unnecessary.

<u>Id.</u> at ¶ 10. Based on the investigatory medical evaluation, First Coast concluded that the entire amount of funds received by FHI and Sample Rehab for these individuals was an overpayment. <u>Id.</u> at ¶11. FHI and Sample Rehab billed this selected group of Medicare beneficiaries more than any others. The fact that FHI and Sample Rehab provided each of its top 20 billed Medicare beneficiaries with therapy based on inadequate physician evaluations and diagnosis creates probable cause to believe that the defendants knowingly presented false, fictitious or fraudulent claims to First Coast.

4.    Dr. De Lamar Produced Medical Records for Patients He Allegedly Evaluated, Notwithstanding the Fact That the Defendants Billed Medicare upon the Prescription and Plan of Treatment of Dr. Blumberg

Prior to Dr. de Lamar's deposition, the United States subpoenaed medical records for all Medicare beneficiaries billed by FHI and Sample Rehab in the random sample where he was listed in the bill to First Coast as the referring physician. [Exh. 11, <u>de Lamar Subpoena</u>]. Dr. de Lamar produced complete medical records for six Medicare beneficiaries that FHI billed to First Coast with Dr. Blumberg listed as the referring physician. [Exh. 7, <u>de Lamar depo.</u> (Gov't Exh's 55, 56, 60, 61, 63, 65)]. The beneficiaries were Gloria Abraham, Roberto Perez, Zaida Alonso, Noemi Carronza, Angel Hernandez, and Estelita Frias. <u>Id.</u> Dr. de Lamar testified that he had seen and evaluated each

of these patients.  Id. at 95, 98, 103, 104, 106, 108.  When confronted with the false billing, Dr.

de Lamar concluded that it was not his mistake.  Id. at 110.

Based on the forged signatures, the failures of Dr. de Lamar, First Coast's medical

Investigation, obvious fraud in the document production, and the results of the random sample

discussed in the government's initial memorandum in support of its Motion for Entry of a TRO and

Preliminary Injunction, the United States has established a reasonable probability to believe that the

defendants knowingly presented false, fictitious or fraudulent claims to First Coast.  The sole

remaining issue is the amount of property lost as a result of fraudulent offense.

B.    United States Has Established that the Amount of Funds Frozen by the TRO is Far
      Less Than the Equivalent Value of Assets obtained as a Result of False Claims

Under the TRO, $1,505,303 of defendants' assets are frozen.  Based solely on false billing

related to Dr. de Lamar, the government's estimated loss is $2,823,521.  This is the amount paid to

FHI and Sample Rehab since the defendants acquired the CORFs based on Dr. de Lamar's

prescriptions and plans of treatment discussed above.  [Exh. 3, Williams' Aff. ¶10].  Dr. Blumberg

identified 69 percent of the signatures on prescriptions attributed to him by the defendants as forged

or photocopied.  Based solely on false billing related to Dr. Blumberg, the government's estimated

loss is $1,628,423 (.69 x $2,360,033).  See Id. at ¶11.  If this Court were to extrapolate from the

medical review conducted by First Coast, the government's estimated loss would be the total amount

paid to FHI and Sample Rehab, $6,237,179.  Id. at ¶¶ 6-7.

In conclusion, the amount currently frozen fails to adequately protect the interests of the

United States.  The government requests that this Court hold the status quo by keeping the

$1,505,303 frozen, ordering the defendants to disclose the location of all personal and corporate

assets, and extending the injunction to cover any amount under $4,451,944 (the total received by FHI and Sample Rehab based on the false claims related to Dr. de Lamar and Dr. Blumberg).

### III. DEFENDANTS' REQUEST
### TO VACATE THE TRO IS BASELESS

Defendants' Motion to Vacate the TRO contains two arguments. First, the defendants assert that the TRO must be vacated because the government cannot establish that the defendants' are "currently engaged or about to engage" in a further fraud. Second, the defendants argue that there was no "probable cause" for the issuance of the TRO because the investigator's sworn affidavit "consisted of hearsay and speculation." On both counts, their arguments fail.

With regard to the injunction pursuant to § 1345, the defendants' have failed to offer even an assurance that they are not currently submitting false claims to the Medicare program through a related or affiliated company. Due to the pattern of purchasing CORFs without informing Medicare or the state of Florida, there can be no assurance that these defendants are not currently engaged in submitted false claims. The United States recently learned that defendants Housley and Mignott purchased Cresthaven Physical Therapy and Rehabilitation Center, Inc., on February 2, 1999. Further, given the volume of claims and the speed with which the defendants were able to accumulate millions of dollars of Medicare funds, the United States requests that this court issue the preliminary injunction.

Defendants' factual contention that "the Government is in no current danger of being victimized by the submission and payment of fraudulent Medicare claims" because the "Medicare provider numbers" of FHI and Sample Rehab have been suspended is misleading. First, only "Medicare payments" to FHI and Sample Rehab have been suspended. Both FHI and Sample Rehab

still have provider numbers and may submit bills for payment to the Medicare Program under those

numbers.

Finally, each of the defendants, Housley, Mignott, and Choi, refused to answer any question

about whether he intended to alienate or dispose of property obtained as a result of submitting false

claims to the Medicare Program.  They testified as follows:

> Q:    Did you acquire the funds that have been frozen by the
> submission of false claims to the Medicare Program?
>
> A:    Fifth.[1]  [I invoke my Fifth Amendment privilege against
> compelled self-incrimination and decline to answer the
> question.]
>
> Q:    If the funds wrongfully acquired by you through the
> submission of false or fraudulent claims to the Medicare
> Program were released to you, how would you dispose of
> those funds?
>
> A:    Fifth.  [I invoke my Fifth Amendment privilege against
> compelled self-incrimination and decline to answer the
> question.]

[Exh. 4, Housley Depo, pgs. 103-06].  Given this lack of testimony, this Court must assure that the

defendants do not further dissipate Medicare funds.

With regard to the argument that this Court should vacate the TRO because S/A Rodriguez'

sworn affidavit consisted of "hearsay and speculation," defendants offer no support for their blanket

assertion.  They refer the Court to S/A Rodriguez' deposition without so much as single page cite.

---

[1] After several hours of Defendant Housley's deposition, during which time he answered almost every question by stating "I invoke my Fifth Amendment privilege against compelled self-incrimination and decline to answer the question," counsel for parties agreed that he would use the "shorthand phase 'Fifth'" when invoking his Fifth Amendment privilege against compelled self-incrimination. [Exh. 4; Housley Depo, at pg. 63].

In that deposition, S/A Rodriguez provides the defendants with a chart explaining which Medicare beneficiaries the OIG has interviewed and how each beneficiary has responded. The results of the OIG investigation were explained to the defendants in that chart and yet they baldly assert the agent's affidavit is speculation without conducting any investigation of their own. The facts remain that OIG agents interviewed beneficiaries that reported never receiving therapy, never being examined by the referring doctor, and facts supporting that services were medically unnecessary. Even assuming part of S/A Rodriguez' affidavit was hearsay, the defendants fail to inform this Court that it is well settled law that hearsay may form for basis of a TRO and preliminary injunction. Levi Strauss, 51 F.3d at 985.

For all the foregoing reasons, the United States respectfully requests that this Court enter the Preliminary Injunction based on the attached Exhibits and deny the Motion to Vacate the TRO.

Respectfully submitted,

Thomas E. Scott
United States Attorney

By:
J. Kirk Ogrosky, No. A5500479
Laurie E. Rucoba, No. A5500052
Assistant United States Attorneys
99 N.E. 4th Street, 3rd Floor
Miami, Florida 33132-2111
(305) 961-9401
(305) 536-4101 fax

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the foregoing United States of America's Motion for Entry of Preliminary Injunction Based on Substantial Evidence, and Response to Defendants' Motion to Vacate Temporary Restraining Order was mailed this $\underline{24}$ day of March, 2000, to Lawrence R. Metsch, Esq., Metsch & Metsch, P.A., 1385 N.W. 15th Street, Miami, Florida 33125.

By: _____
      J. Kirk Ogrosky
      Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6143-CIV-FERGUSON/SNOW

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FLORIDA HEALTH INSTITUTE, INC.,
SAMPLE ROAD REHABILITATION
CENTER, INC., PENNACLE REHAB
SERVICES OF FLORIDA, INC.,
NATIONAL MEDICAL SYSTEMS and
SUPPLIES, INC., GATEWAY TO
HEALTH REHABILITATION, INC.,
WEMAC, INC., ELLIOT HOUSLEY,
RICARDO CHOI, and ANTHONY
MIGNOTT, a/k/a MARK A. MIGNOTT,
individually,

        Defendants.

_____/



EXHIBITS TO UNITED STATES OF AMERICA'S MOTION
FOR ENTRY OF PRELIMINARY INJUNCTION BASED ON
SUBSTANTIAL EVIDENCE, AND RESPONSE TO DEFENDANTS'
MOTION TO VACATE TEMPORARY RESTRAINING ORDER

**United States of America v. Florida Health Institute, Inc., et al**
**Case No. 00-6143-CIV-FERGUSON**

**RESPONSE TO SUBPOENA DUCES TECUM ISSUED TO MICHAEL SCULLY,**
**MIRTHA REBSTOCK AND MAITE ECHEVARRIA**

## INDEX OF DOCUMENTS PRODUCED

1.  Stock Purchase Agreement, dated June 9, 1999, between Michael Scully, Maite
    Echevarria and Mirtha Rebstock as Seller, and Anthony Mignott, as Buyer.
    (Together with exhibits, 12 pages);

2.  Minutes of Special Meeting of Shareholders and Directors, dated June 4, 1999
    (1 page);

3.  Resignation of Officer and Director, dated June 4, 1999, Mirtha Rebstock
    (1 page);

4.  Resignation of Officer and Director, dated June 4, 1999, Michael Scully (1 page);

5.  Resignation of Officer and Director, dated June 4, 1999, Maite Echevarria
    (1 page);

6.  Correspondence, dated February 7, 2000, from Philip E. Goss, Jr., PA, to Mr.
    Robert VanSickle, Agency of Health Care Administration, (1 page);

7.  Correspondence, dated February 10, 2000, from Philip E. Goss, Jr., PA, to
    Department of State, Division of Corporations (1 page);

8.  Confidentiality Agreement, dated May 7, 1999 (2 pages);

9.  Stock Certificates and Transfers (4 pages); and

10. Specific Power of Attorney certifications, dated June 4, 1999 (3 pages).

DC01/328221.1

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

PLEASE REFER TO COURT FILE